# 13-4022-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————

CORPORACIÓN MEXICANA DE MANTENIMIENTO
INTEGRAL, S. DE R.L. DE C.V.,

*Petitioner-Appellee,*

— v. —

PEMEX-EXPLORACIÓN Y PRODUCCIÓN,

*Respondent-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR RESPONDENT-APPELLANT

RICHARD C. LORENZO
HOGAN LOVELLS US LLP
600 Brickell Avenue, Suite 2700
Miami, Florida 33131
(305) 459-6500

CATHERINE E. STETSON
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
(202) 637-5600

DENNIS H. TRACEY, III
IRA M. FEINBERG
HAGAN C. SCOTTEN
ERIN M. MEYER
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Attorneys for Respondent-Appellant*

Dated: January 28, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ........................................................................... 1

JURISDICTION ............................................................................. 4

ISSUES PRESENTED ..................................................................... 5

STATEMENT OF FACTS ................................................................. 5

SUMMARY OF ARGUMENT ............................................................ 16

ARGUMENT ................................................................................ 19

STANDARD OF REVIEW ................................................................ 19

I.    THE DUE PROCESS CLAUSE PROHIBITS EXERCISING
      PERSONAL JURISDICTION OVER PEP ..................................... 19

      A.    The Due Process Clause Applies to State-Owned
            Corporations .......................................................... 19

      B.    PEP Lacks the Minimum Contacts with the Forum
            Required for Personal Jurisdiction ............................. 24

II.   THE FOREIGN SOVEREIGN IMMUNITIES ACT DOES
      NOT ALLOW VENUE IN THE SOUTHERN DISTRICT OF
      NEW YORK .......................................................................... 27

III.  THE DISTRICT COURT ERRED BY ENFORCING AN
      ARBITRATION AWARD NULLIFIED BY A COMPETENT
      COURT IN THE PRIMARY JURISDICTION ............................... 32

      A.    A Nullified Arbitration Award Cannot Be Enforced
            Absent Extraordinary Circumstances ......................... 32

      B.    The Collegiate Court's Decision Does Not Present
            Extraordinary Circumstances ................................... 38

i

## TABLE OF CONTENTS—Continued

Page

1. The Collegiate Court's Citation to a 2009 Statute Was Not Improper, Much Less "Repugnant to Fundamental Notions of What Is Decent and Just" .................39

2. The Collegiate Court's Decision Did Not Deprive COMMISA of a Forum for Its Claims, Much Less Violate Fundamental Due Process Rights ................................47

3. Administrative Rescission Is Not "Repugnant to Fundamental Notions of What Is Decent and Just" .................52

IV.  THE DISTRICT COURT LACKED AUTHORITY TO AUGMENT THE AWARD BY $106 MILLION ........................................54

CONCLUSION .....................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

<u>Page</u>

**CASES:**

*Ackermann* v. *Levine*,
  788 F.2d 830 (2d Cir. 1986) ........................................................35, 38

*AdMart AG* v. *Stephen & Mary Birch Found.*,
  457 F.3d 302 (3d Cir. 2006) ...............................................................57

*Argentine Republic* v. *Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989)..............................................................................27

*Atlantic Marine Const. Co., Inc.* v. *U.S. Dist. Court*,
  134 S. Ct. 568 (2013)...........................................................................31

*Baker Marine (Nig.) Ltd.* v. *Chevron (Nig.) Ltd.*,
  191 F.3d 194 (2d Cir. 1999) ......................................................*passim*

*Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*,
  171 F.3d 779 (2d Cir. 1999) ...............................................................19

*Bank of America* v. *Whitney Cent. Nat'l Bank*,
  261 U.S. 171 (1923)........................................................................28, 29

*Bank of New York* v. *First Millennium, Inc.*,
  607 F.3d 905 (2d Cir. 2010) ...............................................................19

*Banque Worms* v. *Bankamerica Int'l*,
  77 N.Y.2d 362 (1991) ..........................................................................40

*Bird* v. *Glacier Electric Cooperative, Inc.*,
  255 F.3d 1136 (9th Cir. 2001) ............................................................50

*Blue Ridge Inv., LLC* v. *Republic of Argentina*,
  735 F.3d 72 (2d Cir. 2013) ..................................................................55

*Chaidez* v. *United States*,
  133 S. Ct. 1103 (2013)..........................................................................42

*Chromalloy Aeroservices* v. *Arab Republic of Egypt*,
  939 F. Supp. 907 (D.D.C. 1996)...............................................35, 36, 37

## TABLE OF AUTHORITIES—Continued

Page

*City of New York* v. *Permanent Mission of India to United Nations*,
  618 F.3d 172 (2d Cir. 2010) ...............................................................45

*Clarke* v. *Fonix Corp.*,
  1999 WL 105031 (S.D.N.Y.), *aff'd*, 199 F.3d 1321 (2d. Cir. 1999)..................29

*Consolidated Dev. Corp.* v. *Sherritt, Inc.*,
  216 F.3d 1286 (11th Cir. 2000) .........................................................26

*Control Data Corp.* v. *Carolina Power & Light Co.*,
  274 F. Supp. 336 (S.D.N.Y. 1967) ....................................................28

*Daimler AG* v. *Bauman*,
  No. 11-965 (U.S. Jan. 14, 2014) ..............................................25, 26

*De Csepel* v. *Republic of Hungary*,
  714 F.3d 591 (D.C. Cir. 2013)...........................................................50

*Desiderio* v. *Nat'l Ass'n of Sec. Dealers, Inc.*,
  191 F.3d 198 (2d Cir.1999) ..............................................................46

*Figueredo* v. *Republic of Peru*,
  665 F.3d 384 (2d Cir. 2011) ..............................................................43

*First Inv. Corp. of Marshall Islands* v. *Fujian Mawei Shipbuilding, Ltd.*,
  703 F.3d 742 (5th Cir. 2012) ...............................................21, 22, 23

*First Nat'l City Bank* v. *Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983).....................................................20, 21, 22, 23

*Frontera Resources Azerbaijan Corp.* v. *State Oil Co.*,
  582 F.3d 393 (2d Cir. 2009) .......................................................*passim*

*General Dynamics Corp.* v. *United States*,
  131 S. Ct. 1900 (2011).......................................................................54

*Glencore AG* v. *Bharat Aluminum Co.*,
  2010 WL 4323264 (S.D.N.Y. 2010)...................................................29

# TABLE OF AUTHORITIES—Continued

Page

*Goodyear Dunlop Tires Operations, S.A.* v. *Brown*,
   131 S. Ct. 2846 (2011).....................................................................19, 23, 24, 25

*GSS Group Ltd.* v. *National Port Authority*,
   680 F.3d 805 (D.C. Cir. 2012)..................................................................21, 22, 23

*Helicopteros Nacionales de Colombia, S.A.* v. *Hall*,
   466 U.S. 408 (1984)...............................................................................19, 25, 26

*Hilton* v. *Guyot*,
   159 U.S. 113 (1895)...............................................................................................43

*In re Ski Train Fire in Kaprun, Austria*,
   2003 WL 1807148 (S.D.N.Y. 2003)..................................................................29

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 659 (2d Cir. 2013), *petition for cert. filed*,
   82 U.S.L.W. 3127 (Sept. 9, 2013) (No. 13-318) ........................................24, 25

*Ingenohl* v. *Walter E. Olsen & Co.*,
   273 U.S. 541 (1927)...........................................................................................43, 49

*International Trading & Indus. Inv. Co.* v. *DynCorp Aerospace Tech.*,
   763 F. Supp. 2d 12 (D.D.C. 2011)........................................................................36

*Karaha Bodas Co. L.L.C.* v. *Perusahaan Pertambangan Minyan*
   *Dan Gas Bumi Negara*,
   364 F.3d 274 (5th Cir. 2004) ....................................................................35, 47

*Klonis* v. *Nat'l Bank of Greece, S.A.*,
   492 F. Supp. 2d 293 (S.D.N.Y. 2007) .............................................................29

*Kuhali* v. *Reno*,
   266 F.3d 93 (2d Cir. 2001) ........................................................................45, 46

*Landgraf* v. *USI Film Products*,
   511 U.S. 244 (1994).......................................................................................*passim*

*Leroy* v. *Great Western United Corp.*,
   443 U.S. 173 (1979)........................................................................................31, 32

## TABLE OF AUTHORITIES—Continued

Page

*Lindh* v. *Murphy*,
   521 U.S. 320 (1997)....................................................................49

*Louisiana Power & Light Co.* v. *City of Thibodaux*,
   360 U.S. 25 (1959).....................................................................43

*McDermott Int'l, Inc.* v. *Wilander*,
   498 U.S. 337 (1991)..............................................................29, 30

*Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) ......................................................25

*Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985)..................................................................46

*Montana* v. *United States*,
   440 U.S. 147 (1979)..................................................................52

*Nelson* v. *Mass. Gen. Hosp.*,
   2007 WL 2781241 (S.D.N.Y. 2007), *aff'd on op. below*, 299 F. App'x 78
   (2d Cir. 2008)............................................................................29

*NFL Players Ass'n* v. *NFL Mgmt. Council*,
   523 F. App'x 756 (2d Cir. 2013) .......................................55

*Ottley* v. *Schwartzberg*,
   819 F.2d 373 (2d Cir. 1987) .................................................54, 58

*Pike* v. *Freeman*,
   266 F.3d 78 (2d Cir. 2001) ......................................................19

*Productos Mercantiles E Industriales, S.A.* v. *Faberge USA, Inc.*,
   23 F.3d 41 (2d Cir. 1994) ........................................................33

*Republic of Argentina* v. *Weltover, Inc.*,
   504 U.S. 607 (1992)..................................................................30

*Republic of Austria* v. *Altmann*, 541 U.S. 677 (2004)...........................46

## TABLE OF AUTHORITIES—Continued

Page

*Rowe* v. *New Hampshire Motor Trans. Ass'n*,
  552 U.S. 364 (2008)..................................................................29, 30

*Seatrain Shipbuilding Corp.* v. *Shell Oil Co.*,
  444 U.S. 572 (1980)..........................................................................40

*Spier* v. *Calzaturifico Tecnica, S.p.A.*,
  71 F. Supp. 2d 279 (S.D.N.Y. 1999) ...........................................36, 37

*TermoRio S.A. E.S.P.* v. *Electranta S.P.*,
  487 F.3d 928 (D.C. Cir. 2007)...................................................*passim*

*TMR Energy Ltd.* v. *State Property Fund of Ukraine*,
  411 F.3d 296 (D.C. Cir. 2005)..........................................21, 22, 23

*Totten* v. *United States*,
  92 U.S. 105 (1875).......................................................................53, 54

*Trizna* v. *New York, Chicago & St. Louis R.R.*,
  57 F. Supp. 484 (S.D.N.Y 1944) ..................................................28, 29

*Union Internationale de Placements* v. *Hoey*,
  96 F.2d 591 (2d Cir. 1938) .................................................................28

*United States* v. *Harrell*,
  268 F.3d 141 (2d Cir. 2001) ..............................................................26

*United States* v. *Tohono O'Odham Nation*,
  131 S. Ct. 1723 (2011).......................................................................51

*United States* v. *Williams*,
  504 U.S. 36 (1992).............................................................................26

*United States* v. *Winstar Corp.*,
  518 U.S. 839 (1996)......................................................................15, 53

*U.S. Titan, Inc.* v. *Guangzhou Zhen Hua Shipping Co., Ltd.*,
  241 F.3d 135 (2d Cir. 2001) ..........................................................19, 30

# TABLE OF AUTHORITIES—Continued

Page

*Usery* v. *Turner Elkhorn Mining Co.*,
  428 U.S. 1 (1976)..........................................................................46

*Wartsila Finland OY* v. *Duke Capital LLC*,
  518 F.3d 287 (5th Cir. 2008) ...........................................................57

*Westerman* v. *Grow*,
  198 F. Supp. 307 (S.D.N.Y 1961) ...................................................28

*Wiwa* v. *Royal Dutch Petroleum Co.*,
  226 F.3d 88 (2d Cir. 2000) ..............................................................31

*Wong* v. *CKX, Inc.*,
  890 F. Supp. 2d 411 (S.D.N.Y. 2012) .............................................47

*Yusuf Ahmed Alghanim & Sons, W.L.L.* v. *Toys "R" Us, Inc.*,
  126 F.3d 15 (2d Cir.1997) ........................................................*passim*

*Zeiler* v. *Deitsch*,
  500 F.3d 157 (2d Cir. 2007) .....................................................18, 55

CONSTITUTIONAL PROVISIONS:

U.S. Const. amend. V........................................................................20, 23

STATUTES:

104 Stat. 448, O.A.S. T.S. No. 42 (the Panama Convention),
  *codified at* 9 U.S.C. § 301 *et seq.* ............................................4, 32, 33

21 U.S.T. 2517, 330 U.N.T.S. 38 (the New York Convention),
  *reprinted at* 9 U.S.C. § 201................................................................33

9 U.S.C. § 201 ...................................................................................33

9 U.S.C. § 301 .....................................................................................4

9 U.S.C. § 302 ...................................................................................32

9 U.S.C. § 305 ...................................................................................33

## TABLE OF AUTHORITIES—Continued

<u>Page</u>

9 U.S.C. § 307 ........................................................................................32

28 U.S.C. § 1291 ......................................................................................4

28 U.S.C. § 1330(a) ..................................................................................4

28 U.S.C. § 1391(c) ...........................................................................28, 30

28 U.S.C. § 1391(f)(1) ............................................................................30

28 U.S.C. § 1391(f)(3) ......................................................................*passim*

28 U.S.C. § 1603(a) ..................................................................................4

28 U.S.C. § 1605(a)(6) ...................................................................4, 54, 55

N.Y. C.P.L.R. § 301 ...............................................................................29

### OTHER AUTHORITIES:

H.R. Rep. 94-1487 (1976) ......................................................................30

S. Rep. 94-1310 (1976) ...........................................................................30

## INTRODUCTION

This appeal stems from a dispute about contracts, formed under Mexican law and to be performed in Mexico, between two Mexican companies, Appellant Pemex Exploración y Producción (PEP) and Appellee Corporación Mexicana de Mantenimiento Integral S. de R.L. de C.V. (COMMISA).  For nearly a decade, Mexico's courts—including its Supreme Court—have heard cases arising from this controversy.  In one of those cases, a Mexican appellate court nullified an arbitration award that COMMISA had obtained in a Mexico City arbitration, holding that the arbitral panel had lacked jurisdiction over the dispute.

COMMISA's attempt to profit from that void award brought this case to New York.  Immediately after the arbitration panel issued the award, COMMISA rushed to confirm it, but not in Mexico.  Instead, COMMISA came to the Southern District of New York, a forum with no prior connection to this dispute.  The District Court (Hellerstein, J.) could have sent the case back to the parties' home forum, or stayed its hand until PEP's challenge to the award—then making its way through Mexico's judiciary—was resolved.  Instead, it entered the fray.

The District Court could do so only by breaking new ground on two issues.  First, it first had to establish personal jurisdiction over a defendant with no meaningful connection to the forum.  Eschewing the well-worn due process test for personal jurisdiction, the court formulated a special, lower standard—"a reasonable

basis in accord with fairness or comity in international law"—applicable only to state-owned corporations such as PEP.  That novel standard finds no support in this circuit's precedent, and contradicts the holdings of two others.  The court also had to find venue under the Foreign Sovereign Immunities Act, which provides venue where state enterprises are "doing business."  28 U.S.C. § 1391(f)(3).  Under a century of precedent, PEP's only connection with this forum—limited participation in New York's financial markets—does not qualify.  The District Court, however, declined to apply that settled law.  Instead, it again fashioned a new and lower standard to apply to PEP, this one requiring only "a notion of commercial activity." And after having established those highly tenuous jurisdictional prerequisites, the District Court confirmed the Mexican arbitral award.

PEP appealed to this Court.  And while the District Court's decision was on appeal, the Mexican appellate court *nullified* the underlying arbitral award. COMMISA nonetheless asked this Court to become the first federal appellate court ever to uphold confirmation of a foreign arbitration award nullified by the jurisdiction where the award was granted.   This Court rejected that invitation, unanimously remanding to the District Court without reaching the above issues.

On remand, the District Court recognized that the Mexican appellate court had authority to review the award and that its decision was an authentic result of a legitimate judicial process.  And under controlling precedent—which this Court

2

took care to catalogue in its remand order—the jurisdiction where an arbitration award is handed down controls its validity. That should have ended the matter.

It did not. The District Court elected to conduct an exhaustive re-examination of the Mexican appellate court's decision, complete with a three-day hearing featuring warring experts on Mexican law. It then rejected the Mexican court's reasoning, reaching its own conclusions as to the underpinnings and consequences of the Mexican decision. And it found that its disagreements with the Mexican court justified confirming the now-void award.

The court's analysis errs at every level: It misunderstands the limited scope of a confirmation court's purview. It misconstrues Mexican law. And it mischaracterizes aspects of the Mexican decision as "repugnant to fundamental notions of what is decent and just," when in fact they are either consistent with or analogous to U.S. law, and would not merit such derision even if they were not.

The District Court's intervention in the Mexican judiciary's handling of this Mexican dispute did not end with its resurrection of COMMISA's nullified arbitration award. After confirming the nullified award, the court tacked on another $106 million nowhere mentioned in the award. That bonus, the court explained, served to compensate COMMISA for losses resulting from *another* Mexican court decision, to which COMMISA was not even a party, with which the

District Court also disagreed.  No source of authority whatsoever allowed the court to grant this largesse.

Individually, each of the District Court's rulings contradicts settled law or sound reasoning, and often both.  Together, these rulings constitute an unwarranted intrusion upon the affairs of a neighboring sovereign's judiciary.  The parties mutually agreed that their disputes would be settled in Mexico under Mexican law.  COMMISA's own choices thus subjected this controversy to the review of Mexico's courts.  It should not now be able to escape those courts' decisions simply because it disagrees with them.  The District Court's judgment should be reversed.

## JURISDICTION

COMMISA asserted subject matter jurisdiction under the Foreign Sovereign Immunities Act, *see* 28 U.S.C. §§ 1330(a), 1603(a), 1605(a)(6), and the Inter-American Convention on International Commercial Arbitration, *done* Jan. 30, 1975, 104 Stat. 448, O.A.S. T.S. No. 42 (the Panama Convention), codified at 9 U.S.C. § 301 *et seq*.  The District Court entered judgment on September 25, 2013.  PEP filed a timely notice of appeal on October 15, 2013.  This Court has jurisdiction under 28 U.S.C. § 1291.

4

## ISSUES PRESENTED

1.      Whether the District Court erred in finding personal jurisdiction by holding that the Due Process Clause does not apply to state-owned corporations.

2.      Whether the mere act of guaranteeing another company's bond issuances qualifies as "doing business" in New York under 28 U.S.C. § 1391(f)(3).

3.      Whether the District Court erred when it gave effect to an arbitration award nullified by a competent court in the jurisdiction where the award was rendered.

4.      Whether the District Court had authority to augment COMMISA's arbitration award by $106 million, in order to make COMMISA whole for losses resulting from a separate Mexican court judgment in a separate case.

## STATEMENT OF FACTS

**The Dispute in Mexico.**  PEP is a subsidiary of Petróleos Mexicanos (PEMEX), Mexico's state oil company.  In 1997, PEP hired COMMISA to build and install two offshore natural gas platforms in the Gulf of Mexico.  The parties' contract provided, among other things, that it was governed by Mexican law; that contractual disputes would be arbitrated in Mexico City under the auspices of the International Chamber of Commerce; that COMMISA would post bonds guaranteeing its performance; and that PEP could rescind the contract if COMMISA did not meet its obligations.  *See* SPA40-41.  The last provision

5

reflects Mexican law allowing state-owned corporations like PEP to administratively rescind public works contracts if the contractor fails to perform, which the District Court referred to as the "administrative rescission statutes." SPA43.

In 2003, after extensive delays and cost overruns, the parties attempted to resolve a series of disputes by entering a second contract with similar terms. But in 2004, another dispute arose after COMMISA again failed to meet the revised deadline for completing the project. COMMISA ceased work and the parties accused each other of breaching the contracts. PEP notified COMMISA of its intent to rescind the contract, but first attempted conciliation efforts. When those efforts failed, COMMISA filed a demand for arbitration and PEP proceeded with the rescission. *See* SPA40-42.

COMMISA challenged PEP's rescission in Mexico's courts, arguing that it was untimely, that the administrative rescission statutes did not apply, and that those statutes were unconstitutional. COMMISA's constitutional claim went all the way to Mexico's Supreme Court, which upheld the constitutionality of the administrative rescission statutes in 2006. It reasoned that the administrative rescission statutes do not violate the rights of contractors like COMMISA because despite a rescission, the private party can still sue for breach of contract in

6

Mexico's federal district courts for administrative matters.[1]  The Supreme Court then remanded to an appellate court to rule on COMMISA's timeliness and statutory interpretation arguments.  The appellate court rejected COMMISA's claims.  *See* SPA42-43.

COMMISA did not file an action in the Mexican federal district court where—as the Supreme Court's opinion explained—it could have presented a claim for damages arising from PEP's rescission and alleged breach.  Instead, it went ahead with the arbitration.  *See* SPA43-44.

Over the course of the arbitration, PEP challenged the panel's jurisdiction on multiple grounds.   Among them, PEP argued that because the Mexican judiciary had upheld the propriety of its rescission, res judicata barred COMMISA from re-litigating the dispute before the arbitration panel.  PEP also argued that its rescission was an act of public authority taken to benefit the public interest, and thus could not, as a matter of Mexican law, be subject to private arbitration.  The arbitral panel issued a preliminary ruling that it possessed jurisdiction.  *See* SPA44-45.

---

[1]    The structure of Mexico's federal court system is similar to that of the United States.  Beneath the Supreme Court are intermediate appellate courts, known as Collegiate Courts.  Beneath the Collegiate Courts are, as in the United States, district courts.  The district courts are subdivided by subject matter, such as criminal, civil, and administrative.  *See* SPA42 n.6.

In December 2009 the panel rendered its final decision.  A two-member majority found for COMMISA, awarding damages of over $286 million, plus interest, fees, and expenses.  The only Mexican lawyer on the panel dissented.  He explained that the panel lacked jurisdiction because—among other reasons—the rescission was an act of public authority that could not be arbitrated, and res judicata barred arbitration after Mexico's courts rejected COMMISA's challenge to the rescission.  *See* SPA46-47.

COMMISA did not pursue judicial confirmation of the award in Mexico.  Instead, it quickly made its way to the Southern District of New York, seeking confirmation there less than four weeks after the award was handed down.  In the meantime, PEP pursued appellate remedies in Mexico, asking Mexican courts to declare the arbitration award void because it was issued without jurisdiction.  *See* SPA47-48.

**The District Court's First Decision.**  Even while litigation continued in Mexico, the District Court confirmed the award in New York.  *See* SPA1-2, 31-32.  The court denied PEP's request to stay its proceedings until Mexico's courts had finished reviewing the award's validity.  SPA32-33.  The court also rejected PEP's argument that the confirmation proceedings would be better held in Mexico—the home forum of both parties, the source of the law governing the arbitration, the seat of arbitration, and the site of the underlying dispute.  SPA30-31.

8

The District Court found that PEP was subject to personal jurisdiction because PEP had served as a guarantor of PEMEX bonds issued through New York financial markets, and had appointed an agent for service of process regarding those transactions.   SPA29.  The court recognized that "the lawsuit here does not arise from these financing activities" and that PEP's "consent to jurisdiction does not extend beyond transactions of financing."  SPA26.  But it held that because PEP's parent company is a state-owned corporation, the "test is not a due process test."  SPA28.  Instead, the court stated that "[w]hat is required is a reasonable basis in accord with fairness or comity in international law."  SPA29.  The court found that PEP's limited connection to New York satisfied this new standard.  *Id.*

According to the District Court, the same limited connection to New York sufficed to support venue under 28 U.S.C. § 1391(f)(3), which allows venue where a state-owned corporation is "doing business."  PEP had argued that the established meaning of "doing business" required more than just supporting transactions in New York's financial markets.  The District Court agreed that this was the settled meaning of "doing business," but held that "Section 1391(f)(3) requires a lesser standard dealing not with [the] general doing business standard, but with a notion of commercial activity under the Foreign Sovereign Immunities Act."  SPA28.

That standard apparently was satisfied by PEP's assistance to PEMEX in raising capital in New York. *See* SPA29-30.

The District Court then confirmed the award, concluding that COMMISA was owed $355,864,541.75. SPA37. PEP appealed.

**The Mexican Courts Nullify the Award.** While PEP's appeal was pending in this Court, PEP's challenge to the validity of the arbitration award made its way through the Mexican judicial system. In August 2011, Mexico's Eleventh Collegiate Court for the Federal District —a court "generally equivalent in hierarchy and authority to the U.S. Court of Appeals for the D.C. Circuit"—issued a decision. SPA39. The three-judge panel unanimously held that the award should be nullified. *See* SPA49-50.

The Collegiate Court explained that PEP had statutory authority to rescind contracts in order to protect the public interest. A3750. PEP therefore could not bargain that prerogative away by private contract. And because administrative rescissions are "issued to safeguard national financial resources," private arbitration panels designed to resolve private disputes cannot rule on them. A3753-55. The Collegiate Court found that the arbitration panel had done exactly that, conducting a "parallel" proceeding that effectively declared the rescission illegal. A3752.

10

In support of its reasoning, the Collegiate Court relied on a 1994 decision by Mexico's Supreme Court establishing that rescissions are acts of public authority, and thus the federal courts for administrative matters have jurisdiction to hear cases concerning administrative rescissions.  A3767-68.  The Collegiate Court also noted that its decision was "strengthened by" a 2009 statute forbidding arbitrators from evaluating rescissions.  A3758; *see also* SPA50.  But the court expressly stated that it was not retroactively applying the 2009 statute to PEP and COMMISA's 1997 and 2003 contracts, only considering it as evidence of a "guiding principle" already present in Mexican law.  A3763.

The Collegiate Court emphasized that its ruling did not deprive COMMISA of "basic rights to have its claim adjudicated in a neutral forum."  SPA51.  It explained that COMMISA had already challenged the constitutionality of the rescission statutes, their application to this case, and the timeliness of the rescission.  A3763-64.  And it repeatedly echoed the 2006 Supreme Court opinion pointing out that COMMISA could still seek damages on its breach-of-contract claim by filing an action in the federal administrative courts.  A3749, 3765, 3785-86.

The parties continued to litigate related matters in Mexico's courts.  In October 2011, a court ruled on PEP's action to enforce the performance bonds, rendering judgment in PEP's favor for approximately $106 million.  *See* SPA52-

53, 94.  COMMISA also brought an action seeking damages as a result of PEP's rescission.  But instead of filing in the federal district courts for administrative matters—as suggested by the Supreme Court and Collegiate Court opinions—COMMISA sought relief in a different forum known as the Tax and Administrative Court.  In November 2012 that court rejected the action as barred by both the court's statute of limitations—which is far shorter than the limitations period in the federal district courts—and res judicata.  *See* SPA53.

**This Court's Prior Decision.**  After the Collegiate Court's decision, PEP asked this Court to vacate the District Court's decision and remand to that court.  Over COMMISA's objection, this Court unanimously granted PEP's request.

This Court's order directed the District Court "to address in the first instance whether enforcement of the award should be denied because it 'has been set aside or suspended by a competent authority of the country in which, or under the law of which, the award was made.' "  A2104 (quoting New York Convention, art. V(1)(e)).  The order cited the key precedents establishing the primacy of the awarding jurisdiction's courts—and the limited purview of courts in other jurisdictions—in assessing the validity of an arbitration award.  A2104-05 (citing, among other cases, *Baker Marine (Nig.) Ltd.* v. *Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 (2d Cir. 1999), and *Yusuf Ahmed Alghanim & Sons, W.L.L.* v. *Toys "R" Us,*

12

*Inc.*, 126 F.3d 15, 19 (2d Cir.1997)).  The order also directed that any subsequent appeal be heard by the same panel.  A2105.

**The District Court's Second Decision.**  On remand, the District Court conducted an extensive inquiry into Mexican law.  It ordered supplemental briefing on substantive issues such as the reasoning of the Collegiate Court's decision and the operation of certain Mexican statutes of limitation.  The court then held a three-day hearing at which each side put on expert witnesses.  The main subjects were whether the Collegiate Court's decision was consistent with Mexican law and whether that decision left COMMISA with another opportunity to litigate the merits of its contract claims in the Mexican courts.  *See* SPA54-55.

At the conclusion of the hearing, the District Court explained that (contrary to COMMISA's claims) the Collegiate Court's decision "didn't come out of nowhere.  It was grounded in judicial reasoning and preceden[ts] with which people may disagree.  But it wasn't a sport."  A3286.

Four months later the District Court issued a written opinion.  It held that the Collegiate Court was "[c]learly" a "competent authority" under the Panama Convention.  SPA57.  The District Court also recognized that under the governing legal standard it could confirm an award that had been nullified by a competent authority in the primary jurisdiction only under extraordinary circumstances. SPA62.

13

Yet the court went on to hold that the Collegiate Court's decision—despite being "grounded in judicial reasoning and preceden[ts]"—had nonetheless "violated basic notions of justice." *Id.* According to the District Court, the Collegiate Court's decision "relied heavily" on the 2009 Mexican statute, even though the Collegiate Court had expressly said it was not retroactively applying the law. SPA64-65. The Mexican court's reference to the 2009 Mexican statute, the District Court found, ran afoul of a U.S. Supreme Court decision establishing that U.S. statutes do not apply to conduct antedating their enactment without clear indication that Congress intended them to do so. SPA65 (citing *Landgraf* v. *USI Film Products*, 511 U.S. 244 (1994)).

The District Court further determined that the Collegiate Court had "left COMMISA without a remedy to litigate the merits of the dispute that the arbitrators had resolved in COMMISA's favor." SPA66. The District Court recognized that both Mexico's Supreme Court and the Collegiate Court had indicated that COMMISA could seek such a remedy in the federal district courts for administrative matters. The District Court, however, disagreed with the Mexican courts' understanding of the jurisdiction of the Mexican courts. *See* SPA66-67. And it asserted that even if COMMISA could bring its claim in Mexican courts, doing so would "add undue and unreasonable delay" to COMMISA's efforts to collect on its contract claims. SPA67 n.24.

14

The District Court also held that the Collegiate Court's reasoning "flouts a basic principle of justice" by allowing state instrumentalities to rescind contracts. SPA65. To establish this proposition, the District Court cited several U.S. Supreme Court opinions holding that when the U.S. Government enters a contract, it waives sovereign immunity. SPA65-66 (citing, among other cases, *United States* v. *Winstar Corp.*, 518 U.S. 893, 895 (1996)).

**The District Court Adds $106 Million to Its Judgment.** After the court's confirmation decision, the parties submitted briefing on the exact amount of the final judgment, addressing issues such as the rate of interest and payment of taxes. But COMMISA also asked for something else. It submitted wire transfer confirmations purporting to show that it had paid $106 million to a Mexican bonding company after the Mexican judgment against that company concerning the performance bonds. *See* A3934-35. COMMISA therefore asked that the District Court increase its judgment by the same amount, in order to compensate it for these alleged losses resulting from that separate litigation. PEP objected, arguing—among other things—that the District Court lacked subject matter jurisdiction to do anything more than confirm the award as written. The District Court granted COMMISA's request, explaining that the Mexican court's decision regarding the bonds did not reflect "a willingness to accept the [arbitration] award

15

as authoritative." SPA83. It thus entered judgment in favor of COMMISA, and against PEP, for a total of $465,060,206.42. SPA94.

PEP has appealed.

## SUMMARY OF ARGUMENT

1. The Due Process Clause governs the exercise of personal jurisdiction over PEP, just as it does other corporations. The District Court mistakenly believed that it could create a lower standard for PEP because PEP is a state-owned corporation. The two circuits to have reached this question have rejected the District Court's novel approach, observing that it is settled law that due process limits personal jurisdiction over foreign corporations. And under Supreme Court precedent, state-owned foreign corporations are treated just like any other foreign corporation absent proof that the corporation is a mere alter ego of its state owner. Because COMMISA made no effort to offer such proof here, the Due Process Clause applies.

PEP's attenuated connection with this forum does not satisfy the due process requirements for personal jurisdiction. Specific jurisdiction does not apply, because this case does not arise from the only contacts the District Court identified—PEP's limited activity in New York's financial markets. And that limited contact falls far short of the standard for general jurisdiction.

16

2.    The Foreign Sovereign Immunities Act does not provide venue for this suit in the Southern District of New York. The District Court found venue under 28 U.S.C. § 1391(f)(3), which authorizes venue for actions against state instrumentalities "doing business" in the forum. But a century of precedent establishes that raising capital through New York financial markets does not constitute "doing business" in New York. The District Court identified no reason to believe Congress intended "doing business" to indicate a lower standard in § 1391(f)(3) than it does everywhere else.

3.    The District Court had no grounds to confirm an arbitration award made in Mexico and then nullified by Mexico's Eleventh Collegiate Court.

District courts can confirm foreign awards nullified by the rendering jurisdiction's courts only under extraordinary circumstances. As this Court's decisions in *Yusuf* and *Baker Marine* make clear, the responsibility for reviewing an award's validity rests entirely with the courts of the arbitral seat, or "primary jurisdiction"—here, Mexico. Courts in secondary jurisdictions can therefore reject a primary jurisdiction's nullification decision only for the most egregious violations of fundamental norms. That standard should have made the District Court's task simple. Once it determined that the Collegiate Court had authority to review the award, and that the resulting nullification was an authentic result of a

fair judicial process, the District Court too should have treated the Circuit Court's decision as binding, and in turn treated the arbitration award as void.

When it instead conducted a bottom-up review of the Collegiate Court's opinion, the District Court erred thrice over. *First*, the court misdiagnosed flaws in the nullification decision based on its own interpretation—and misunderstanding—of Mexican law. *Second*, the court ignored precedent holding that it could not review a Mexican court's analysis of Mexican law, even assuming it could have done so accurately. *Third*, the flaws the court perceived in the nullification decision come nowhere near the high threshold required to disregard the judgment of the jurisdiction that handed down the arbitration award, even assuming those flaws actually existed.

4.      A court confirming an arbitration award "may not enlarge upon" its terms. *Zeiler* v. *Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007). The terms of the award here are clear, and they just as clearly do not include the extra $106 million the District Court added to its judgment after confirming the award. The court had no authority to augment its judgment simply because COMMISA had to pay the same amount as the result of a separate Mexican court proceeding.

## ARGUMENT

## STANDARD OF REVIEW

For each issue in this appeal, this Court reviews the District Court's conclusions of law de novo; it reviews any determinations of fact for clear error. *See U.S. Titan, Inc.* v. *Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 151 (2d Cir. 2001) (personal jurisdiction); *Bank of New York* v. *First Millennium, Inc.*, 607 F.3d 905, 920 (2d Cir. 2010) (venue); *Pike* v. *Freeman*, 266 F.3d 78, 86 (2d Cir. 2001) (confirmation of arbitration awards).

## I.    THE DUE PROCESS CLAUSE PROHIBITS EXERCISING PERSONAL JURISDICTION OVER PEP.

### A.    The Due Process Clause Applies to State-Owned Corporations.

Few legal standards are better established than the test for whether a court's exercise of personal jurisdiction comports with the Due Process Clause.  And foreign corporations fall within the ambit of the Due Process Clause, as the Supreme Court and this Court have held in a host of personal jurisdiction cases.[2] The District Court, however, invented a new—and apparently lower—standard of "a reasonable basis in accord with fairness or comity in international law" for personal jurisdiction over state-owned foreign corporations such as PEP.  SPA29.

---

[2]    *See, e.g.*, *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 131 S. Ct. 2846, 2850 (2011); *Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408 (1984); *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).

The District Court created its special rule for state-owned corporations based on its reading of this Court's decision in *Frontera Resources Azerbaijan Corp*. v. *State Oil Co.*, 582 F.3d 393 (2d Cir. 2009). *See* SPA28-29. But *Frontera* held only that foreign *states* lack due process rights. *See* 582 F.3d at 399. This Court expressly declined in *Frontera* to decide whether foreign corporations that happen to be owned by foreign states would, for that reason, be treated differently than all other foreign corporations. *Id.* at 401.

*Frontera*'s reasoning, however, indicates that the Due Process Clause will typically apply to such companies. Foreign states lack due process rights because a foreign nation, like a U.S. state, is not a "person" covered by the Fifth Amendment. *Id.* at 399-401. But a corporation does not cease to be a juridical "person" merely because it is state-owned. As *Frontera* explains, the Supreme Court held in *Bancec* that " 'government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.' " 582 F.3d at 400 (quoting *First Nat'l City Bank* v. *Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 626-627 (1983)). Under *Bancec*, the legal separation of a state and a state-owned corporation can be disregarded only "if the state so 'extensively controls' the instrumentality 'that a relationship of principal and agent is created,' or if 'adhering blindly to the

corporate form would cause injustice.' " *Id.* (quoting *Bancec*, 462 U.S. at 629, 632 (alterations omitted)).

*Frontera* nonetheless did not announce a holding on whether the Due Process Clause applies to the typical state-owned corporation—that is, one that remains legally separate from its owner under *Bancec*.  It observed that the D.C. Circuit had held the question open.  *Id.* at 401 (citing *TMR Energy Ltd.* v. *State Property Fund of Ukraine*, 411 F.3d 296, 302 n.* (D.C. Cir. 2005)).  And the *Frontera* Court found that it had no need to resolve the question.  Instead, it remanded to the trial court to determine whether the *Bancec* test was satisfied and, only if it was not, to analyze in the first instance whether the defendant was "entitled to the protections of the Due Process Clause."  *Id.*

Since the District Court issued its personal jurisdiction ruling in this case (in 2010), two circuits have addressed that question.  Both held that the due process test applies to state-owned corporations.  *See GSS Group Ltd.* v. *National Port Authority*, 680 F.3d 805, 808-810 (D.C. Cir. 2012); *First Inv. Corp. of Marshall Islands* v. *Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 744-745 (5th Cir. 2012).  In the first case, *GSS Group*, the D.C. Circuit resolved the issue it had previously left open in *TMR*:  It held that, absent piercing the corporate veil under *Bancec*, due process limits the exercise of personal jurisdiction over foreign, state-owned corporations.  *See* 680 F.3d at 813-816.   The Fifth Circuit then adopted the D.C.

21

Circuit's holding.  *See First Inv. Corp.*, 703 F.3d at 752-753.  No federal court of appeals appears to disagree.

This Court should join the D.C. and Fifth Circuits.  The Due Process Clause indisputably controls the exercise of personal jurisdiction over foreign corporations.  *See supra* at 19 n.2.  It does not, by contrast, apply to foreign states.  The question thus boils down to whether state-owned foreign corporations should be treated as foreign corporations, or as foreign states.  *Bancec* supplies the answer:  State-owned corporations are not treated as states; they are treated as separate juridical entities, absent proof that a state so dominated a corporation as to merge their legal identities.  *See* 462 U.S. at 625-627.  Without such proof, there is no principled basis to treat state-owned foreign corporations differently than other foreign corporations.  *See First Inv. Corp.*, 703 F.3d at 752-753; *GSS Group*, 680 F.3d at 815-816.

*Frontera* reserved the possibility of a contrary conclusion based on a footnote in the D.C. Circuit's 2005 *TMR Energy* decision.  *See Frontera*, 582 F.3d at 401.  That footnote's theory does not withstand careful analysis—as the D.C. Circuit has since recognized.  The *TMR* note suggested that state-owned foreign corporations might lack sufficient connection to the United States to claim constitutional protections, and so the Due Process Clause would not limit their amenability to personal jurisdiction.  *See* 411 F.3d at 302 n.*.  But the *TMR*

footnote's reasoning is not limited to state-owned companies; foreign corporations with *private* owners do not, as such, have any more contact with the United States than foreign corporations with *state* owners. *See GSS Group*, 680 F.3d at 813-814. The footnote's logic would thus mean that any foreign corporation without connections to the United States would nevertheless be subject to personal jurisdiction in U.S. courts. But under binding precedent, due process protects a foreign corporation from being haled into American courts if it lacks a sufficient connection with the United States. The logic of *TMR Energy*'s footnote therefore cannot be reconciled with precedent. *See id.* at 813-817.

The established test for personal jurisdiction consistent with the Due Process Clause thus governs the assertion of personal jurisdiction over PEP. COMMISA could have escaped that test only by proving that PEP should be treated as Mexico's alter ego under *Bancec. See First Inv. Corp.*, 703 F.3d at 752 (" '*Bancec* is the exclusive means for determining whether a foreign, state-owned corporation is a 'person' for Fifth Amendment purposes.' ") (quoting *GSS Group*, 680 F.3d at 816). PEP pointed out the need for COMMISA to attempt this showing in the District Court. *See* SPA10-11. COMMISA declined to offer evidence on this score. Personal jurisdiction over PEP can therefore be sustained only if it comports with due process. *See GSS Group*, 680 F.3d at 812; *Goodyear*, 131 S. Ct. at 2857. As we next explain, it does not.

23

**B.    PEP Lacks the Minimum Contacts with the Forum Required for Personal Jurisdiction.**

Applying its "fairness or comity in international law" test, the District Court found that PEP had sufficient contact with the forum to be amenable to personal jurisdiction here.  SPA29.  It based that conclusion on PEP's limited support for the participation of its parent, PEMEX, in New York's financial markets.  PEP had served as a guarantor in several bond issues by PEMEX, and had appointed a New York agent for service of process with respect to those transactions.[3]  Whatever significance these activities might have under the District Court's novel test, they plainly do not constitute the "minimum contacts with the relevant forum" due process requires.  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013), *petition for cert filed*, 82 U.S.L.W. 3127 (Sept. 9, 2013) (No. 13-318), (internal quotation marks omitted).

---

[3]    The District Court also purported to identify several other contacts with the New York financial markets.  *See* SPA25-26.  These additional assertions are clearly erroneous, and COMMISA did not attempt to show otherwise during the first appeal.  For example, PEMEX—not PEP—created a master trust in conjunction with the PEMEX securities sales and appointed the Bank of New York Mellon to act as trustee.  A1540.  PEP was not a party to the trust agreement and did not use it as a vehicle to raise any funds in New York.  *Id.*  Similarly, PEMEX—not PEP—appointed a paying agent in New York in connection with the bond issues.  A1666.  PEP and PEMEX are separate legal entities, and thus PEMEX's jurisdictional contacts cannot be imputed to PEP without satisfying the high standard for piercing the corporate veil between the two.  *See Goodyear*, 131 S. Ct. at 2857.  No such showing has been made in this case.

Personal jurisdiction can be either specific or general. Specific jurisdiction applies "in a suit arising out of or related to the defendant's contacts with the forum." *Id.* at 673-674. Specific jurisdiction does not apply in this case because, as the District Court explained, "the lawsuit here does not arise from [PEP's] financing activities." SPA26.

That leaves general jurisdiction, which "permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 567-568 (2d Cir. 1996) (quoting *Helicopteros*, 466 U.S. at 414-416 & nn.8-9 (1984)). Because general jurisdiction subjects a defendant to suit in a forum's courts for any reason whatsoever, the test is "more stringent * * *, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts' with the forum." *Id.* (quoting *Helicopteros*, 466 U.S. at 416). " 'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.' " *Id.* (quoting *Goodyear*, 131 S. Ct. at 2853-54 (alteration omitted)); *see also Daimler AG* v. *Bauman*, No. 11-965, slip op. at 3, 8, 18 (U.S. Jan. 14, 2014) (reaffirming this standard).

PEP cannot be "fairly regarded as at home" in this forum. PEP is a Mexican corporation, formed to develop petrochemical resources in Mexico. The District

25

Court did not suggest that PEP maintains offices or employees, owns property, sells products, or otherwise has a sustained presence in the forum. PEP's only connection with the forum comes from assisting PEMEX's bond sales here. Selling securities in a forum, and appointing an agent for service of process with respect to those transactions, falls far short of establishing a corporate "home." The Eleventh Circuit has thus rejected an assertion of general jurisdiction relying on just such contacts. *See Consolidated Dev. Corp.* v. *Sherritt, Inc.*, 216 F.3d 1286, 1292-93 (11th Cir. 2000) (no general federal jurisdiction where defendant sold bonds in the United States and appointed an agent for service of process related to those sales). And rightly so; the Supreme Court has found general jurisdiction lacking over foreign corporations with far more significant operations in the United States. *See Daimler*, slip op. at 18-23; *Helicopteros*, 466 U.S. at 416, 418-419. PEP's attenuated connection to New York does not permit COMMISA to summon it from Mexico on matters—such as Mexican contract litigation— wholly unrelated to that connection.[4]

---

[4]     In the first appeal, COMMISA argued that this issue was not preserved for appellate review, because in the District Court PEP initially attacked personal jurisdiction for lack of proper service, not insufficient contacts with the forum. This Court will review an argument that was " 'pressed or passed upon below.' " *United States* v. *Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) (quoting *United States* v. *Williams*, 504 U.S. 36, 41 (1992)). This issue was both. During the August 2010 hearing before the District Court, PEP argued at length that it lacked sufficient contact with the forum to be amenable to personal jurisdiction consistent

## II.   THE FOREIGN SOVEREIGN IMMUNITIES ACT DOES NOT ALLOW VENUE IN THE SOUTHERN DISTRICT OF NEW YORK.

If the District Court were correct that the Constitution does not restrict the exercise of personal jurisdiction over state-owned corporations such as PEP, that would make the statutory protections Congress created for such entities all the more important.  Those safeguards include the congressional limits on venue for suits against state instrumentalities provided in the Foreign Sovereign Immunities Act.  *See Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U.S. 428, 435 n.3 (1989) (describing the Act's venue provisions as part of Congress's "comprehensive statutory scheme" for suits against foreign states and their instrumentalities).  In this case, the relevant provision permits venue only where PEP is "doing business."  28 U.S.C. § 1391(f)(3).  The District Court, however, held that the same attenuated connection to New York undergirding its personal jurisdiction holding—PEP's role in supporting PEMEX's New York bond issuances—qualified as "doing business" in the Southern District.

---

with the Due Process Clause.  SPA9-14.  COMMISA did not suggest that the question was conceded or waived, but instead addressed it on the merits.  *See* SPA5-6, 15-16.  And the District Court left no doubt that PEP had raised the issue, stating that "PEP moves to dismiss the action to confirm the award for lack of personal jurisdiction, a point that has been withdrawn in terms of service of process, but which remains in terms of the forum not having sufficient contacts with the cause of action and the parties * * * ."  SPA22.  It then ruled on the issue at the hearing—exploring the key precedent, *Frontera*, at length—and reiterated that it had done so in its written final judgment.  *See* SPA1, 28-30.

27

For nearly a century, courts have been rejecting that view. When the due process standard for personal jurisdiction over a corporation was "doing business" in the forum, the Supreme Court held that activity in New York's financial markets did not qualify. *See Bank of America* v. *Whitney Cent. Nat'l Bank*, 261 U.S. 171, 172-173 (1923). This Court reached the same result in analyzing a tax law that applied only to companies "doing business" in the United States. *See Union Internationale de Placements* v. *Hoey*, 96 F.2d 591, 593 (2d Cir. 1938). The Southern District repeatedly so held in applying a neighboring—and much more commonly invoked—venue provision, § 1391(c), which governs venue over corporations generally. For many decades, "doing business" provided the standard for venue under § 1391(c).[5] District courts in the Southern District consistently rejected efforts to rely on a company's participation in the New York financial markets in order to establish venue under that provision. *See, e.g.*, *Control Data Corp.* v. *Carolina Power & Light Co.*, 274 F. Supp. 336, 340 (S.D.N.Y. 1967), *Westerman* v. *Grow*, 198 F. Supp. 307, 308 (S.D.N.Y 1961); *Trizna* v. *New York, Chicago & St. Louis R.R.*, 57 F. Supp. 484, 485 (S.D.N.Y 1944). Courts continue to reach the same result in applying New York's jurisdiction statute, which allows

---

[5]     Former § 1391(c) provided, in relevant part: "A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business." Congress amended this provision in 1988, providing for venue in "any judicial district in which [the corporation] is subject to personal jurisdiction."

general jurisdiction over corporations "doing business" in the state.  N.Y. C.P.L.R.

§ 301.[6]  Put simply, "it is well-settled that raising financing through the use of New

York institutions is not 'doing business' in New York."  *Nelson* v. *Mass. Gen.*

*Hosp.*, 2007 WL 2781241, at *27 (S.D.N.Y. 2007), *aff'd on op. below*, 299 F.

App'x 78 (2d Cir. 2008) (some internal quotation marks omitted).

Although this Court has not yet applied § 1391(f)(3), there is no reason to

believe "doing business" means something different there than it does everywhere

else.  Just the opposite.  Congress enacted § 1391(f)(3) in 1976 as part of the

Foreign Sovereign Immunities Act (FSIA).  It thus drafted the provision well after

*Bank of America* and other cases had settled the meaning of "doing business."  "In

the absence of contrary indication [courts] assume that when a statute uses such a

term, Congress intended it to have its established meaning."  *McDermott Int'l, Inc.*

v. *Wilander*, 498 U.S. 337, 342 (1991); *see also Rowe* v. *New Hampshire Motor*

*Trans. Ass'n*, 552 U.S. 364, 370 (2008) ("[W]hen judicial interpretations have

settled the meaning of an existing statutory provision, repetition of the same

---

[6]    *See, e.g.*, *Glencore AG* v. *Bharat Aluminum Co.*, 2010 WL 4323264, at *6-
*7 (S.D.N.Y. 2010) (no jurisdiction over arbitration confirmation proceeding
because issuing securities and engaging agents in connection with doing so is not
"doing business" in New York); *Klonis* v. *Nat'l Bank of Greece, S.A.*, 492 F. Supp.
2d 293, 299-300 (S.D.N.Y. 2007); *In re Ski Train Fire in Kaprun, Austria*, 2003
WL 1807148, at *4 (S.D.N.Y. 2003); *Clarke* v. *Fonix Corp.*, 1999 WL 105031, at
*5 (S.D.N.Y.) ("Raising financing is not a form of 'doing business' for the purpose
of § 301; if it were, then almost every company in the country would be subject to
New York's jurisdiction."), *aff'd*, 199 F.3d 1321 (2d Cir. 1999).

language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." (internal quotation marks omitted)).

The Supreme Court has thus interpreted other provisions of the FSIA in light of the meaning courts gave those terms in 1976. *See Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 613 (1992) (citing *McDermott*, 498 U.S. at 342). And this Court has already interpreted another FSIA venue provision— 1391(f)(1)—in light of the identical language in a neighboring venue provision. *See U.S. Titan*, 241 F.3d at 153-154.  That approach makes particular sense here, given that the Senate and House committee reports expressly state that § 1391(f)(3) was "based on" § 1391(c) as it then stood.  S. Rep. 94-1310, at 31 (1976); H.R. Rep. 94-1487, at 32 (1976).  Thus, not only is there no reason to think "doing business" has an idiosyncratic meaning in § 1391(f)(3); there is good reason to think Congress intended the term to mean exactly what it means elsewhere.

The District Court, however, chose to apply "a lesser standard dealing not with [the] general doing business standard, but with a notion of commercial activity."  SPA28.  The court's reasons for doing so are not entirely clear. Immediately after announcing its new, lower standard for venue, the court discussed "the need for personal jurisdiction."  *Id.*  It then offered an extended discussion of *Frontera*—a case that has nothing to do with venue.  *See* SPA28-29. After that, the court never clearly returned to the subject of venue, announcing

30

express holdings only with respect to jurisdiction and *forum non conveniens*, and offering its own policy justifications for those holdings.  *See* SPA30-31.

To the extent the court intended those policy arguments to also support its venue ruling, they do not.  The District Court found it "important that there be a ready access to international courts to confirm these international arbitration awards" and therefore reasoned that "the public interest is advanced by providing this forum."  SPA30.  But that notion contradicts a settled policy of allowing companies to participate in New York's capital markets without subjecting themselves to New York's courts.  *See Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000).

The District Court also emphasized that COMMISA found it "convenient and appropriate" to attempt confirmation in New York.  SPA30.  The Supreme Court, however, recently reaffirmed that the plaintiff's "privilege" of choosing where to sue "exists within the confines of statutory limitations, and 'in most instances, the purpose of statutorily specified venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial.' " *Atlantic Marine Const. Co., Inc.* v. *U.S. Dist. Court*, 134 S. Ct. 568, 582 n.7 (2013) (quoting *Leroy* v. *Great Western United Corp.*, 443 U.S. 173, 183-184 (1979) (alteration omitted)).  In § 1391(f)(3), Congress limited venue over foreign instrumentalities such as PEP to places where the defendant is "doing business."

31

That term does not include supporting securities sales through New York financial markets. COMMISA's notion of what might be convenient and appropriate thus did not license the District Court to disregard the statutory protections of the FSIA.

## III. THE DISTRICT COURT ERRED BY ENFORCING AN ARBITRATION AWARD NULLIFIED BY A COMPETENT COURT IN THE PRIMARY JURISDICTION.

This Court should not become the first Court of Appeals to confirm an arbitration award nullified by a competent court in the nation where the award was rendered. As this Court's precedent makes clear, doing so would require truly extraordinary circumstances. The errors the District Court perceived in the decision of Mexico's Eleventh Collegiate Court come nowhere near qualifying. In fact, they are not even errors.

### A. A Nullified Arbitration Award Cannot Be Enforced Absent Extraordinary Circumstances.

COMMISA asked the District Court to confirm the nullified arbitration award under the Panama Convention, which is domestically enforceable under the Federal Arbitration Act. *See* 9 U.S.C. §§ 302, 307. The Convention helps ensure speedy confirmation of *valid* arbitration awards, but Article 5(e) provides that courts may refuse confirmation if the arbitration decision "has been annulled or suspended by a competent authority of the State in which, or according to the law

32

of which, the decision has been made." [7]  The arbitration here was decided in

Mexico and under its laws—both as the parties expressly contracted that it would

be.  Mexico's Eleventh Collegiate Court annulled the award, and as the District

Court recognized, "the Eleventh Collegiate Court is a 'competent

authority.' "  SPA57.

This Court's cases make clear the "paramount importance" of the Collegiate

Court's decision.  *Yusuf*, 126 F.3d at 22.  In *Yusuf*, this Court explained the sharp

distinction between the role of courts in the primary jurisdiction—the jurisdiction

where an award was granted—and those in secondary jurisdictions—foreign

jurisdictions where an awardee tries to enforce the award:  The Convention leaves

review of an award's validity in the hands of the primary jurisdiction's courts, to

be determined by local law.  Thus "the state in which, or under the law of which,

the award is made, will be free to set aside or modify an award in accordance with

its domestic arbitral law and its full panoply of express and implied grounds for

relief."  *Id.* at 22-23.

---

[7]      Under 9 U.S.C. § 305, the Panama Convention applies here because both
parties are Mexican citizens, and Mexico is a member of the Organization of
American States.  Most of the cases discussed in this section analyze the New York
Convention, 21 U.S.T. 2517, 330 U.N.T.S. 38, *reprinted at* 9 U.S.C. § 201.  The
relevant provisions of the fifth articles of the New York and Panama Conventions
are "substantially identical," and so the same precedents apply to both.  SPA58
n.18; *see also Productos Mercantiles E Industriales, S.A.* v. *Faberge USA, Inc.*, 23
F.3d 41, 45 (2d Cir. 1994) ("Congress intended * * * courts in the United States to
achieve a general uniformity of results under the two conventions").

In *Baker Marine*, this Court applied *Yusuf*'s principles to reject an attempt, like COMMISA's, to confirm an arbitration award that had been nullified in the primary jurisdiction. *See* 191 F.3d at 196-197 (citing *Yusuf*, 126 F.3d at 20-21). It rebuffed the argument that a foreign nullification decision can be disregarded merely because U.S. courts applying U.S. law would not have nullified the underlying award. *Id.* at 197. In so holding, this Court explained that allowing secondary-jurisdiction courts to routinely reexamine nullification decisions would "undermine finality and regularly produce conflicting judgments." *Id.* at 197 n.2. That, in turn, would give "the losing party" in the primary jurisdiction "every reason to pursue its adversary with enforcement actions from country to country until a court is found, if any, which grants the enforcement." *Id.* (internal quotation marks omitted).

Following this Court's precedents, the D.C. Circuit reached the same conclusion in *TermoRio S.A. E.S.P.* v. *Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007). Quoting *Yusuf* at length, it explained the primacy of the awarding jurisdiction when it comes to questions of validity. *Id.* at 935. Then, adhering to "the reasoning of the Second Circuit in *Baker Marine*," the D.C. Circuit declined to enforce an award nullified by the primary jurisdiction. *Id.*

The *TermoRio* court refused to entertain arguments that the nullification could be ignored because it conflicted with domestic (meaning, United States) law.

34

Rather, the D.C. Circuit understood *Baker Marine* to allow disregarding the

primary jurisdiction's nullification of an award only under "extraordinary

circumstances." *Id.* at 938.  To delineate those circumstances, it relied on another

of this Court's precedents, *Ackermann* v. *Levine*, 788 F.2d 830 (2d Cir. 1986).

Under *Ackermann*, a foreign court's judgment will be followed unless it is

"repugnant to fundamental notions of what is decent and just in the State where

enforcement is sought." *Id.* at 841; *TermoRio*, 487 F.3d at 938.  *TermoRio* also

cited Fifth Circuit precedent setting a similarly high bar: violation of " 'the forum

state's most basic notions of morality and justice.' " *Id.* (quoting *Karaha Bodas*

*Co. L.L.C.* v. *Perusahaan Pertambangan Minyan Dan Gas Bumi Negara*, 364 F.3d

274, 305-306 (5th Cir. 2004)).

The District Court recognized that *Baker Marine* and *TermoRio* supply the

correct standard.  *See* SPA57-60.  But it then suggested it might have more

flexibility than this high standard allows, citing a district court decision,

*Chromalloy Aeroservices* v. *Arab Republic of Egypt*, 939 F. Supp. 907 (D.D.C.

1996).  *See* SPA60-61.  In *Chromalloy*, the District Court for the District of

Columbia confirmed an arbitration award that the primary jurisdiction, Egypt, had

nullified.  *See* 939 F. Supp. at 914.  *Chromalloy* reached this anomalous result by

applying domestic U.S. law—specifically, the deference to domestic arbitration

awards required by the Federal Arbitration Act.  *Id.* at 913.

35

*Chromalloy* was never good law in this Circuit, and is no longer good law anywhere. The D.C. Circuit in *TermoRio* rejected the plaintiff's reliance on *Chromalloy*, effectively limiting that opinion to its facts. *See* 487 F.3d at 937.[8] After *TermoRio*, the D.C. district court has also rejected an effort to rely on *Chromalloy*. *See International Trading & Indus. Inv. Co.* v. *DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 29-30 & n.13 (D.D.C. 2011) (distinguishing *Chromalloy* and indicating it is no longer good law). That the court that decided *Chromalloy* hesitates to follow it should alone have warned the District Court off *Chromalloy*.

But even more damning than the fact that D.C. federal courts do not rely on *Chromalloy* is why they refuse to do so: *Chromalloy* is at odds with the precedent of *this* Court. *TermoRio* reasoned that reexamining primary jurisdiction nullification decisions for conformity with U.S. law would upend the division of authority *Yusuf* explained. *See TermoRio*, 487 F.3d at 937 (citing *Yusuf*, 126 F.3d

---

[8]     The contract in *Chromalloy* provided that the arbitration's result "shall be final and binding and cannot be made subject to any appeal or other recourse." *Chromalloy*, 939 F. Supp. at 912. But the losing arbitral party there nonetheless sought and obtained nullification of the award on appeal. The *Chromalloy* court confirmed the arbitral award, honoring the contract's terms. Several courts, including this one, have seized on this important detail to confine *Chromalloy* to those rare facts. *See Baker Marine*, 191 F.3d at 197 n.3; *TermoRio*, 487 F.3d at 937; *Spier* v. *Calzaturifico Tecnica, S.p.A.*, 71 F. Supp. 2d 279, 288-289 (S.D.N.Y. 1999). The contracts in this case do not contain any such promise to abstain from seeking judicial review of the arbitration award.

at 23).  It would also contradict *Baker Marine*'s "holding that it is insufficient to enforce an award solely because a foreign court's grounds for nullifying the award would not be recognized under domestic United States law."  *TermoRio*, 487 F.3d at 936 (internal quotation marks omitted).  Thus even before *TermoRio*, district courts in this Circuit hesitated to rely on *Chromalloy*.  *See Spier*, 71 F. Supp. 2d at 288-289.  Now that the Circuit that produced *Chromalloy* has demonstrated that it conflicts with this Court's precedent, it can hardly be considered good law here.

But according to the District Court, "*Chromalloy* remains alive, for both *Baker Marine* and *TermoRio* recognized that a district court should hesitate to defer to a judgment of nullification that conflicts with fundamental notions of fairness."  SPA61.  That misreads the passages on which the District Court relied. They merely hold open the possibility "that there is a narrow public policy gloss on * * * the Convention and that a foreign judgment is unenforceable against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the United States."  *TermoRio*, 487 F.3d at 939 (internal quotations omitted); *see also Baker Marine*, 191 F.3d at 197 n.3 (stating that the foreign judgment did not "conflict with United States public policy").  A general inquiry into the equities of the primary jurisdiction's decision, querying whether its results comport with "notions of fairness," is exactly the sort of plenary review that *Baker Marine* and *TermoRio* reject.   They provide for a much narrower inquiry,

discounting the primary jurisdiction's judgment only if "tainted" or "inauthentic." *TermoRio*, 487 F.3d at 935.   Exceeding that limited role does violence to both the general respect accorded to foreign judgments—as explained in *Ackermann*—and the specific scheme of the Convention—as explained in *Yusuf* and vindicated in *Baker Marine*.

Had the District Court confined itself to the limited role contemplated by precedent, its task would have been easy.  Judge Hellerstein readily discerned that the Collegiate Court's decision was an authentic result of a legitimate judicial process, even if COMMISA did not like the result:

> I appreciate that the decision of the Mexican collegiate court, the 11th Collegiate Court was not a sport, as we might say.  It didn't come out of nowhere.  It was grounded in judicial reasoning and preceden[ts] with which people may disagree.  But it wasn't a sport.

A3286.  That should have ended the matter:  A competent court in the primary jurisdiction had interpreted local law to nullify the award, and "an arbitration award does not exist to be enforced * * * if it has been lawfully set aside by a competent authority in the State in which the award was made." *TermoRio*, 487 F.3d at 936 (internal quotation marks omitted).

### B. The Collegiate Court's Decision Does Not Present Extraordinary Circumstances.

Instead of accepting the Collegiate Court's judgment, the District Court launched a searching inquiry into its accuracy and effects.  The District Court

38

entertained multiple rounds of briefing and three days of expert hearings, issuing a 30-page opinion resurrecting the arbitration award two years after the Collegiate Court struck it down.  That lengthy process itself conflicted with the limited role assigned to the secondary jurisdiction by the Convention—which after all, aims to *expedite* the litigation of international arbitration awards.  And its result turned up nothing even approaching the extraordinary circumstances that would justify ignoring the primary jurisdiction's decision on the award's validity.

> 1. *The Collegiate Court's Citation to a 2009 Statute Was Not Improper, Much Less "Repugnant to Fundamental Notions of What Is Decent and Just."*

The District Court's main objection to the Collegiate Court's decision concerned a statute that Mexico passed in 2009, referred to as Section 98.  *See* SPA46 (citing Section 98 of the Law of Public Works and Related Services). Section 98 declares that administrative rescissions are not subject to arbitration. *Id.*  According to the District Court, the Collegiate Court had retroactively applied this statute to the rescission of contracts formed in 1997 and 2003.  In the District Court's view, that created sufficient "unfairness" to justify overruling the primary jurisdiction's nullification of the award.  SPA64-65.  The District Court erred at every level of its analysis, and each error constitutes an independent basis to reverse its judgment.

39

a. To begin with, the Collegiate Court did not apply Section 98 to this case. The Collegiate Court discussed the statute, but expressly stated that this did "not entail the retroactive application of the law." A3763. Rather, the statute was only "considered as a constructive and argumentative guiding principle for the current case." *Id.* This kind of reinforcing citation to recently passed legislation—without retroactively applying it—is hardly unheard of in American law. *See, e.g.*, *Seatrain Shipbuilding Corp.* v. *Shell Oil Co.*, 444 U.S. 572, 596 (1980); *Banque Worms* v. *Bankamerica Int'l*, 77 N.Y.2d 362, 371 (1991) ("Although the new statute * * * may not be applied retroactively to resolve the issues presented by this litigation, the statute's legislative history * * * and the policy considerations addressed by this legislation, can appropriately inform our decision and serve as persuasive authority in aid of the resolution of this issue presented in this case.").

Because the Collegiate Court did not apply Section 98 at all, it plainly did not *retroactively* apply it. Instead, the court used typical tools of judicial reasoning to determine whether administrative rescissions occurring before that statute's enactment can be subject to private arbitration. A 1994 decision by Mexico's Supreme Court supplied a key premise: Administrative rescissions are acts of public authority. A3767. And reasoning from its understanding of the purpose behind the rescission power—to conserve public resources—the Collegiate Court determined that PEP could not contract away its rescission power, and hence could

40

not subject it to arbitration. A3750-54. That Mexico's legislature had reached the same conclusion, codifying it in a statute that applies *prospectively*, merely "strengthened" the Collegiate Court's confidence in its own judgment. A3758.

The District Court, however, refused to take the Collegiate Court at its word. It concluded that the nullification decision must have relied on the 2009 law, "[b]ased on the Eleventh Collegiate Court's extensive discussion of Section 98." SPA65. And it asserted that the 1994 Mexican Supreme Court decision could not have supported the nullification, because it did not mention arbitration and was not discussed in the early stages of this litigation. SPA64-65.[9]

The District Court's reasoning reflects a basic misunderstanding of the Collegiate Court's decision. To be sure, the 1994 Mexican Supreme Court decision did not discuss arbitration, or hold that administrative rescissions cannot be arbitrated. That is why the Collegiate Court had to author its own opinion to resolve the matter. As the District Court recognized, whether such rescissions could be subject to arbitration was an open question before the Collegiate Court took up this case. *See* A3016-17, 3034, 3068. The 1994 Supreme Court opinion does, however, establish the premise from which the Collegiate Court's conclusion

---

[9]     The District Court also suggested the Supreme Court opinion lacked significance because it was only available as an "extract." SPA65. Quite the contrary. The "extract" in question is an official report of the decision, prepared by court officials, and reflecting the decision's status as "jurisprudence," or binding precedent. *See* A2126.

flows:  administrative rescissions are acts of public authority (the premise);

therefore, administrative rescissions cannot be privately arbitrated (the

conclusion).[10]  The Collegiate Court's use of that precedent to resolve a new

question hardly marks its decision as aberrant.  *See, e.g.*, *Chaidez* v. *United States*,

133 S. Ct. 1103, 1111 (2013) ("a decision can be right and also be novel").

The same regular process of judicial reasoning also explains the Collegiate

Court's use of Section 98.  The statute's preamble offers the legislature's reasoning

on the question before the court:  Should administrative rescissions be arbitrable?

*See* A3757-62.  And the Collegiate Court's extended citation to that *preamble*

actually undermines the District Court's belief that the Collegiate Court applied

Section 98 to COMMISA's case.  The operative text of Section 98 clearly and

concisely states that " 'administrative rescission * * * may not be subject to

---

[10]    Under Mexican law, acts of authority cannot be subject to arbitration, as
COMMISA's attorney in the Mexican litigation (and its expert in the District
Court) acknowledged.  *See* A1203-04 ("Acts of authority, in other words, those
acts that imply the exercise of public authorities, are not subject to arbitration
according to Mexican law, but rather they are under the exclusive jurisdiction of
Mexican courts * * * .").  COMMISA sought to overcome this by arguing that the
arbitration panel had only reviewed its breach-of-contract claims, not the propriety
of the rescission.  The Collegiate Court rejected that argument, explaining that the
two issues were inextricably intertwined.  *See* A3751-53.  The text of the arbitral
panel's opinion makes that clear:  In order to find for COMMISA, the panel
determined that "PEP failed to prove the existence of the grounds invoked * * * for
declaring the administrative rescission" and therefore "the rescission lacks legal
and factual grounds."  A447.

arbitration proceedings.' "  SPA46.  If the Collegiate Court had applied Section 98, it could simply have quoted that language and nullified the award.  The court instead focused on the reasoning behind the statute's enactment—as captured in the law's precatory language—precisely because it was trying to reach its own decision on how to resolve a case *not* controlled by the statute.

b.  In asserting that the Collegiate Court had applied Section 98 to this case, the District Court simply misread the Mexican Court's decision.  But it also exceeded its authority.  Over a century of precedent holds that federal courts will not second-guess other nations' courts applying their domestic law.  *See Hilton* v. *Guyot*, 159 U.S. 113, 158 (1895).  When a court interprets the laws of its own nation, it "is the final exponent of that law," so it is not "possible for a foreign Court to pronounce [its] decision wrong."  *Ingenohl* v. *Walter E. Olsen & Co.*, 273 U.S. 541, 544 (1927).  And the District Court's foray into Mexican law was particularly inappropriate because the matter at hand concerned an issue of sovereign power:  the scope of the administrative rescission authority available to state instrumentalities.  As this Court recently reaffirmed, deference to another jurisdiction's courts is particularly appropriate "where the litigation is 'intimately involved with sovereign prerogative.' "  *Figueredo* v. *Republic of Peru*, 665 F.3d 384, 392 (2d Cir. 2011) (quoting *Louisiana Power & Light Co.* v. *City of Thibodaux*, 360 U.S. 25, 28-29 (1959)).

43

The District Court insisted that it was not reviewing Mexican law, but only applying "basic notions of justice."  SPA68.  If, however, the Collegiate Court's conclusions of Mexican law are correct, then the injustice perceived by the District Court vanishes:  If Section 98 did not dictate the result in COMMISA's case, then no retroactive application of that statute occurred.  And if there was no retroactive application, then the District Court identified no flaw in the Collegiate Court's citation to Section 98, much less one at odds with "basic notions of justice."

c.  Even if the Collegiate Court had applied Section 98 to COMMISA's case, and even if the District Court had authority to disregard the Collegiate Court's contrary statement, that still would not justify confirming the nullified arbitration award.  Retroactive application of Section 98—had it occurred—would fall far short of the sort of fundamental miscarriage of justice that might allow a secondary jurisdiction's courts to disregard the primary jurisdiction's decision.  Indeed, even judged under U.S. law, retroactive application of Section 98 would not be error at all.

The District Court reached a different conclusion by relying on the U.S. Supreme Court's decision in *Landgraf* v. *USI Film Products*, 511 U.S. 244 (1994). *See* SPA65.  But *Landgraf* does not declare any rule so vital that transgressing it would be "repugnant to fundamental notions of what is decent and just in the United States."  *TermoRio*, 487 F.3d at 939 (internal quotations omitted).  Far from

44

it. *Landgraf* merely establishes "a default rule for statutory interpretation." *City of New York* v. *Permanent Mission of India to United Nations*, 618 F.3d 172, 192 (2d Cir. 2010). Under *Landgraf*, U.S. courts will not read certain types of federal legislation to apply to conduct antedating its enactment, absent a clear statement from Congress. *Landgraf*, 511 U.S. at 272-273. It is difficult to see how a Mexican court's failure to apply an American rule of statutory interpretation would constitute an error so egregious that it undermines the integrity of the Mexican decision.

To be sure, *Landgraf* derives its default rule from the Anglo-American legal tradition's historic suspicion of retrospective laws, as the passage quoted by the District Court reveals. *See* SPA65. But *Landgraf* makes clear that this skepticism does not allow modern courts to block the retroactive application of laws. *See* 511 U.S. at 272. Instead, it held that if Congress wishes to regulate retroactively, all it must do is expressly say so. *Id.*; *see, e.g.*, *Kuhali* v. *Reno*, 266 F.3d 93, 110 (2d Cir. 2001) (retroactively applying a statute where "Congress has explicitly defined the temporal reach of the * * * statute"). There simply is no general principle of American law that it is fundamentally unjust, or even necessarily improper, to apply civil legislation to past conduct. *See Landgraf*, 511 U.S. at 267-268 ("Retroactivity provisions often serve entirely benign and legitimate purposes"

including "simply to give comprehensive effect to a new law Congress considers salutary.").[11]

And even if it made sense to consider whether a Mexican appellate court's decision comported with American rules of statutory interpretation, the Collegiate Court's decision would pass that test. *Landgraf*'s presumption comes into play only when a statute affects "substantive rights"; statutes addressing "matters of procedure * * * may be applied to all pending cases regardless of when the underlying conduct occurred." *Republic of Austria* v. *Altmann*, 541 U.S. 677, 694 (2004). Whether a claim will be arbitrated or litigated does not affect substantive rights, only matters of procedure. *See Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth Inc.*, 473 U.S. 614, 628 (1985); *Desiderio* v. *Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 205 (2d Cir.1999). Indeed, *Landgraf* itself makes clear that statutes "conferring or ousting jurisdiction" are not subject to its default rule. 511 U.S. at 274. For those reasons, the district court has held that a recently enacted U.S. statute eliminating certain contractual rights to arbitrate applies retroactively

---

[11]    In precedents not cited by the District Court, the U.S. Supreme Court has identified some due process limits on retroactive civil legislation. *See, e.g.*, *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976). But the standard is very deferential: Retroactive legislation will be upheld unless "the legislature has acted in an arbitrary and irrational way." *Id.* at 15, 16-18; *see also, e.g.*, *Kuhali*, 296 F.3d at 110. Few questions could fall further outside a confirmation court's limited purview than examining whether a Mexican statute would fail rational basis review under the U.S. Constitution.

under *Landgraf*. *See Wong* v. *CKX, Inc.*, 890 F. Supp. 2d 411, 421-423 (S.D.N.Y.

2012).[12]  Because Section 98 has the same effect, its retroactive application would

pose no problem under *Landgraf*—much less be "repugnant to fundamental

notions of what is decent and just"—even if it were a U.S. law, subject to U.S.

rules of statutory interpretation.

> 2. *The Collegiate Court's Decision Did Not Deprive COMMISA of a Forum for Its Claims, Much Less Violate Fundamental Due Process Rights.*

The District Court bolstered its ruling with a second conclusion of Mexican

law.  In its view, "the Eleventh Collegiate Court's decision left COMMISA

without a remedy to litigate the merits" of its breach-of-contract claim.  SPA66.

That, according to the District Court, "exacerbated" the "unfairness" of the

Collegiate Court's ruling.  *Id.*  This analysis too errs at every level.

a.  In upholding the constitutionality of PEP's rescission, Mexico's Supreme

Court explained that COMMISA could still pursue its breach-of-contract claim in

the federal district courts for administrative matters.  SPA43.  The Collegiate Court

thus reasoned that even without arbitration, a forum remained available for breach-

---

[12]    Other district courts have disagreed, finding that § 922 of the Dodd-Frank Act, which bars arbitration of alleged violations of the Sarbanes-Oxley whistleblower protections, does not apply retroactively under *Landgraf*.  *See Wong*, 890 F. Supp. 2d at 423 n.2 (collecting cases).   But the fact that U.S. courts disagree on the question still shows just how far the Collegiate Court's decision is from violating " 'the forum state's most basic notions of morality and justice.' " *TermoRio*, 487 F.3d 938 (quoting *Karaha Bodas*, 364 F.3d at 305-306).

of-contract claims like COMMISA's.  *See* A3749, 3765, 3786.  The District Court, however, decided that the Collegiate Court had missed a nuance of Mexican civil procedure that would deprive COMMISA of a judicial forum.

The question is one of statutory interpretation.  In 2007, Mexico enacted legislation providing that disputes over administrative rescissions could be heard in an administrative tribunal called the Tax and Administrative Court.  Then, in 2010, Mexico's Supreme Court held that the 2007 statute granted the tax court *exclusive* jurisdiction over disputes concerning administrative rescissions.  SPA45-46.  Actions filed in the tax court are subject to a 45-day statute of limitations, which is obviously long expired in this case.  SPA67.  PEP's expert, however, explained that COMMISA could still file in the federal district courts—where its claim would be subject to a ten-year statute of limitations, and thus not be time-barred— because the text of the 2007 law applies only to claims arising after its enactment. *See* SPA45 n.8, A3209-11.  At first, the District Court characterized this as an open question of Mexican law that should be resolved by Mexican courts.  *See* A3260-61, 3286-87.  Yet the District Court later resolved the question itself, disregarding the Collegiate Court's statements and determining that COMMISA could no longer bring its breach-of-contract claim in any Mexican court.  *See* SPA67 & 67 n.24.

The District Court had no grounds to do so.  Whether the 2007 law governs COMMISA's claim turns on the tense of a verb in the statute's text.  *See* SPA45

n.8.  The District Court acknowledged its lack of competence to answer this

question of Spanish grammar.  *Id.*  Instead, it based its decision on COMMISA's

testimony that the 2007 statute could be applied retroactively because it was solely

procedural.  *See* SPA67 n.24.  That conclusion does not follow from the premise:

True, there is typically nothing improper about applying procedural statutes to

cases antedating their enactment—a point that undermines the District Court's

reasoning regarding the Collegiate Court's discussion of Section 98.  *See supra* at

46-47.  But whether a law *could* apply to past conduct without cause for concern is

entirely different than whether its text actually *does* apply retroactively.  *See Lindh*

v. *Murphy*, 521 U.S. 320, 326 (1997) ("normal rules of construction" can "remove

even the possibility of retroactivity," regardless of "*Landgraf*'s default rule").  The

District Court thus identified no basis to doubt the Collegiate Court's belief that

COMMISA retains a judicial forum for its claims.

　　b.  Even if the District Court had not gotten it wrong, clarifying Mexican

civil procedure would still fall far outside federal courts' limited role in enforcing

foreign arbitration awards.  *See Yusuf*, 126 F.3d at 22-23.  And it was particularly

inappropriate for the District Court to resolve the question in a way that

undermined a premise of the Collegiate Court's decision.  That allowed the District

Court to do exactly what it may not do:  Pronounce the decision of a Mexican

Court on matters of Mexican law wrongly decided.  *See Ingenohl*, 273 U.S. at 544.

c. And even if the District Court had not erred both by attempting to reinterpret Mexican law and by interpreting it incorrectly, its conclusions would still not justify overturning the Collegiate Court's judgment. Other than "unfairness," the District Court's opinion fails to identify what fundamental tenet of American justice the operation of a Mexican statute of limitations could violate. The closest candidate would seem to be due process. But federal courts will deny recognition to foreign judgments on due process grounds only for " 'outrageous departures from our notions of civilized jurisprudence.' " *De Csepel* v. *Republic of Hungary*, 714 F.3d 591, 608 (D.C. Cir. 2013) (quoting *Bird* v. *Glacier Electric Cooperative, Inc.*, 255 F.3d 1136, 1142 (9th Cir. 2001)).

COMMISA received far more than adequate process. It litigated the propriety of PEP's rescission all the way to Mexico's Supreme Court. It received full and fair hearings on the validity of its arbitration award, prevailing in several lower courts. *See* SPA48-49. COMMISA lost in the Collegiate Court, but the District Court never questioned the fairness of that court's jurists or its procedure. And if COMMISA could not now retry its damages claim in a new forum, COMMISA would have no one to blame but itself. By 2006, COMMISA knew that the arbitration panel's jurisdiction was contested, and that the federal district courts for administrative matters had unassailable jurisdiction; the Mexican Supreme Court had just said so. *See* SPA43. And there is no dispute that until the

Mexican Supreme Court's decision in 2010, COMMISA could have brought its breach-of-contract claim in those courts. *See* A3168-69. So even if COMMISA had lost its opportunity to seek damages by gambling on the uncertain jurisdiction of its preferred forum, that would hardly violate the United States' "most basic notions of morality and justice." *TermoRio*, 487 F.3d at 938. COMMISA's failure to pursue its claims in the correct forum cannot justify imposing a void arbitration award on PEP.

Indeed, the possibility of harsh results from jurisdictional holdings is hardly alien to American law. For example, the Supreme Court recently resolved an open question of jurisdiction in a way that prevented an Indian tribe from seeking monetary relief in one forum because it had first sought equitable relief in another. *See United States* v. *Tohono O'Odham Nation*, 131 S. Ct. 1723, 1730-31 (2011). The Court explained that the plaintiff might have avoided this result by initially filing in the correct forum—as COMMISA might have done here—and that Congress could save the action for monetary damages by extending the statute of limitations—as the Mexican legislature may have done here. *Id.* But although the Court also noted the potential hardship if none of this occurred, it held that it "enjoys no liberty to add an exception" to the jurisdictional scheme "to remove apparent hardship." *Id.* at 1731 (internal quotation marks and alterations omitted).

Strict enforcement of procedural rules at home does not become a fundamental injustice when it occurs abroad.

In the end, it was not the process, but the result, that troubled the District Court. The court made that clear by lamenting that res judicata may bar COMMISA's claim, even if the statute of limitations does not. *See* SPA67 n.24.[13] The District Court did not identify any reason that the application of res judicata would be improper. And that established doctrine does not violate due process, or otherwise connote unfairness; it reflects a finding that a litigant has already had a full and fair opportunity to present its claims. *See Montana* v. *United States*, 440 U.S. 147, 153 (1979). COMMISA enjoyed a fair opportunity to litigate in its home courts. A belief that the contest should not end until COMMISA wins does not justify resurrecting an invalid arbitration award just to change the score.

### 3. Administrative Rescission Is Not "Repugnant to Fundamental Notions of What Is Decent and Just."

The District Court shored up its decision with one other secondary ruling: The Collegiate Court's decision "flouts a basic principle of justice" by failing to treat "the private party and the sovereign as equals" when the sovereign enters a contract with the private party. SPA65-66. It is true that, for over century, Mexico

---

[13] In addition to its statute-of-limitations reasoning, the tax court that rejected COMMISA's claim also held res judicata attached after COMMISA's challenge to the rescission failed in 2007. *See* SPA53.

has embraced a doctrine of French law allowing public entities to avoid contractual obligations harmful to the public. *See* A3096-98. But the District Court identified no reason to believe that this approach "flouts basic principles of justice" simply because American courts might not subscribe to it.

The U.S. cases the District Court cited for this proposition say nothing of the sort. *See* SPA65-66. They simply apply a rule of American contract law, without suggesting that anything about it has such importance that a different approach would violate the United States' most basic notions of justice. In fact, the District Court's leading citation explains that this rule does not always apply. *See United States* v. *Winstar Corp.*, 518 U.S. 839 (1996). *Winstar* is a fractured opinion, but one thing the entire Court agreed on is that sometimes the U.S. Government is not treated like a private party simply because it contracts with one. *See id.* at 895-896 (plurality op.); *id.* at 918 (Breyer, J., concurring); *id.* at 920-921 (Scalia, J., concurring in the judgment); *id.* at 926 (Rehnquist, J., dissenting). The District Court supplied no explanation as to how such nuanced jurisprudence supplies an inviolable principle to which foreign judgments will be held.

Moreover, the view that public entities can abrogate contracts for reasons unavailable to private parties is hardly alien to American law. For example, the U.S. Government can block breach-of-contract suits against it by asserting that the litigation would reveal state secrets. *See Totten* v. *United States*, 92 U.S. 105

53

(1875); *General Dynamics Corp.* v. *United States*, 131 S. Ct. 1900, 1906-07 (2011).  That Mexican law allows for analogous procedures does not make it repugnant to the United States' basic concepts of justice.  And COMMISA has particularly weak grounds to complain about Mexican law here, given that the contract it signed expressly provides for administrative rescissions.  *See* SPA40; c*f*. *General Dynamics*, 131 S. Ct. at 1909 (" 'Both parties 'must have understood' that state secrets would prevent courts from resolving many possible disputes under the [contract].' " (quoting *Totten*, 92 U.S. at 106)).

## IV.  THE DISTRICT COURT LACKED AUTHORITY TO AUGMENT THE AWARD BY $106 MILLION.

Whatever authority the District Court had to confirm a nullified arbitration award, it plainly could not do more than that.  It possessed subject matter jurisdiction only "to confirm an award."  28 U.S.C. § 1605(a)(6).  But two weeks after issuing its opinion confirming the award, the court tacked on another $106,827.658.59 nowhere mentioned in the award.  The court lacked any basis to make this surprising addition, and it should be overturned even if the actual confirmation of the award could somehow be sustained.

"Actions to confirm arbitration awards * * * are straightforward proceedings in which no other claims are to be adjudicated."  *Ottley* v. *Schwartzberg*, 819 F.2d 373, 377 (2d Cir. 1987).  And although a court can enforce an award once confirmed, "this enforcement does not extend beyond the scope of the arbitration

award: 'the judgment to be enforced encompasses the terms of the confirmed arbitration award and may not enlarge upon those terms.' " *NFL Players Ass'n* v. *NFL Mgmt. Council*, 523 F. App'x 756, 760 (2d Cir. 2013) (quoting *Zeiler*, 500 F.3d at 170) (alteration omitted)).

Here, those strict limits mark the boundaries of the District Court's jurisdiction. "The only source of subject matter jurisdiction over a foreign sovereign or its instrumentalities in the courts of the United States is the FSIA." *Blue Ridge Inv., LLC* v. *Republic of Argentina*, 735 F.3d 72, 83 (2d Cir. 2013). Recognizing that PEP qualifies as an instrumentality of Mexico, the District Court staked its jurisdiction solely on § 1605(a)(6) of the FSIA, authorizing district courts "to confirm an award made pursuant to * * * an agreement to arbitrate." SPA22. Thus any undertaking beyond confirming or denying confirmation of the award would exceed not only the proper scope of confirmation proceedings, but the court's limited jurisdiction.

COMMISA, however, asked that the District Court not only confirm its nullified arbitration award, but augment that award by over $100 million—more than one-third the size of the original award—for the sake of "making [COMMISA] whole" for losses elsewhere. SPA82. Specifically, a Mexican court had ordered Afianzadora Insurgentes S.A. de C.V., a Mexican bonding company, to pay PEP the amount due on COMMISA's performance bonds. COMMISA

55

claimed that it had in turn had to pay Insurgentes. *See* A3922. In a bid to recoup that expense, COMMISA argued that the roughly $106 million it paid to the bonding company should be added to the District Court's judgment. A3920-21.

The final (now nullified) Mexican arbitration award does not include—or even mention—such an amount. It is not for lack of attention to detail. After explaining its reasoning at great length, the arbitration panel's opinion states that "the Arbitral Tribunal has resolved to issue the following award." A866. Thirteen resolutions follow. *See* A866-869. One specifies the precise amount of the award—$286,101,437.71 plus 34,459,577.48 Mexican Pesos—including a detailed breakdown of its components, such as $206,969.99 for "ducts, valves, and flanges." A866-867. Other resolutions provide instructions concerning payment of the award, such as interest and rates of exchange. But nowhere do those resolutions mention the bond payments COMMISA asked the District Court to add to the award. The District Court was thus quite correct to say that "there is nothing in the award itself" supporting COMMISA's request. SPA81.

Yet the District Court added $106 million to its judgment anyway. According to Judge Hellerstein, the Mexican court enforcing the bonds failed to "accept the award as authoritative," thereby acting "opposite to what I am doing." SPA83. The District Court thus attempted to cancel out the effect of the Mexican court's judgment by ordering that PEP pay COMMISA the same amount

56

COMMISA had paid to its bonding company, over and above the amount of the actual arbitration award. *Id.*

The District Court identified no source of authority for that order. The best COMMISA could offer was a Third Circuit case suggesting that district courts have a "very small" amount of "flexibility to modify execution of an award without altering its substance"—and then *reversing* a district court's modification for not "adher[ing] more closely to the award." *AdMart AG* v. *Stephen & Mary Birch Found.*, 457 F.3d 302, 309, 311 (3d Cir. 2006). Nothing in that opinion supports *adding* over $100 million to an arbitration award because the result in a foreign court case against a third party creates effects inconsistent with the confirmation court's intent.

A "district court should enforce an arbitration award as written." *Wartsila Finland OY* v. *Duke Capital LLC*, 518 F.3d 287, 292 (5th Cir. 2008). The District Court's approach imagines a vastly more expansive role for confirmation courts. COMMISA's attempt to confirm its award in New York notwithstanding, this case remains a dispute between two Mexican companies, concerning a contract formed in Mexico, to be performed there, and designating Mexican law as controlling. The Mexican court adjudicating the bond litigation thus quite naturally issued an opinion consistent with Mexican law—which includes the Eleventh Collegiate Court's opinion nullifying the award. That the District Court disagrees with

Mexican precedent does not give it plenary jurisdiction to "make COMMISA whole" for the effects of the Mexican courts' adherence to Mexican law. If COMMISA believes the Mexican court adjudicating the bond issue erred, it has potential remedies, among them an appeal in Mexico, or the NAFTA claim it is currently pursuing on this very issue.[14] But COMMISA cannot expand jurisdiction here beyond confirming or denying confirmation of the award in "straightforward proceedings in which no other claims are to be adjudicated." *Ottley*, 819 F.2d at 377.

## CONCLUSION

For the foregoing reasons, the District Court's decision should be reversed.

Respectfully submitted,

---

[14] In August 2013, COMMISA and its parent company, KBR, Inc., filed a request for arbitration under NAFTA Chapter 11. Among its claims, COMMISA objects to the Mexican court decision enforcing the performance bonds. *See* A3949.

|  | /s/ Catherine E. Stetson |
|---|---|
| RICHARD C. LORENZO | CATHERINE E. STETSON |
| HOGAN LOVELLS US LLP | HOGAN LOVELLS US LLP |
| 600 Brickell Avenue, Suite 2700 | 555 13th Street, NW |
| Miami, FL 33131 | Washington, D.C. 20004 |
| (305) 459-6500 | (202) 637-5600 |

DENNIS H. TRACEY, III
IRA M. FEINBERG
HAGAN C. SCOTTEN
ERIN M. MEYER
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
(212) 918-3000

Dated:  January 28, 2014                    Counsel for Respondent-Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby

certify that:

1.     This brief complies with the type-volume limitations of Federal Rule

of Appellate Procedure 32(a)(7)(B) because it contains 13,789 words.

2.     This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6) because it has been prepared in a proportionally-

spaced typeface using Microsoft Office Word in Times New Roman 14-point font.


/s/ Catherine E. Stetson
Catherine E. Stetson

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January 2014, I caused the foregoing Brief for Appellant PEP to be served on counsel for Appellee via Electronic Mail generated by the Court's electronic filing system (CM/ECF).

/s/ Catherine E. Stetson
Catherine E. Stetson