# No. 13-4022

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

CORPORACIÓN MEXICANA DE MANTENIMIENTO
INTEGRAL, S. DE R.L. DE C.V.,

*Petitioner-Appellee*,

v.

PEMEX-EXPLORACIÓN Y PRODUCCIÓN,

*Respondent-Appellant*,
_____

On Appeal from the United States District Court for the
Southern District of New York, No. 1:10-cv-00206-AKH
_____

## BRIEF FOR APPELLEE
_____

JEFFREY S. BUCHOLTZ
BRIAN CALLANAN
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006

RICHARD T. MAROONEY
CHARLES C. CORRELL, JR.
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036

PAUL D. CLEMENT
 *Counsel of Record*
ZACHARY D. TRIPP
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellee*

April 11, 2014

## CORPORATE DISCLOSURE STATEMENT

COMMISA has as its parent corporation KBR, Inc., a publicly-held company that indirectly owns 100 percent of COMMISA's stock. No other publicly-held corporation owns ten percent or more of COMMISA's stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF AUTHORITIES .................................................... iv

INTRODUCTION ........................................................... 1

STATEMENT OF THE CASE.................................................. 4

I.      The Panama Convention And The Confirmation Of Arbitral
        Awards ......................................................... 4

II.     The Parties And Their Agreements To Arbitrate ................... 6

III.    PEP's Breaches And The Arbitration.............................. 8

        A.      PEP's Serial Breaches Followed by Rescission ............ 8

        B.      PEP's Bond Claim and the Bond *Amparo* ................. 10

        C.      The Initiation of Arbitration ..........................11

        D.      Subsequent Changes in Mexican Law ..................... 13

        E.      Final Arbitral Award for COMMISA ..................... 13

IV.     Confirmation Proceedings And PEP's Efforts To Nullify The
        Award ......................................................... 14

        A.      The District Court's Confirmation of the Award............. 14

        B.      PEP's Campaign to Nullify the Award in Mexico ........... 15

        C.      The District Court's Renewed Confirmation on Remand ........ 19

SUMMARY OF ARGUMENT ................................................ 23

STANDARD OF REVIEW .................................................. 25

ARGUMENT ............................................................. 26

I.      The District Court Correctly Exercised Personal Jurisdiction Over
        PEP. .......................................................... 26

A. PEP Expressly Conceded that It Has No Due Process Rights. .......... 26

B. PEP Has Sufficient Minimum Contacts. ............................................ 28

C. Minimum Contacts Are Unnecessary Because Jurisdiction Exists Over PEP's Property. ................................................................ 32

II. Venue In The District Court Was Proper ...................................................... 33

A. PEP Engages in "Commercial Activity" and Is Thus "Doing Business" in the Southern District. ..................................................... 33

B. Venue Was Proper Under § 1391(f)(1) .............................................. 36

III. The District Court Properly Confirmed The Arbitral Award. ..................... 37

A. Foreign Judgments of Annulment Do Not Merit Deference When They Violate U.S. Public Policy. ............................................. 37

B. The Judgment of Annulment Violated U.S. Public Policy. ............... 42

C. PEP's Counterarguments Are Meritless. ........................................... 51

   1. The Collegiate Court Retroactively Deprived COMMISA of a Remedy. ........................................................ 51

   2. The District Court Properly Evaluated Whether the Mexican Judgment Violated U.S. Public Policy. ..................... 54

   3. The Judgment of Annulment Indeed Violates U.S. Public Policy. .......................................................................... 56

IV. The Amount Of The Judgment Is Correct. .................................................. 59

CONCLUSION ...................................................................................................... 61

# TABLE OF AUTHORITIES

## Cases

*Ackermann v. Levine*,
  788 F.2d 830 (2d Cir.1986) ........................................................ 38, 39

*Adelphia Bus. Solutions, Inc. v. Abnos*,
  482 F.3d 602 (2d Cir. 2007) ...............................................................27

*Admart AG v. Stephen & Mary Birch Found., Inc.*,
  457 F.3d 302 (3d Cir. 2006) ...............................................................60

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978) .................................................................... 46, 49

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
  994 F.2d 996 (2d Cir. 1993) ...............................................................26

*Altmann v. Republic of Austria*,
  142 F. Supp. 2d 1187 (C.D. Cal. 2001) .............................................34

*Altmann v. Republic of Austria*,
  317 F.3d 954 (9th Cir. 2002) .............................................................34

*Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*,
  480 U.S. 102 (1987) ...........................................................................31

*Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*,
  191 F.3d 194 (2d Cir. 1999) ...................................... 19, 21, 37, 40

*Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*,
  406 U.S. 706 (1972) ...........................................................................36

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009) ...........................................................................51

*Choi v. Kim*,
  50 F.3d 244 (3d Cir. 1995) .................................................................50

*Chromalloy Aeroservices v. Arab Republic of Egypt*,
  939 F. Supp. 907 (D.D.C. 1996) ........................................................41

*CME Media Enters. B.V. v. Zelezny*,
    No. 01-1733, 2001 WL 1035138 (S.D.N.Y. Sept. 10, 2001) ................ 23, 32, 33

*Consol. Dev. Corp. v. Sherritt, Inc.*,
    216 F.3d 1286 (11th Cir. 2000) ......................................................... 31

*Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*,
    529 U.S. 193 (2000) .......................................................................... 36

*Diorinou v. Mezitis*,
    237 F.3d 133 (2d Cir. 2001) ............................................................. 55

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998) .......................................................................... 48

*Encyc. Universalis S.A. v. Encyc. Britannica, Inc.*,
    403 F.3d 85 (2d Cir. 2005) ........................................... 4, 6, 31, 39

*Europcar Italia, S.p.A v. Maiellano Tours, Inc.*,
    156 F.3d 310 (2d Cir. 1998) ............................................................. 39

*Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda.*
    *v. Republic of Peru*,
    655 F. Supp. 2d 361 (S.D.N.Y. 2009) .............................................. 30

*Finanz AG Zurich v. Banco Economico S.A.*,
    192 F.3d 240 (2d Cir. 1999) ...................................................... 26, 39

*Freytag v. CIR*,
    501 U.S. 868 (1991) .......................................................................... 28

*Frontera Res. Azer. Corp. v. State Oil Co. of Azer.*,
    582 F.3d 393 (2d Cir. 2009) ............................................................. 32

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
    284 F.3d 1114 (9th Cir. 2002) ................................................... 32, 33

*Hughes Aircraft Co. v. U.S. ex rel. Schumer*,
    520 U.S. 939 (1997) .......................................................................... 57

*INS v. St. Cyr*,
    533 U.S. 289 (2001) .......................................................................... 48

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)...............................................................35

*Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*,
   347 F.3d 589 (5th Cir. 2003)................................................50

*Iran Aircraft Indus. v. Avco Corp.*,
   980 F.2d 141 (2d Cir. 1992)..................................................50

*Karaha Bodas Co.*
   *v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
   335 F.3d 357 (5th Cir. 2003)................................................37

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994)...................................................... 22, 48, 57

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985)..............................................................31

*Moskal v. United States*,
   498 U.S. 103 (1990)..............................................................35

*Osorio v. Dole Food Co.*,
   665 F. Supp. 2d 1307 (S.D. Fla. 2009) .............................50

*Parsons & Whittemore Overseas Co.*
   *v. Societe Generale de L'Industrie Du Papier (RAKTA)*,
   508 F.2d 969 (2d Cir. 1974) ............................... 2, 5, 39, 60

*Penn Cent. Transp. Co. v. City of N.Y.*,
   438 U.S. 104 (1978).............................................................49

*Reich v. Collins*, 513 U.S. 106 (1994)...................................50

*Scherk v. Alberto-Culver Co.*,
   417 U.S. 506 (1974)..........................................................5, 38

*Shaffer v. Heitner*,
   433 U.S. 186 (1977).............................................................32

*Tahan v. Hodgson*,
   662 F.2d 862 (D.C. Cir. 1981) ...........................................39

*Telcordia Tech Inc. v. Telkom SA Ltd.*,
  458 F.3d 172 (3d Cir. 2006) ...............................................................29

*Telenor Mobile Commc'ns AS v. Storm LLC*,
  584 F.3d 396 (2d Cir. 2009) .................................................................6

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
  487 F.3d 928 (D.C. Cir. 2007) ........................................... 3, 21, 37, 38

*Thai-Lao Lignite (Thai.) Co.*
  *v. Gov't of Lao People's Democratic Republic*,
  No. 10-5256, 2014 WL 476239 (S.D.N.Y. Feb. 6, 2014) ....................41

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
  241 F.3d 135 (2d Cir. 2001) ...............................................................29

*U.S. Trust Co. of N.Y. v. New Jersey*,
  431 U.S. 1 (1977) ................................................................................49

*United States v. Fahey*,
  510 F.2d 302 (2d Cir. 1974) ...............................................................27

*United States v. Huntington Nat'l Bank*,
  574 F.3d 329 (6th Cir. 2009) ..............................................................27

*United States v. Tohono O'Odham Nation*,
  131 S. Ct. 1723 (2011) ........................................................................58

*Victrix S.S. v. Salen Dry Cargo A.B.*,
  825 F.2d 709 (2d Cir. 1987) ......................................................... 39, 55

*Walden v. Fiore*,
  134 S. Ct. 1115 (2014) ........................................................................29

*Weltover, Inc. v. Republic of Arg.*,
  941 F.2d 145 (2d Cir. 1991) ......................................................... 34, 36

*Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*,
  532 U.S. 588 (2001) ............................................................................28

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ............................................................................29

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*,
126 F.3d 15 (2d Cir. 1997) ........................................................ *passim*

*Zeiler v. Deitsch*,
500 F.3d 157 (2d Cir. 2007) ................................................ 6, 31, 39

*Zicherman v. Korean Air Lines Co.*,
516 U.S. 217 (1996) ........................................................................41

**Statutes**

9 U.S.C. § 207 ..................................................................................4

9 U.S.C. § 301 ..................................................................................4

9 U.S.C. § 302 ..................................................................................4

28 U.S.C. § 1391(f) ............................................................... *passim*

28 U.S.C. § 1602 ..............................................................................1

28 U.S.C. § 1605(a) ........................................................................35

Foreign Sovereign Immunities Act of 1976,
Pub. L. No. 94-583, 90 Stat. 2891 (1976) ..........................................33

**Other Authorities**

*Directorate General of Civil Aviation of the Emirate of Dubai v. Int'l Bechtel Co.*, Cour d'appel [Court of Appeal] Paris, 29 Sept. 2005,
31 Y.B. Comm. Arb. 629 (Kluwer Law Int'l 2006)............................40

The Federalist No. 10 (James Madison) (Jacob E. Cooke ed., 1961) ...................51

Inter-American Convention on International Commercial Arbitration,
Jan. 30, 1975, 104 Stat. 448, O.A.S.T.S. No. 42 ....................... *passim*

Int'l Chamber of Commerce,
Enforcement of Int'l Arbitral Awards: Report and Preliminary Draft Convention, U.N. Doc. E/C.2/373 (March 13, 1953)..........................38

23 Int'l Chamber of Commerce, Supp. ICC Publication 733-BUL *ICC Guide to National Procedures for Recognition and Enforcement of Awards under the New York Convention* (2012)..................................40

Int'l Chamber of Commerce Arbitration Rules (2012),
    http://bit.ly/1staN3O ........................................................................10

Int'l Commercial Disputes Comm. of the Assoc. of the Bar of the City of
    N.Y., *Lack of Jurisdiction and Forum Non Conveniens as Defenses to
    the Enforcement of Foreign Arbitral Awards*, 12 Am. Rev. Int'l Arb.
    407 (2004) ...........................................................................................33

North American Free Trade Agreement, U.S.-Can.-Mex.,
    Dec. 17, 1992, 32 I.L.M. 289 (1993) ...................................................7

Restatement (Second) of Conflict of Laws (1971) ...................................39

14D Wright & Miller, *Federal Practice & Procedure* (3d ed. 2010).............. 34, 35

*Yukos Capital s.a.r.l. v. OAO Rosneft*, Gerechtshof [Court of Appeal]
    Amsterdam, 28 Apr. 2009, 34 Y.B. Comm. Arb. 703 (Kluwer Law
    Int'l 2009) ...........................................................................................40

Hector F. Zamudio, *A Brief Introduction to the Mexican Writ of* Amparo,
    9 Cal. W. Int'l L.J. 306 (1979) ...........................................................10

## INTRODUCTION

The District Court below properly confirmed a foreign arbitral award and thereby prevented Pemex Exploración y Producción ("PEP"), a Mexican state-owned company, from repudiating contractual commitments it made to KBR, Inc.'s subsidiary, Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V ("COMMISA"), and leaving COMMISA without a remedy—arbitral or judicial—in violation of basic notions of justice. To induce COMMISA to build offshore oil platforms in Mexico, PEP promised to arbitrate "[a]ny controversy, claim, difference, or dispute" related to the contracts. A-93. PEP breached the contracts repeatedly—and then seized the platforms and rescinded the contracts. COMMISA invoked arbitration and, after years of litigation, a tribunal awarded COMMISA $300 million in damages. COMMISA moved to enforce the Final Award in the Southern District of New York, where PEP has both property and extensive financial contacts. The District Court confirmed the Award, and this Court should affirm.

At the outset, the District Court had jurisdiction over PEP and venue was proper. The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 ("FSIA"), grants federal courts jurisdiction to confirm arbitral awards against foreign state-instrumentalities like PEP, and includes multiple venue provisions to make that jurisdictional grant a practical reality. PEP now asserts that it lacks

"minimum contacts" with the United States.  But PEP repeatedly conceded below that this test was inapplicable, and PEP's property and financing activities in the United States amply justify the limited exercise of jurisdiction needed to confirm the Award.  PEP's arguments would make international arbitral awards often unenforceable in the United States, frustrating Congress' judgment and severely undermining the utility of arbitration for U.S. corporations doing business abroad. PEP's venue arguments are similarly meritless.  Indeed, PEP's interpretation of the FSIA's venue provisions would create a "venue gap" where venue would frequently be unavailable in *any* district—notwithstanding that the FSIA itself grants *every* district jurisdiction.  The District Court correctly rejected PEP's effort to vitiate the FSIA.

The District Court properly confirmed the Award.  Under the Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975, 104 Stat. 448, O.A.S.T.S. No. 42 ("Panama Convention"), confirmation of foreign arbitral awards is overwhelmingly the norm.  Its "pro-enforcement bias" reflects the determination of the United States, Mexico, and other nations that swift and certain enforcement of foreign arbitral awards is critical to international trade.  *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974).  The Convention gives the host country's courts a primary role, but not a veto power.  Indeed, the Panama Convention eliminated the

worldwide veto over enforcement that host country courts previously enjoyed. Consistent with the Convention's text, history, and purpose, it is undisputed that district courts have discretion to confirm an award that has been nullified by a foreign judgment when that judgment violates "basic notions of justice." *See TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d. 928, 938–39 (D.C. Cir. 2007).

The District Court appropriately exercised that discretion here. To induce COMMISA's investment, PEP unambiguously promised that it would arbitrate any claims arising from the contracts. COMMISA had no reason to doubt PEP's promises, as they were backed by a Mexican statute clearly providing that such claims were arbitrable. But after COMMISA worked for years on the project, after years of arbitration, after COMMISA won and PEP lost, after the District Court confirmed the Award, and after three Mexican courts rejected PEP's efforts to nullify the Award, PEP persuaded Mexico's Eleventh Collegiate Court to rely on a newly-enacted law to declare retroactively that PEP's promises of arbitration were a mirage. It set aside the Award and held that no part of the dispute could be arbitrated at all.

Worse still, this reversal left COMMISA with no remedy. By the time COMMISA learned that the arbitration was barred, it was too late to challenge PEP's breaches in court because the applicable statute of limitations had expired. And although the arbitral tribunal awarded COMMISA $300 million because *PEP*

3

breached, PEP has collected $106 million in performance bonds based on its unilateral—and now-unreviewable—determination that *COMMISA* breached. The Eleventh Collegiate Court's judgment thus completed an extraordinary bait-and-switch, applying a new law retroactively, upending COMMISA's legitimate and investment-backed expectations, stripping it of its Award for the benefit of the state, depriving it of an opportunity to be heard, and saddling it with $106 million in damages by making PEP both the judge and jury of its own actions. The District Court's determination does not exercise any broad authority to disregard foreign nullification decisions. It vindicates "basic notions of justice" in the narrow, and exceptionally unfair, circumstances of this case.

## STATEMENT OF THE CASE

### I.    The Panama Convention And The Confirmation Of Arbitral Awards

The Federal Arbitration Act ("FAA") incorporates the Panama Convention and governs enforcement of foreign arbitral awards in the United States. 9 U.S.C. § 301. The FAA and Convention make confirmation mandatory unless certain narrow defenses are proved, in which case confirmation becomes discretionary. A court "shall" confirm an arbitral award, save when one of the defenses is proven, where "[t]he recognition and execution of the [arbitral] decision *may* be refused." Panama Convention art. 5 (emphasis added); 9 U.S.C. §§ 207, 302; *see also Encyc. Universalis S.A. v. Encyc. Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005). One

4

defense allows courts in the jurisdiction where confirmation is sought (the "secondary jurisdiction") discretion to grant or refuse confirmation when the award has been "annulled or suspended by a competent authority" in the country where the award was rendered (the "primary jurisdiction"). Panama Convention art. 5(1)(e). There are no circumstances in which confirmation is categorically prohibited.

The Panama Convention, like the materially-identical New York Convention, is designed to "encourage the recognition and enforcement of commercial arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). The Convention effectuates its "pro-enforcement bias" by "remov[ing] preexisting obstacles to enforcement" in both the primary and secondary jurisdictions. *Parsons*, 508 F.2d at 973. Before the New York and Panama Conventions, a party seeking to confirm arbitral awards had to go to court twice, in a procedure known as "double exequatur": the party had to obtain confirmation from courts in the primary jurisdiction, and then had to request enforcement in the courts of a secondary jurisdiction. *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997). The Panama Convention abolished this procedure, facilitating enforcement by permitting arbitration winners to enforce awards abroad without obtaining the blessing of local courts. *Id.*

5

The Convention also removed barriers to enforcement in secondary jurisdictions by requiring enforcement of awards in almost all circumstances. "Given the strong public policy in favor of international arbitration, … review of arbitral awards under the … Convention is 'very limited.'" *Encyc. Universalis*, 403 F.3d at 90 (quoting *Yusuf*, 126 F.3d at 23); *see also Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009).  Confirmation actions are intended to be "summary proceeding[s]" that "do[] little more than give the award the force of a court order."  *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007).

## II.    The Parties And Their Agreements To Arbitrate

COMMISA is a Mexican subsidiary of KBR, Inc., a U.S. corporation.  SPA-40.  PEP is a subsidiary of Petróleos Mexicanos ("PEMEX"), Mexico's state-owned petroleum company.  A-1515.

In 1997, PEP and COMMISA entered into a contract for COMMISA to construct two 13,000-ton offshore oil and gas platforms in the Gulf of Mexico.  A-44–45; A-1343.  To attract bids, PEP offered to resolve any disputes arising from the project through arbitration under International Chamber of Commerce ("ICC") rules.  A-1484.  The PEP-COMMISA contract in turn contained a "broadly worded and mandatory," SPA-63, promise to arbitrate:    "Any controversy, claim, difference, or dispute that may arise from or that is related to, or associated with, the present Contract or any instance of breach with the present Contract, shall be

definitively settled through arbitration." A-93. In May 2003, PEP and COMMISA entered into a second, related contract with a materially identical promise to arbitrate: "Any difference or dispute that may arise or that is related to, or associated with this Specific Agreement … or any instance of breach with this Agreement, shall be definitively settled through arbitration." A-131; SPA-41.

Both contracts also contained clauses permitting PEP to rescind the contract under specified circumstances, including if COMMISA abandoned its work. A-74; A-115. Nothing in the contracts excludes disputes concerning the contractual validity of such rescissions—much less pre-rescission breaches—from the mandate that "any" dispute be arbitrated. Preliminary Award ("PA") 20 (A-1448).

PEMEX's enabling statute expressly authorized PEP's agreements to arbitrate. SPA-41. The statute provides: "Petróleos Mexicanos or its Affiliates may … execute arbitration agreements whenever deemed appropriate." *Id*. Mexico enacted this law in 1994 after acceding to the North American Free Trade Agreement ("NAFTA"), which authorizes arbitration between private parties and state enterprises. SPA-41 (citing NAFTA, arts. 1115, 2022, U.S.-Can.-Mex., Dec. 17, 1992, 32 I.L.M. 289 (1993)). PEMEX and PEP have arbitrated other disputes, including those involving administrative rescissions. *See* A-2939, 2973.

7

### III.    PEP's Breaches And The Arbitration

####       A.    PEP's Serial Breaches Followed by Rescission

From 1997 to 2003, PEP committed numerous breaches that resulted in innumerable change orders, delays, and cost overruns.  *See* Final Award ("FA") 60–114, 166–80, 186–96, 729–35 (A-194–248, 300–30, 863–69); Ex. 68 to Decl. of Richard T. Marooney (Dkt. 117-1); A-1344–45, 1351–52.  PEP never disputed that it owed COMMISA money under the vast majority of the change orders necessitated by PEP's breaches.  Dkt. 116 at 12; A-2570 (Hutchinson Aff. ¶¶ 49–50).  To resolve these issues, the parties entered three supplemental contracts.  Two were retrospective and established that PEP would pay COMMISA to resolve COMMISA's claims from 1999 through 2002; one was a prospective change order covering COMMISA's remaining work through 2004.  A-2572–76 (Hutchinson Aff. ¶¶ 58–81); A-96, 101, 104, 112–13.  As noted *supra* Part II, PEP again promised to arbitrate any disputes.

COMMISA resumed work in spring 2003, but PEP resumed its chronic breaches.  FA 426–81 (A-560–615).  Among other things, PEP refused to allow COMMISA workers unimpeded access to the platforms; failed to supply agreed-upon accommodations for COMMISA personnel; delayed necessary work permits; and supplied defective equipment—all of which greatly delayed the project and produced additional cost overruns.  *Id*.; A-2478–81.

8

On March 17, 2004, after COMMISA had completed 94% of the final phase of the project, PEP forcibly seized the platforms, ejected COMMISA personnel from the site, barred their return, and put the platforms into production.  FA 286–87, 309–15 (A-420–21, 443–49).  PEP notified COMMISA that it intended to rescind the contract on the supposed grounds that COMMISA had failed to meet contractual milestones, abandoned the project, and refused to return to work.  FA 15, 276 (A-149, 410).

COMMISA initiated arbitration proceedings before the ICC on December 1, 2004.  FA 16 (A-150).  COMMISA alleged that PEP breached the contracts and thus owed it damages.  FA 6 (A-140).  COMMISA did not seek to set aside the rescission or reinstate the contracts.  On December 16, 2004, PEP completed the rescission.  SPA-42; FA 16 (A-150).  The rescission was entirely unilateral.  No Mexican court or other authority reviewed PEP's assertion that rescission was justified under the contract.

PEP issued a "*finiquito*," a final accounting and demand for damages in connection with a rescission.  A-1274–75; FA 17, 46 (A-151, 180).  PEP conceded that "COMMISA is entitled to challenge the *finiquito* … through an Arbitration Proceeding, thus safeguarding its rights."  FA 17, 46 (A-151, 180); A-2197; A-1274–75; *see also* A-1314.

**B.    PEP's Bond Claim and the Bond *Amparo***

After rescinding but before an arbitral tribunal was appointed, PEP filed a claim against $80 million in bonds that COMMISA had posted to secure performance.  FA 16 (A-150).  To maintain the status quo, COMMISA filed an *amparo* action seeking interim relief from the Mexican courts.  *Id*.; PA 56 (A-1484); *see also* ICC Arbitration Rules, art. 28.2 (2012), http://bit.ly/1staN3O (permitting parties to seek "interim or conservatory measures" from local courts before a tribunal is appointed).  An *amparo* is a specialized proceeding allowing private parties to challenge the constitutionality of government action.  A-1266–67; PA 57–58 (A-1485–86).  An *amparo* court cannot adjudicate a breach of contract or award damages; instead, "[j]udgments on the merits are purely declaratory" of the parties' constitutional rights.  Hector F. Zamudio, *A Brief Introduction to the Mexican Writ of* Amparo, 9 Cal. W. Int'l L.J. 306, 343 (1979); A-1489; *see also* FA 31, 43 (A-165, 177).  COMMISA accordingly argued that the law permitting a government agency to rescind unilaterally was unconstitutional and inapplicable to the parties' dispute.  FA 27 (A-161).

In June 2006, the Mexican Supreme Court held that the statute comported with due process because COMMISA retained its ordinary breach-of-contract remedies.  SPA-66; A-2654; FA 297 (A-431); A-1265, 1273–74.  The court did not address the arbitrability of such claims.  On remand, Mexico's Sixth Collegiate

10

Court held that the rescission statutes applied and that PEP followed them.  SPA-66.  It accordingly dismissed the *amparo*.  Neither court considered or ruled on the merits of COMMISA's breach-of-contract claims, *i.e.*, that PEP repeatedly breached before rescinding and that the rescission violated express contractual provisions governing rescissions.

### C.    The Initiation of Arbitration

The Arbitral Tribunal formed in May 2005.  FA 7 (A-141).  PEP participated fully in the arbitration and filed counterclaims.  PEP also agreed to the Terms of Reference, which specifically provide that the Tribunal would decide all jurisdictional issues.  PA 5 (A-1433); FA 7, 9, 28 (A-141, 143, 162); A-1914–15.  PEP challenged the Tribunal's jurisdiction on narrow grounds that it has since abandoned, including that COMMISA had waived its right to arbitrate by filing the *amparo*.  *See* SPA-44; PA 13–15, 44 (A-1441–43, 1472).  PEP did not argue that its rescission of the contracts barred arbitration of any part of the dispute.  SPA-44; PA 12–16 (A-1440–44).

On November 20, 2006, the Tribunal issued a unanimous Preliminary Award holding that it had jurisdiction over the parties' claims.  PA 81 (A-1509).  The Tribunal held that COMMISA's *amparo* was no obstacle to arbitration because it did not resolve the underlying "contractual disputes concerning which Party breached the Contract and which Party is entitled to compensation by the other."

PA 58 (A-1486); *see* PA 56–59 (A-1484–87).  The Preliminary Award also enjoined PEP "from filing any claim attempting to collect the bonds … until the Tribunal issues its final award, and according to such award, PEP has any right to claim the payment of the bonds."  PA 62, 81–82 (A-1490, 1509–10).  Thus, if the Tribunal ultimately found that PEP breached, PEP could not collect on the bonds.  *Id.*

Under Mexican law, PEP had 30 days to challenge the Preliminary Award in court.  A-1268, 2343 (Art. 1432 of Mexico's Code of Commerce); A-2209–13; SPA-45 & n.7.  PEP never did.

In March 2007, PEP moved for reconsideration, renewing its argument that COMMISA had waived its right to arbitration by seeking *amparo* relief.  PEP also argued that the *amparo* ruling upholding the constitutionality of the rescission statute somehow barred COMMISA's breach-of-contract claims.  The Tribunal denied PEP's motion.  FA 18 (A-152).

In October 2007, PEP belatedly challenged the Tribunal's jurisdiction yet again, arguing for the first time that its rescission was an "act of authority" that was not subject to arbitration at all.  Trial Ex. 117, at 2 (ICC Procedural Order No. 11); SPA-44–45.  The Tribunal rejected this novel and belated attack.  FA 12 (A-146); SPA-45.

**D.    Subsequent Changes in Mexican Law**

More than a decade after PEP promised to arbitrate "any" contractual dispute with COMMISA, and after years of arbitration between PEP and COMMISA, Mexico changed its laws governing public contracts.  First, Mexico enacted Section 98 of the Law of Public Works and Related Services, which provided that, effective May 28, 2009, rescissions of government contracts "'may not be subject to arbitration proceedings.'"  SPA-46; A-3758.

Second, Mexico enacted Article 14(VII) of the Organic Law of the Federal Court in Tax and Administrative Matters, which amended judicial review of public contract disputes.  Previously, Mexico's District Courts for Administrative Matters heard such disputes, and a 10-year statute of limitations applied.  SPA-45–46. Under Article 14(VII), Mexico's Tax and Administrative Court would hear them, and its 45-day statute of limitations would apply.  SPA-45–46; A-3867–69; A-3860–63; A-3112–13 (Von Wobeser Testimony).  The Supreme Court of Mexico held in 2010 that the Tax and Administrative Court was the exclusive judicial forum to hear public contract disputes.  SPA-45–46, 67.

**E.    Final Arbitral Award for COMMISA**

On December 16, 2009, the Tribunal issued its Final Award, holding that PEP repeatedly breached the contracts and awarding COMMISA approximately $300 million in damages.  The Final Award granted damages only for PEP's pre-

rescission breaches.  FA 732–34 (A-866–68).  Specifically, the Tribunal awarded COMMISA damages for the change orders, delays, and cost overruns from 1997 to 2003, and for breaches and work completed from 2003 until PEP seized the platforms on March 17, 2004.  FA 732-33 (A-866–67).

PEP's appointed arbitrator dissented, concluding that the panel lacked jurisdiction because newly enacted Section 98 barred arbitration of rescissions.  FA 35 (A-169); FA 46–47 (A-180–81).  The majority disagreed, holding that Section 98 did not apply retroactively.  At the time of contracting, PEMEX's enabling statute "explicitly authorize[d] PEP to include arbitration clauses in the contracts it executes" with no "restriction whatsoever."  FA 35–36 (A-169–70).

## IV.    Confirmation Proceedings And PEP's Efforts To Nullify The Award

### A.    The District Court's Confirmation of the Award

In January 2010, COMMISA filed a petition in the United States District Court for the Southern District of New York to confirm the Final Award under the Panama Convention.  A-33–39.  PEP moved to dismiss for, *inter alia*, improper venue and lack of personal jurisdiction due to insufficient service of process.  Dkts. 8, 9.  Months later, PEP sued in Mexican court to nullify the Final Award.  SPA-48. PEP then moved to dismiss or stay COMMISA's petition pending the outcome of that action.  SPA-47; A-1164–85.

14

In hearings, PEP repeatedly conceded that the "minimum contacts" test did not apply because PEP has no due process rights for the purpose of personal jurisdiction analysis. *See* A-1173 & n.2, 1963, 2006, 2072. But on the same day as the District Court's final ruling, PEP reversed course and asserted that minimum contacts would be required unless COMMISA could prove that it is Mexico's agent. SPA-11.

In a bench ruling, the District Court rejected PEP's threshold defense and confirmed the Award. SPA-21-35. First, the Court held that PEP's "substantial financing activities" in the United States were sufficient to support jurisdiction in this confirmation proceeding. SPA-26, 28. Second, the Court held that venue was proper under 28 U.S.C. § 1391(f)(3) due to PEP's extensive commercial activity in New York, including issuing billions of dollars in debt offerings, raising capital, and engaging in financial transactions. SPA-26; A-1622–23; A-1740–41; A-1871; A-2050–52. The Court also exercised its "broad discretion" to deny PEP a stay during its quest to nullify the Award in Mexico. SPA-3–35; A-1248–52. PEP appealed.

## B.    PEP's Campaign to Nullify the Award in Mexico

### 1.    PEP's Failed Nullity Actions

In addition to appealing the District Court's confirmation judgment, PEP continued litigating in Mexico to annul the Award. First, PEP sought to nullify the

Award in Mexico's Third District Court.  Supp. Decl. of Dennis H. Tracey, III at 1–2 (Dkt. 25).  The court dismissed for lack of jurisdiction.  *Id*. at 2; Ex. S (Dkt. 25-2); SPA-48.

Second, PEP sought to cancel the Award in the Fifth District Court, which similarly refused.  SPA-48–49.  It held that PEP had waived its non-arbitrability argument by failing to timely object to the Preliminary Award.  A-3306–07.  And it held further that the contracts' arbitration clauses encompassed these disputes, PEMEX's enabling statute authorized arbitration, and PEP consented to the Tribunal's power to decide jurisdiction when it agreed to the Terms of Reference.  A-3300–04.

Third, PEP brought an *amparo* challenge to that ruling in the Tenth District Court, which dismissed, echoing the Fifth District Court's reasoning.  A-2145.

## 2.    PEP's Appeal to the Eleventh Collegiate Court

PEP appealed to the Eleventh Collegiate Court.  A-3334.  On September 21, 2011, that court issued an opinion reversing and ordering the lower court to annul the Final Award.  A-3816.  The Collegiate Court recognized that PEP had "agreed to submit to arbitration any dispute arising under [the contracts]" and that this encompassed disputes about the contractual basis for rescission.  A-3737–38, 3766.  The court nevertheless held that arbitration of a dispute involving a rescission would be contrary to Mexican public policy because rescissions are "issued to

safeguard financial resources" of the state. SPA-49. Arbitrations were designed to settle private disputes, the court reasoned, and it would be "absurd" if a "private party in its capacity as [a] subject [could] hear, try and rule [on] acts of authority," including administrative rescissions. A-3752–55. PEP thus became "superior" to COMMISA and the Tribunal once it unilaterally rescinded the contract. A-3753–55. In the court's view, this meant not only that the act of rescission itself could not be arbitrated, but also that any pre-rescission breaches could not be arbitrated either. A-3745, 3789–90. The court brushed aside PEMEX's statutory authority to arbitrate on the ground that the statute did not "expressly" waive the later-enacted rule against arbitration of rescissions. A-3766; *see also* A-3776–78.

The court did not cite any precedent holding that rescissions preclude arbitration. Instead, it relied on Section 98, the new statute prohibiting arbitration of rescissions enacted in 2009—twelve years after PEP promised to arbitrate and five years after arbitration began. A-3758–63. The court explained that Section 98 evidenced "the current trend of the legislator regarding public works ... to protect the economy and public expenditure by abandoning the practices that were aimed at granting more participation to private parties than to the State" and "[t]herefore, the State should be granted, once again, suitable mechanisms to fulfill those objectives." A-3762. The court's conclusion was "strengthened by" Section 98, which supplied a "guiding principle," but the court denied that its holding

17

"entail[ed] the retroactive application of the law."  A-3758, 3763.  It pointed to a 1994 Mexican Supreme Court case that did not discuss arbitration but described rescissions as "acts of authority."  Because "acts of authority" should not be arbitrated, the Collegiate Court reasoned, the Tribunal lacked jurisdiction to hear any challenge to the rescission itself—or even COMMISA's pre-rescission breach-of-contract claims.  A-3767–78.

The Collegiate Court emphasized that, although not arbitrable, "administrative rescissions by the public party did not deprive the private contracting party of basic rights to have its claim adjudicated in a neutral forum." SPA-51.  "[T]he Eleventh Collegiate Court commented that COMMISA should have brought its breach of contract claims to the District Courts for Administrative Matters."  SPA-51.  But the court did not address whether COMMISA would still have a remedy in 2010.  Indeed, the court did not mention Article 14(VII), the new law that granted exclusive jurisdiction to Mexico's Tax and Administrative Court to hear disputes concerning rescissions—and whose 45-day statute of limitations has long since expired.  SPA-51–52.  On remand, the Fifth District Court nullified the Final Award.

In a last-ditch effort to obtain a remedy in Mexican court, COMMISA sued PEP in the Tax and Administrative Court, which confirmed that the 45-day limit barred COMMISA's suit.  It also held that the Sixth Collegiate Court's *amparo*

ruling that PEP had properly issued the administrative rescission as a matter of statute was *res judicata* as to COMMISA's claims.  *See* SPA-53.

### 3.  PEP's Unilateral Rescission Allows It To Collect on the Performance Bonds

The only fact finder in this case—the Tribunal—held that PEP breached the contracts and thus had no right to collect on the performance bonds.  But after the Collegiate Court's nullification ruling, PEP obtained a court order entitling it to recover all $80 million in bonds plus $26 million in interest, based solely on PEP's unilateral determination that COMMISA had breached.  A-3934–35.[1]

### C.  The District Court's Renewed Confirmation on Remand

1. PEP's initial appeal was pending before this Court when the Collegiate Court annulled the Final Award.  Dkt. 133 (No. 10-4656).  This Court remanded for the District Court "to address in the first instance whether enforcement of the award should be denied because it 'has been set aside ….'"  Order at 2 (A-2103–05) (citing *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 (2d Cir. 1999)).

2. On remand, PEP moved to dismiss COMMISA's petition and COMMISA renewed its motion to confirm the Award.  SPA-53–54.  The District Court

---

[1] PEP also filed a *finiquito* suit in Monterrey district court to collect yet more money from COMMISA, and that suit was dismissed on venue grounds.  SPA-53–54.  "PEP has indicated that it plans to re-file the *finiquito* action."  *Id.*

presided over a thorough examination of the disputed legal issues to determine whether the Mexican annulment decision warranted deference under U.S. law, culminating in a three-day evidentiary hearing in April 2013.

Each side presented two experts. COMMISA's expert witnesses testified that the Collegiate Court had, without precedent, retroactively applied Section 98 and left COMMISA with no remedy. *See* A-2974–75; A-2977. COMMISA's first expert, Dr. Carlos Loperena, is a former president of the Mexican Bar Association. He has served as an arbitrator for more than 30 cases, including another case where PEP rescinded a contract, and Mexico appointed him a member of the advisory committee on private commercial disputes established under NAFTA. A-2937–39. He testified that before Section 98, "there was not only no prohibition, but clear and explicit authorization to go to arbitration" under the PEMEX enabling statute. A-2999. COMMISA's second expert, Dr. Claus Von Wobeser, is also a former president of the Mexican Bar Association. He is the President of the Arbitration Commission, the Mexican chapter of the ICC, and served as Mexico's appointed arbitrator in the country's first NAFTA case. A-2950. He testified that COMMISA had no remaining remedy in Mexican courts to pursue its breach-of-contract claims. A-3112–13. He explained that, due to Article 14(VII), a challenge to PEP's rescission would be "absolutely" time-barred and that this limitation cannot be waived. A-3113.

20

PEP's witnesses portrayed the Collegiate Court's decision as consistent with "the development of Mexican law." SPA-55. But neither PEP witness identified a single past case in which a Mexican court had held that, even after agreeing to a valid arbitration clause—and much less after agreeing that the arbitrators could decide jurisdiction and failing to appeal their ruling that jurisdiction was proper—a state enterprise could undo that promise, unwind an arbitration, and prevent arbitration of any dispute under the contracts whatsoever simply by pointing to its unilateral decision to rescind.

3.   On August 27, 2013, the District Court issued a thorough opinion confirming the Award. SPA-68. The Court explained that although courts in a secondary jurisdiction "'may'" refuse to enforce an arbitral award that has been annulled in the primary jurisdiction, such an award may still be confirmed if there are "'adequate reason[s]'" for doing so, including when the judgment of annulment "'violate[s] any basic notions of justice to which [the United States] subscribe[s].'" SPA-62 (quoting *Baker Marine*, 191 F.3d at 197, and *TermoRio*, 487 F.3d at 938–39). Applying this standard, the District Court held that the Collegiate Court's judgment was not entitled to recognition because it violated "'basic notions of justice.'" SPA-62 (quoting *TermoRio*, 487 F.3d at 939).

The District Court focused on two extreme deficiencies in the judgment. First, the Collegiate Court retroactively applied a new statute—Section 98—that

post-dated the parties' contract by more than decade, to invalidate a completed arbitration pursuant to a clear, preexisting arbitration agreement that had been validly formed.    The Court explained that such a dramatic disruption of COMMISA's "'settled expectations'" concerning its right to arbitrate violated "'[e]lementary considerations of fairness.'"  SPA-65 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265−66 (1994)).  This retroactive application of law was all the more objectionable, the District Court found, because it was "undertaken to favor a state enterprise over a private party."  *Id*.

Second, the Collegiate Court's judgment not only wiped out the $300 million Award and prohibited any further arbitration, it left COMMISA without a remedy.  In 2007, a Mexican statute (Article 14(VII)) had transferred jurisdiction over government contract suits to a court with a 45-day statute of limitations. SPA-67.  That period expired long before the Collegiate Court's ruling.  Moreover, PEP's subsequent collection of $106 million on the performance bonds made "[t]his lack of remedy … particularly unjust."  *Id*.  "COMMISA has been deemed to owe damages to PEP … simply because PEP issued an administrative rescission," even though the only neutral factfinder—the Tribunal—concluded that PEP is the breaching party.  *Id*.

The District Court held that confirmation of an arbitral award must entail a judgment for the "full amount of the award," not "a diminished amount."  SPA-76.

22

The Preliminary Award "forbade [PEP] from enforcing" the performance bonds unless it prevailed in the arbitration, this admonition was "merged into the final award" as PEP's counsel conceded.  SPA-80.  It is undisputed that the Final Award "did not contemplate any further actions on the bond[s]" because the Tribunal held that PEP breached.  *Id.*  PEP nonetheless collected $106 million from COMMISA on its performance bonds.  Accordingly, the District Court entered judgment for $465 million, representing the amount of the Final Award plus interest, plus the amount of COMMISA's loss on the performance bonds.

## SUMMARY OF ARGUMENT

1.    The District Court properly exercised personal jurisdiction over PEP. PEP repeatedly conceded below that the minimum contacts test is inapplicable because it lacks due process rights.  But even if the issue were not waived, PEP would have sufficient contacts with the United States to satisfy due process in the context of a confirmation proceeding.  And in all events, "minimal contacts are not required for a court to exercise jurisdiction over assets to permit a party to collect on an arbitration award."  *CME Media Enters. B.V. v. Zelezny*, No. 01-1733, 2001 WL 1035138, at *3-4 (S.D.N.Y. Sept. 10, 2001).

2.    Venue was proper in the Southern District.  First, PEP engages in "commercial activity" in the Southern District within the meaning of the FSIA, and is thus "doing business" there for purposes of § 1391(f)(3).  Second, venue is

23

independently proper under § 1391(f)(1), as "a substantial part of property that is the subject of the action is situated" in the Southern District. This is an action to confirm a foreign arbitral award and attach PEP's assets, and PEP's property in the Southern District is the "subject of the action."

3.      The District Court properly confirmed the Final Award.  It is undisputed that district courts have discretion under the Panama Convention to confirm an award that has been nullified by a foreign court judgment that violates "basic notions of justice."  The Collegiate Court here retroactively applied a sweeping no-arbitration rule after arbitration was complete, depriving COMMISA of an alternative remedy.  PEP has, moreover, collected on $106 million in performance bonds based on its now-unreviewable unilateral determination that COMMISA breached by abandoning the project—when PEP forcibly seized the oil platforms for its own benefit.  SPA-67, 94.  The judgment thus upended COMMISA's settled and investment-backed expectations, stripped it of a favorable award for the benefit of the state, deprived it of an opportunity to be heard on the merits of its claims, and turned a $300 million win into a massive windfall for PEP.

The judgment thus completed PEP's bait-and-switch.  PEP induced KBR's foreign investment in Mexico by promising to arbitrate, a directly on-point statute authorized PEP to arbitrate, PEP agreed that the arbitrators could decide jurisdiction, and PEP did not appeal the Preliminary Award's ruling that

jurisdiction was proper.  Only after all that did PEP turn around and belatedly disclaim its own promises.  If PEP had prevailed before the arbitrators, it would have been perfectly content to confirm that award.  But after losing on the merits, PEP procured a nullification order that simultaneously deprived COMMISA of its victory, and foreclosed the opportunity to meaningfully vindicate its claims or contest PEP's seizure of the bonds.  Nothing in the Panama Convention requires U.S. courts to endorse PEP's heads-I-win-tails-you-lose stratagem.  The District Court did not err, much less abuse its discretion, in concluding that this extraordinary result violates basic notions of justice.

4.    The District Court correctly enforced the entire amount of the Award, including a $106 million payment on COMMISA's performance bonds.  The amount of the bonds is "integral to the award itself," as the Award's language makes clear.  Indeed, it would be a grave injustice for PEP to collect $106 million based on an unreviewable unilateral assertion that COMMISA breached, when the only neutral fact finder—the Tribunal—concluded that PEP breached and thus could not collect on the bonds at all.

## STANDARD OF REVIEW

No appellate court has established a standard of review of a district court's decision to confirm an arbitral award after a foreign court judgment has annulled that award, but a district court's exercise of its discretion to decline deference to a

foreign judgment of annulment is most naturally reviewed for abuse of discretion. This Court similarly "review[s] a district court's decision to extend or deny comity to a foreign proceeding for abuse of discretion." *Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir. 1999) (citing *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993)). For the remaining issues here, this Court reviews legal conclusions de novo and findings of fact for clear error. *See* PEP Br. 19.

## ARGUMENT

### I.    The District Court Correctly Exercised Personal Jurisdiction Over PEP.

The District Court correctly exercised personal jurisdiction over PEP. First, PEP expressly conceded that it lacks due process rights, that the minimum contacts test does not apply, and that proper service of process was sufficient to establish personal jurisdiction. Second, even if PEP had not waived the arguments it seeks to raise on appeal, PEP has sufficient contacts with the United States to satisfy due process in a confirmation proceeding. Third, minimum contacts are not even necessary where a party seeks to enforce an arbitral award against property in the jurisdiction.

### A.    PEP Expressly Conceded that It Has No Due Process Rights.

In the District Court, PEP repeatedly denied that it was entitled to any due process protection. PEP's motion to dismiss for lack of personal jurisdiction argued that personal jurisdiction required only valid service of process, and

26

emphasized that proper service is "critical" "[b]ecause foreign states are not persons under the U.S. Constitution for purposes of the typical personal jurisdictional analysis." A-1173 & n.2. In its reply, PEP further emphasized that the "Court's jurisdiction over PEP depends on whether PEP is served properly." A-1963.

PEP reiterated this concession at a July 1, 2010 hearing, expressly conceding that the "minimum contacts" test does not apply:

> The Court: Do you agree with [COMMISA] that there is no minimum contacts test?
>
> [PEP]: Personal jurisdiction is effected by proper service, and our position is there is no proper service. The minimal contacts test has been eliminated by the Second Circuit in this context.

A-2006; *see also* A-2072 ("personal jurisdiction over PEP" follows from proper service). These repeated concessions provide ample reason to reject PEP's argument on appeal. *See, e.g., Adelphia Bus. Solutions, Inc. v. Abnos*, 482 F.3d 602, 607 (2d Cir. 2007); *United States v. Fahey*, 510 F.2d 302, 305 (2d Cir. 1974).

PEP contends that it preserved the minimum contacts argument by raising it belatedly right before the District Court issued its ruling at a second hearing on August 25, 2010. But where a party has not raised an issue in its papers and seeks to raise the issue for the first time at a hearing, the party "must state the issue with sufficient clarity." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009). Where that party earlier expressly conceded the issue, the need for

27

timeliness and clarity is even more pronounced. Here, PEP did not raise its waived minimum contacts argument with clarity, let alone ask Judge Hellerstein for leave to withdraw its earlier concessions. *See Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 594 (2001) ("Wharf's current effort to deny the concession, by pointing to an ambiguous statement in its Court of Appeals reply brief, comes too late and is unconvincing"). This last-minute reversal moments before the judge's ruling was particularly unfair because it deprived COMMISA of the opportunity to show that PEP is Mexico's agent, as PEP insists was required. PEP Br. 23. PEP cannot fault COMMISA for relying on PEP's repeated assurances that this showing was unnecessary, and PEP's avoidance of discovery into its relationship with Mexico should not be laid at COMMISA's door. In these circumstances, overlooking PEP's waiver and concessions would "encourage the practice of 'sandbagging': suggesting or permitting, for strategic reasons, that the trial court pursue a certain course, and later—if the outcome is unfavorable— claiming that the course followed was reversible error." *Freytag v. CIR*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and concurring in judgment).

**B.    PEP Has Sufficient Minimum Contacts.**

Even if PEP had not waived the argument that it has due process rights, the District Court correctly held that exercising personal jurisdiction over PEP is consistent with due process. *See* SPA-29. The "minimum contacts" test requires

that "maintenance of [a] suit … not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014); *see U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001). "[T]he fact that th[is] proceeding [is] for the enforcement of an arbitral award, rather than adjudication on the merits, rightly colors [the] analysis." *Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 178 (3d Cir. 2006). "[T]he desire to have portability of arbitral awards prevalent in the Convention influences the answer as to whether [PEP] 'reasonably anticipate(d) being haled into' a New [York] court." *Id*. at 79 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Here, PEP has purposely availed itself of U.S. law repeatedly, as the District Court recognized:  In conjunction with PEMEX, PEP has raised billions of dollars in New York, SPA-7; PEMEX has made more than 35 SEC filings and has issued at least $23 billion in securities in U.S. dollars, SPA-26; typical offerings list PEMEX and its subsidiaries as the issuer and PEP as a co-registrant and guarantor of the debt, SPA-26; trustees and paying agents in this country handle all monies related to these securities, A-1234–36; and PEP has appointed an agent for service of process and has submitted to jurisdiction in New York for actions based on these

securities, SPA-26.[2] *See Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda. v. Republic of Peru*, 655 F. Supp. 2d 361, 373–74 (S.D.N.Y. 2009), *rev'd on other grounds by* 665 F.3d 384 (2d Cir. 2011) (concluding in virtually identical circumstances that the defendant had "'regularly and significantly availed itself of the privileges of United States banking and financial laws'").

PEP also would have clearly foreseen that confirmation proceedings would occur in the United States.  PEP entered into a contract with a subsidiary of KBR, a major U.S. corporation; PEP knew KBR would design and build the key offshore platforms in the United States; PEP agreed to definitively settle all disputes through arbitration; because PEP is a Mexican state entity, its assets are immune from attachment in Mexico; Mexico is a signatory to the Panama Convention, which provides for confirmation of arbitral awards—including in the United States; and PEP has property in the United States that could be used to satisfy the Final Award.  *See* A-1344–45; A-1369–70.

The due process analysis also considers the "interests of the forum State" and the "interest in obtaining the most efficient resolution of controversies."  *Asahi*

---

[2] PEP asserts that the District Court clearly erred in identifying still other contacts with the New York financial markets relating to a master trust.  But the District Court stated that PEP "guarantee[d] billions of dollars in payments to a 'master trust,' a financing vehicle used by PEMEX, PEP and other subsidiaries, to raise funds in New York," and that is exactly what the evidence showed.  A-1236; *see* A-1539–40; *see also* A-1513; A-1542; A-1532.

*Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987). Here, both weigh in favor of jurisdiction. First, there is an "emphatic federal policy in favor of arbitral dispute resolution," which "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). Second, confirmation actions are "summary proceeding[s]," *Zeiler*, 500 F.3d at 169, designed to "'settle[] disputes efficiently and avoid[] long and expensive litigation.'" *Encyc. Universalis*, 403 F.3d at 90 (quoting *Yusuf*, 126 F.3d at 23). There is thus a strong federal interest in favor of jurisdiction, and the burden on the defendant is relatively minor.[3]

Conversely, a dismissal for lack of jurisdiction would seriously undermine the utility and efficiency of international arbitration. Award creditors would be unable to confirm arbitral awards in the United States unless (1) the award debtor is so "at home" in the United States it is subject to *any* full-blown lawsuit; or (2) the underlying dispute arose out of U.S. contacts. But in international arbitrations, typically one or more of the parties is *not* at home in the United States and the dispute arises abroad. The Panama Convention was enacted specifically to facilitate enforcement of international arbitral awards in the United States and to eliminate jurisdictional hurdles that existed under the pre-Convention regime. This

---

[3] The case PEP cites is therefore inapposite, as it addresses minimum contacts in the context of a full-blown adjudication on the merits. *See* PEP Br. 26 (citing *Consol. Dev. Corp. v. Sherritt*, *Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000)).

Court should not erect new barriers to enforcement that Congress did not contemplate, particularly given PEP's extensive contacts with New York. Quite simply, exercising jurisdiction to enforce the Award is perfectly consistent with traditional notions of fair play and substantial justice.

### C.    Minimum Contacts Are Unnecessary Because Jurisdiction Exists Over PEP's Property.

In any event, minimum contacts are not necessary to sustain the District Court's jurisdiction. "'[I]n the absence of minimum contacts, quasi in rem jurisdiction may be exercised to attach property to collect a debt.'" *Frontera Res. Azer. Corp. v. State Oil Co. of Azer.*, 582 F.3d 393, 396 (2d Cir. 2009). A court may have quasi in rem jurisdiction to "attach property to collect a debt based on a claim already adjudicated in a forum where there was personal jurisdiction over the defendant," and "minimal contacts are not required for a court to exercise jurisdiction over assets to permit a party to collect on an arbitration award." *CME Media*, 2001 WL 1035138, at *3-4 (citing *Shaffer v. Heitner*, 433 U.S. 186, 210 & n.36 (1977)); *see also Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1127 (9th Cir. 2002).

Here, "[m]inimum contacts are not required because an arbitration panel with personal jurisdiction over [PEP] has already adjudicated [COMMISA's] claims against [PEP] and determined that [PEP] is a debtor of [COMMISA]." *CME Media*, 2001 WL 1035138, at *3. There is no dispute that PEP has identified

32

assets within the jurisdiction that are sufficient to satisfy the judgment in this case. *See id*. at \*4; *Glencore*, 284 F.3d at 1127 (foreign arbitral award may be enforced against award debtor's "property in the forum even if that property has no relationship to the underlying controversy between the parties"); Int'l Commercial Disputes Comm. of the Assoc. of the Bar of the City of N.Y., *Lack of Jurisdiction and Forum Non Conveniens as Defenses to the Enforcement of Foreign Arbitral Awards*, 12 Am. Rev. Int'l Arb. 407, 410 (2004) (same).  Accordingly, even if PEP lacked sufficient minimum contacts with the United States for purposes of an ordinary lawsuit, PEP was correct that the District Court nonetheless had jurisdiction to hear this case.

## II.    Venue In The District Court Was Proper

The District Court also correctly concluded that venue was proper because PEP is "doing business" in the Southern District by engaging in commercial activity there.  *See* 28 U.S.C. § 1391(f)(3).  This Court also could affirm because venue is independently proper under § 1391(f)(1), as PEP's property in the Southern District is "the subject of the action" to confirm the Award.

### A.    PEP Engages in "Commercial Activity" and Is Thus "Doing Business" in the Southern District.

The FSIA added to the general venue statute a new subsection, 28 U.S.C. § 1391(f), that prescribes venue in FSIA suits.  Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (1976).  Pursuant to § 1391(f)(3), venue

is proper in any judicial district in which the foreign agency or instrumentality "is licensed to do business or is doing business."

The only court of appeals to consider "doing business" within the meaning of § 1391(f)(3) has held that it is satisfied if the defendant is engaged in "'commercial activity'" there, as the FSIA defines that term. *Altmann v. Republic of Austria*, 317 F.3d 954, 972 (9th Cir. 2002), *amended by* 327 F.3d 1246 (2003), *aff'd*, 541 U.S. 677 (2004). The court in *Altmann* "f[ound] no authority that suggests that a foreign agency or instrumentality that engages in 'commercial activity' within a district is not also 'doing business' within a district." *Id.* "The statutory scheme of the FSIA suggests that these terms, if not interchangeable, are at least substantially similar in meaning." *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1215 (C.D. Cal. 2001). PEP does not dispute that it is engaged in commercial activity within the meaning of the FSIA. *See, e.g., Weltover, Inc. v. Republic of Arg.*, 941 F.2d 145, 151 (2d Cir. 1991), *aff'd*, 504 U.S. 607 (1992) ("[I]ssuing … debt is a commercial activity").

PEP contends that "doing business" was a term of art with "settled" and much narrower meaning when Congress enacted § 1391(f)(3). PEP Br. 29. Far from it. The phrase "doing business" had proven "difficult to construe," provoking at least a three-way circuit split. *See* 14D Wright & Miller, *Federal Practice & Procedure* § 3811 (3d ed. 2010) (discussing the "varying views on the amount of

34

business required"). These "major ambiguities … remained unresolved for decades," before and after Congress enacted § 1391(f)(3). *Id*. PEP's "settled meaning" argument therefore fails, as "there were divergent views on th[e] issue in American courts." *Moskal v. United States*, 498 U.S. 103, 115 (1990).

PEP advocates for the most restrictive of the three interpretations, but its arguments are meritless. PEP relies on outdated and inapposite cases construing "doing business" in the context of personal jurisdiction *before* the watershed case of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), notwithstanding PEP's recognition elsewhere that venue and personal jurisdiction analyses are different. *See* PEP Br. 27. PEP also cites district court cases narrowly construing § 1391(c), which governs venue in *non*-FSIA cases, and New York State cases interpreting the Civil Practice Law. But these decisions do not come close to demonstrating that "doing business" had an established meaning in federal court.

Moreover, Congress could not have intended the narrow meaning PEP advocates because it would create a "venue gap." In the FSIA, Congress granted jurisdiction over the instrumentalities of foreign states, including in cases involving the confirmation of arbitration awards and cases arising out of the instrumentality's foreign commercial activities that cause direct effects in the United States. *See* 28 U.S.C. § 1605(a)(2), (a)(6). But, as PEP has conceded, *see* PEP Reply Br. 11 (No. 10-4656), under its interpretation of "doing business," *no* district would be a

proper venue for such claims unless the foreign instrumentality also happens to be engaged in extensive local business in a particular U.S. district—a highly unlikely scenario.

"Congress does not in general intend to create venue gaps, which take away with one hand what Congress has given by way of jurisdictional grant with the other"—particularly when the very same statute contains both the jurisdictional grant and the venue provision. *Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706, 710 n.8 (1972). As the Supreme Court put it when rejecting a similar argument that would have made venue a barrier to confirming arbitral awards under the FAA, "anomalies like that are to be avoided when they can be." *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 201–03 (2000). PEP argues that defendants have countervailing interests in participating in New York's capital markets and defending in a convenient district. *See* PEP Br. 31. But PEP's reading would prevent many FSIA cases from proceeding in *any* district. And creating a venue gap in the FSIA would be particularly inappropriate, as the FSIA's basic purpose is to "open[] the courthouse doors to those aggrieved by the commercial acts of a foreign sovereign." *Weltover*, 941 F.2d at 151.

## B. Venue Was Proper Under § 1391(f)(1)

This Court could also affirm on the alternative ground that venue was proper under § 1391(f)(1), which allows venue in a district where "a substantial part of

36

property that is the subject of the action is situated." This is an action to enforce an arbitral award against PEP's property in the Southern District. That property is thus the "subject of the action."

The District Court disagreed, holding that the "subject of the action" was determined by reference to the underlying dispute, which arose in Mexico. A-1237–38; A-2495–96. But COMMISA sought to confirm the award in the Southern District for one reason only: to collect on PEP's assets in the Southern District. A-2164–65. Indeed, if COMMISA only sought attachment in the Southern District, venue under § 1391(f)(1) would be obvious. There is no good reason to deny COMMISA venue under § 1391(f)(1) simply because it sought confirmation *and* attachment.

## III.  The District Court Properly Confirmed The Arbitral Award.

### A.  Foreign Judgments of Annulment Do Not Merit Deference When They Violate U.S. Public Policy.

It is undisputed that a foreign judgment that annuls an arbitral award does not command a federal court's deference when the judgment violates U.S. public policy. *See* PEP Br. 35–36. Every circuit to consider the issue, including this one, has so recognized. *Baker Marine*, 191 F.3d at 197 & n.3; *TermoRio*, 487 F.3d at 935, 941; *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 369–70 (5th Cir. 2003). As PEP concedes, *see* PEP Br. 35–36, and as the District Court correctly concluded, *see* SPA-62, a

37

judgment of annulment is "'unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'" *TermoRio*, 487 F.3d at 938 (quoting *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir.1986)); *id.* at 939 (inquiring whether judgment "violated any basic notions of justice to which we subscribe").

The *TermoRio* standard the District Court applied below is consistent with the text and purpose of the Panama Convention, principles of comity, and case law. The Convention states that "recognition and execution" of a foreign arbitral award "*may* be refused" if it "has been annulled" in the primary jurisdiction. Panama Convention art. 5(e) (emphasis added). The permissive "may" (rather than the imperative "shall") indicates that an annulment makes refusal of enforcement discretionary, not mandatory. *See* ICC, Enforcement of Int'l Arbitral Awards: Report and Preliminary Draft Convention, at 13, U.N. Doc. E/C.2/373 (March 13, 1953) (changing "shall" to "may").

This discretion to confirm annulled awards comports with the Panama Convention's purpose to "encourage the recognition and enforcement of commercial arbitration agreements." *Scherk*, 417 U.S. at 520 n.15. The Convention eliminated the veto power local courts previously enjoyed under "double exequatur," and limited the discretion of secondary courts to refuse confirmation. The Convention "clearly shifted the burden of proof to the party"

38

opposing enforcement.  *Parsons*, 508 F.2d at 973.  "The burden is a heavy one, as 'the showing required to avoid summary confirmance is high.'"  *Encyc. Universalis*, 403 F.3d at 90 (quoting *Yusuf*, 126 F.3d at 23); *see also Zeiler*, 500 F.3d at 164.  The Convention thus encourages (and often mandates) the *enforcement* of foreign arbitral awards—but it never categorically prohibits enforcement of any award.  Further underscoring that enforcement does not hinge upon local court action, district courts have "broad discretion" to move forward with confirmation even when annulment proceedings are pending in local courts. *Europcar Italia, S.p.A v. Maiellano Tours, Inc.*, 156 F.3d 310, 316 (2d Cir. 1998); *see* Panama Convention art. 6.

The *TermoRio* standard is also consistent with principles of comity and this Court's precedent.  As a general rule, a district court may decline to recognize a foreign judgment that is "'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'"  *Ackermann*, 788 F.2d at 841; *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (same); *Finanz,* 192 F.3d at 246 ("we will afford comity … only if those proceedings do not violate the laws or public policy of the United States"); *Victrix S.S. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987) (same); Restatement (Second) of Conflict of Laws § 117 cmt. c (1971).  Given the Convention's pro-enforcement purpose, it would be

anomalous to give *more* deference to a foreign judgment annulling an arbitral award than comity requires for other foreign judgments.

In *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, this Court addressed the circumstances in which the primary jurisdiction may annul an award under its domestic law.  126 F.3d at 23.  Although this Court did not address the extent to which courts in secondary jurisdictions must defer to such rulings, this Court emphasized that courts in secondary jurisdictions have limited discretion to refuse to confirm an arbitral award.  *Id*. at 20, 23.  And in *Baker Marine*, this Court acknowledged that a court may decline to recognize a judgment of annulment that conflicts with U.S. public policy.  191 F.3d at 197 & n.3.

Foreign courts applying the Panama and New York Conventions have confirmed awards post-annulment on numerous occasions.  *See, e.g., Directorate General of Civil Aviation of the Emirate of Dubai v. Int'l Bechtel Co.*, Cour d'appel [Court of Appeal] Paris, 29 Sept. 2005, 31 Y.B. Comm. Arb. 629 (Kluwer Law Int'l 2006); *Yukos Capital s.a.r.l. v. OAO Rosneft*, Gerechtshof [Court of Appeal] Amsterdam, 28 Apr. 2009, 34 Y.B. Comm. Arb. 703 (Kluwer Law Int'l 2009); *see also* 23 ICC, Supp. ICC Publication 733-BUL *ICC Guide to National Procedures for Recognition and Enforcement of Awards under the New York Convention* 20 (2012) (identifying at least twelve other foreign jurisdictions where confirmation after annulment is likely).  This "postratification conduct of the contracting parties

displays the same understanding" of courts' authority to confirm annulled awards that the District Court (and the *Baker Marine* and *TermoRio* courts) displayed, and thereby supports its holding. *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 227 (1996).

PEP contends that the District Court applied a more "flexib[le]" standard derived from *Chromalloy Aeroservices v. Arab Republic of Egypt*, 939 F. Supp. 907 (D.D.C. 1996). Not so. The District Court applied the *TermoRio* standard, inquiring whether, "*under the standard announced in TermoRio*, the decision vacating the Award violated 'basic notions of justice.'" SPA-62 (emphasis added); *see* SPA-39 ("decision violated basic notions of justice"); SPA-68 (same); *see also Thai-Lao Lignite (Thai.) Co. v. Gov't of Lao People's Democratic Republic*, No. 10-5256, 2014 WL 476239, at *7 (S.D.N.Y. Feb. 6, 2014) ("*Applying the TermoRio standard*, Judge Hellerstein declined to defer...." (emphasis added)). PEP criticizes the District Court for citing *Chromalloy*, but PEP concedes that one of *Chromalloy*'s two holdings remains good law. *See* PEP Br. 36 n.8. The District Court merely acknowledged this. "The broad holding of *Chromalloy* has been criticized," but "*Chromalloy* remains alive, for both *Baker Marine* and *TermoRio* recognized that a District Court should hesitate to defer to a judgment of nullification that conflicts with fundamental notions of fairness." SPA-61. The

District Court thus credited *Chromalloy* to the same extent *TermoRio* and *Baker Marine* did.

### B.    The Judgment of Annulment Violated U.S. Public Policy.

The District Court properly refused to defer to the Collegiate Court's judgment, which produced a result that is manifestly contrary to basic notions of justice. The Collegiate Court retroactively applied a sweeping no-arbitration rule to enable PEP to renege on its promise to arbitrate that was clearly valid when made and to undo COMMISA's hard-fought arbitral win. The net result was to violate COMMISA's settled and investment-backed expectations made in reliance on PEP's promise, favor the state to the detriment of a private party, deny COMMISA an opportunity to be heard on the merits, and enable PEP to transform a $300 million win for COMMISA into a $106 million win for PEP.

1.  The District Court correctly found that the Collegiate Court invalidated the arbitration by "apply[ing] a law that was not in existence at the time the parties' contract was formed." SPA-39. At the time of contracting there was nothing—no statute, case, or other source of authority—that was "sufficient to put COMMISA on notice that the statute that specifically empowered PEP to arbitrate and the arbitration clauses PEP had agreed to should have been ignored." SPA-65. To the contrary, PEP induced COMMISA to invest in Mexico by twice agreeing to "broadly worded and mandatory" arbitration clauses, and there is no dispute that

42

COMMISA's claims fall within the terms of the parties' arbitration agreements. SPA-63. Indeed, PEP recognized the importance of arbitration to foreign investors by offering to arbitrate even before requesting bids. COMMISA also justifiably relied upon and reasonably believed PEP's promise that it could arbitrate such claims: Its enabling statute "specifically authorized it to resolve commercial disputes by arbitration." *Id*. Mexico had enacted that law to comply with NAFTA, whereby Mexico itself "agreed that it could be subject to arbitration in cases just like thi[s] one." *Id*.

COMMISA still "had every reason to believe that its dispute with PEP could be arbitrated" well after arbitration began. *Id*.; *see* SPA-68. "PEP's own conduct showed that it considered itself subject to arbitration." SPA-63. PEP "expressly" conceded in the arbitration that its *finiquito*—its demand for damages in connection with the rescission—was arbitrable. FA 17, 46 (A-151, 180); A-2197; A-1274–75. PEP stated that "COMMISA is entitled to challenge the *finiquito* ... through an Arbitration Proceeding, thus safeguarding its rights." A-2197. PEP reaffirmed the point at a later hearing. A-1314; FA 46 (A-180). PEP had also arbitrated other cases involving rescissions; no case had ever set aside an arbitral award because a contract had been rescinded; and no law precluded arbitration where rescissions had occurred.

Notably, PEP did not argue that the rescission categorically precluded arbitration. Quite the opposite: PEP raised only narrow challenges to jurisdiction based on *res judicata* grounds, PEP filed its own counterclaims, and PEP agreed that the Tribunal could determine its own jurisdiction. SPA-45; A-3300–04.[4] "Even after the Mexican Supreme Court issued its June 23, 2006 ruling that the administrative rescission statutes were valid and constitutional, PEP's arguments against arbitration were based on the principle of *res judicata*, not public policy." SPA-64. And after the Preliminary Award unanimously found jurisdiction, PEP did not appeal. *Supra* at 12. Indeed, when PEP moved for reconsideration of the Preliminary Award, it *still* did not argue that the rescission barred arbitration. PEP did not raise the argument that the rescission was an "'act of authority'" and therefore non-arbitrable until after almost three years of arbitration. SPA-45, 64. PEP's own expert witness "expressed doubts about the strength of the public policy argument" at the time, noting that "'its success has been virtually zero.'" SPA-64 n.23. PEP also never asked any court to stop the arbitration. A-2714–15 ("THE COURT: You did not try to stop it[?] [PEP's COUNSEL]: No.").

The District Court also properly found that there was no "source of law that supported [PEP's] argument that the parties' dispute was not arbitrable" until May

---

[4] PEP did the same thing in a different matter involving an administrative recession, submitting itself to arbitration and not contesting the arbitral panel's jurisdiction over rescissions. A-2974.

44

28, 2009—nearly 12 years after PEP agreed to arbitrate and after PEP arbitrated for more than 4 years. SPA-64. On that date, Section 98 came into effect, establishing that challenges to administrative rescissions could not be arbitrated. *Id*. The Collegiate Court "relied heavily on Section 98 in its decision to strike down the arbitration award in favor of COMMISA." *Id*. The Collegiate Court observed that, in enacting Section 98, the Mexican Government had determined that "'it was a mistake to decide to exclusively leave to the force of the market the task of making economic decisions.'" SPA-50. Accordingly, the Collegiate Court found it would be contrary to public policy to permit PEP "to be subject to a dispute resolution procedure governed by private parties." SPA-64. The District Court correctly concluded that the Collegiate Court applied Section 98 retroactively, because its decision "was at odds with PEP's own agreement, the PEMEX enabling statute, and the law of Mexico at the time of contracting and the commencement of arbitration." SPA-68.

The Collegiate Court's no-arbitration rule was particularly disruptive of COMMISA's investment-backed expectations and reliance interests because of its vast scope. SPA-65. The Collegiate Court's rule did not just bar arbitration of whether the rescission itself breached the contract,[5] but also barred arbitration of

---

[5] COMMISA never asked the Tribunal to set aside the rescission or to reinstate the contract. COMMISA only sought breach-of-contract damages.

any *pre*-rescission breaches.  The sweeping new rule thus barred arbitration of *all* the breaches the Tribunal found, "work[ing] a severe, permanent, and immediate change in [the parties' contractual] relationships—irrevocably and retroactively." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978).

2.   The District Court also correctly found that barring arbitration "left COMMISA without a remedy to litigate the merits of the dispute that the arbitrators had resolved in COMMISA's favor."   SPA-66.   "[B]y the time the Eleventh Collegiate Court issued its opinion," COMMISA could no longer sue in the ordinary District Courts for Administrative Matters.  SPA-67.  In 2010, the Supreme Court of Mexico interpreted a new law, Article 14(VII), to establish *exclusive* jurisdiction over such disputes in the Tax and Administrative Court. SPA-46, 67.   "The necessary implication is that the District Courts for Administrative Matters, in which a 10-year statute of limitations applies, are not available to hear disputes like this one."  SPA-67.  But review in the Tax and Administrative Court was equally unavailable, because that court's 45-day statute of limitations had long since expired.

COMMISA's lack of a remedy is not merely hypothetical.  "COMMISA tested this issue, filing suit in the Tax and Administrative Court on November 6, 2012, arguing that the 10-year statute of limitations should apply."   *Id*. "COMMISA's argument was rejected and the case was dismissed barely a month

46

after its filing," because, among other things, the suit was barred by the 45-day limitations period. *Id*. COMMISA has thus suffered the unfairness of losing a favorable arbitration award; the greater unfairness of losing the benefit of the arbitral agreement and being forced to litigate in the foreign courts that it demanded arbitration in order to avoid; and the still greater unfairness of losing the arbitral award, the arbitral forum and the ability to vindicate its claims elsewhere.

The performance bonds make matters worse. After years of reviewing a full factual record, the Tribunal found that PEP—not COMMISA—had breached and awarded COMMISA $300 million in damages. But because the Collegiate Court annulled the Tribunal's ruling and eliminated COMMISA's opportunity for review elsewhere, PEP collected on $106 million in performance bonds. COMMISA has "been deemed to owe damages *to PEP* … simply because PEP issued an administrative rescission." *Id*. Instead of PEP owing COMMISA $300 million for PEP's repeated breaches as determined by the arbitrators, COMMISA has been forced to pay PEP $106 million based on PEP's unreviewable determination that COMMISA breached by abandoning the project—when PEP seized the platforms and prevented COMMISA from finishing the job. This is "particularly unjust." *Id*.

3. The District Court thus did not abuse its discretion in concluding that the Collegiate Court's decision "violated basic notions of justice in that it applied a law that was not in existence at the time the parties' contract was formed and left

COMMISA without an apparent ability to litigate its claims." SPA-39. "Retroactivity is generally disfavored in the law, in accordance with fundamental notions of justice that have been recognized throughout history." *E. Enters. v. Apfel*, 524 U.S. 498, 532 (1998); *see id*. at 547 (Kennedy, J., concurring in the judgment and dissenting in part) ("for centuries our law has harbored a singular distrust of retroactive statutes"); *INS v. St. Cyr*, 533 U.S. 289, 315 (2001) ("Retroactive statutes raise special concerns."). This principle is "deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic"—indeed "'as ancient as the law itself.'" *Landgraf*, 511 U.S. at 265 & n.17. It is enshrined in the Ex post facto Clause, prohibiting retroactive application of penal legislation; Takings Clause, providing a "safeguard against retrospective legislation concerning property rights," *E. Enters.*, 524 U.S. at 533–34; Contracts Clause, "prohibit[ing] States from passing another type of retroactive legislation, laws 'impairing the Obligation of Contracts'"; and Due Process Clause, "protect[ing] the interests in fair notice and repose that may be compromised by retroactive legislation," *Landgraf*, 511 U.S. at 266.

When contractual rights are at issue, "predictability and stability are of prime importance." *Landgraf*, 511 U.S. at 271; *see also E. Enters.*, 524 U.S. at 528–29; *see id*. at 549 (Kennedy, J., concurring in the judgment and dissenting in part). "Contracts enable individuals to order their personal and business affairs

according to their particular needs and interests." *Allied Structural Steel*, 438 U.S. at 245. COMMISA was "entitled to rely" on PEP's promises, which were backed by Mexican law and PEP's own concessions and conduct in the arbitration itself. If PEP chose to use its extraordinary power to rescind the contract, COMMISA could arbitrate any pre-rescission breaches as well as PEP's demand for damages in connection with rescission—and indeed PEP did not raise its sweeping no-arbitration argument until after several years of arbitration. *Id*. There is little doubt that if PEP had prevailed in the arbitration it would have been all too happy to see such an award confirmed. But having lost, it procured a nullification based on retroactive applications of laws and limitations on judicial review that did not exist at the time of contracting. Such a heads-I-win-tails-you-lose proposition is clearly inconsistent with basic notions of justice.

To induce COMMISA's investment, PEP promised, pursuant to NAFTA and its enabling statute, to arbitrate. It is well-settled that deprivation of reasonable investment-backed expectations gives rise to grave public policy concerns. *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978). Making matters worse, the abrogation of PEP's promise to arbitrate favored the state over a private party. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25–26 (1977) (contracts clause scrutiny heightened when the "State's self-interest is at stake").

49

The elimination of a meaningful opportunity for COMMISA to be heard exacerbates the public policy violation. There is a fundamental need for an "opportunity to be heard in a meaningful time and in a meaningful manner." *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992). Courts have found violations of public policy where judgments strip defendants of the right to produce evidence in their favor and rebut the plaintiff's claims. *See, e.g., Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1346 (S.D. Fla. 2009).

The deprivation here is more complete, as the ruling deprives COMMISA of any meaningful opportunity to be heard at all. Indeed, when COMMISA tested the issue, the Tax and Administrative Court held that the suit was barred by the 45-day statute of limitations. SPA-67. Courts have repeatedly declined to defer to foreign judgments where the defendant was similarly deprived of a meaningful opportunity to be heard. *E.g., Choi v. Kim*, 50 F.3d 244, 249–50 (3d Cir. 1995); *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 593–96 (5th Cir. 2003). The District Court properly reached the same result here. Once again, such a bait-and-switch denying COMMISA the guarantee of a neutral forum that was necessary for COMMISA's investment in the first place—and indeed depriving COMMISA of a remedy at all—violates basic norms of justice. *See Reich v. Collins*, 513 U.S. 106, 108, 111 (1994) (State may not "bait and

switch" by "hold[ing] out what plainly appears to be a clear and certain postdeprivation remedy and then declare … that no such remedy exists").

Finally, the elimination of a meaningful opportunity for review allowed PEP to collect $106 million on the performance bonds based on its own unilateral assertion that COMMISA breached.  This violates the longstanding principle that "[n]o man is allowed to be a judge in his own cause."  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting The Federalist No. 10, at 59 (James Madison) (Jacob E. Cooke ed., 1961)).  The confluence of all these factors is extraordinary.[6]  The District Court acted well within its authority in concluding that the Collegiate Court's judgment violates basic notions of justice.

### C.    PEP's Counterarguments Are Meritless.

#### 1.    The Collegiate Court Retroactively Deprived COMMISA of a Remedy.

PEP argues that the Collegiate Court's ruling was not retroactive, contending that a 1994 Mexican Supreme Court decision supplied "a key premise" for the

---

[6] The Collegiate Court also never explained how PEP could bring an *amparo* to annul the Final Award on the theory that by rescinding it made itself "superior," as a governmental actor, to COMMISA. A-3754.  An *amparo* permits a private party to challenge the constitutionality of government action, and a state enterprise can seek *amparo* relief only when acting in its private capacity. A-2285–86, 2294; A-3000–01.  The Collegiate Court thus simultaneously treated PEP as both a private party (so it could file an *amparo* to challenge the dismissal of its nullity action), and a governmental actor (so it could use its unilateral rescission to escape its arbitration agreements).

decision.  The District Court correctly disagreed.  "Based on the Eleventh Collegiate Court's extensive discussion of Section 98, it was this law, not the 1994 Mexican Supreme Court decision that was critical to its decision."  SPA-65. "[T]he 1994 decision did not mention arbitration, and its relevance to this case was so marginal that PEP failed to cite it during the initial years of the parties' litigation."  SPA-64–65.[7]  The 1994 decision had merely described administrative rescissions as "'acts of authority.'"  SPA-50.  Even PEP's own witness testified that this was a "weak" premise for the Collegiate Court's decision and that there were cases holding that rescissions are not acts of authority.  *See* A-3072–73.  He conceded that private parties could nonetheless contract with the government to arbitrate contract disputes related to administrative rescissions.  *See* A-3040–41, 3050–55.  And even if the 1994 decision supplied a premise for finding rescissions themselves non-arbitrable, neither PEP nor the Collegiate Court identified any precedent supporting the sweeping rule that a unilateral rescission can render pre-rescission breaches non-arbitrable as well.

PEP maintains that the District Court erred in holding that COMMISA had no remaining remedy.  PEP Br. 48–49.  Notably, PEP never states that COMMISA actually has a remedy; it only states that it is an "open question."  *Id*. at 48.  Again,

---

[7] The District Court did not accord less weight to the 1994 opinion because it was in extract form.  The Court merely noted that only the summary, not the whole opinion, was available for review.  *See* SPA-65.

the District Court properly rejected PEP's argument.  Whether COMMISA could still obtain relief on the merits depends on Article 14(VII), "the 2007 law conferring jurisdiction to the Tax and Administrative Court to hear disputes about administrative rescissions"—thereby subjecting COMMISA to a 45-day statute of limitations.  SPA-52.  PEP contends that the District Court should have deferred to the Collegiate Court's suggestions that there might be an alternative remedy, but the "Collegiate Court did not mention Article 14(VII) … nor did the court discuss the March 2010 decision of the Mexican Supreme Court which held that the Tax and Administrative Court was the exclusive forum to hear such disputes."  *Id*.

PEP suggests that whether Article 14(VII) applies turns on competing translations of its text.  But the District Court properly considered the parties' testimony respecting whether Article 14(VII) would apply.  SPA-67 n.24.  PEP's expert contended—with remarkable irony—that Article 14(VII) would not apply because the Mexican constitution forbids the retroactive application of laws.  But the District Court found "more convincing" COMMISA's expert's testimony that Article 14(VII) "could be applied to actions filed before the statute's enactment because it is considered a procedural law," which ordinarily "*are* applied retroactively."  SPA-67 n.24 (emphasis added).  The Tax and Administrative Court's dismissal of COMMISA's suit on timeliness and *res judicata* grounds

53

reinforced the District Court's finding.[8]  SPA-30.  And even if COMMISA could

overcome these hurdles and obtain merits review, that process "would add undue

and unreasonable delay to a case that has already lasted almost 10 years."  SPA-67

n.24.  A remote sliver of possibility of getting bogged down in yet more Mexican

litigation does not amount to a "meaningful" opportunity for review—particularly

when the whole point of international arbitration is to avoid protracted litigation

against a state enterprise on its home turf.

### 2.    The District Court Properly Evaluated Whether the Mexican Judgment Violated U.S. Public Policy.

PEP suggests that the District Court "exceeded its authority" by inquiring

whether the Collegiate Court was wrong about Mexican law.  But the District

Court repeatedly and expressly disclaimed such an inquiry.  *E.g.*, SPA-68 ("In

declining to defer to the Eleventh Collegiate Court, I am neither deciding, nor

reviewing, Mexican law."); A-3162–63 ("[My] decision will not be based on

whether I agree or disagree with this or that detail of the 11th Collegiate Court

decision."); A-2373 ("I can't rethink what the Mexican court did.").  Instead, the

District Court's review was limited to determining the meaning and effect of the

---

[8] The *res judicata* ruling further confirms that COMMISA has no remedy.  It is undisputed that no Mexican court has reviewed the merits of whether PEP breached before the rescission.  The *res judicata* ruling thus means that there are now not one but two threshold barriers to COMMISA ever obtaining review of this question in Mexican court—and the Tribunal resolved this question in COMMISA's favor to the tune of $300 million.

decision, in light of fundamental principles of U.S. law, consistent with the Second Circuit's remand. *See* A-2708 (District Court noting that "comity doesn't require me to go into all of the issues of the case and to relitigate the case"). This limited review is typical when courts determine whether to grant or deny comity. *E.g., Victrix*, 825 F.2d at 714 ("scrutiniz[ing]" foreign law and judgment); *Diorinou v. Mezitis*, 237 F.3d 133, 143 (2d Cir. 2001) (conducting a close "case-specific" review of foreign judgment and the "subsidiary determinations that underlie the holding").

PEP argues that because the Collegiate Court *said* it was not applying Section 98 retroactively, the District Court necessarily concluded that the decision was wrong as a matter of Mexican law. But that rationale would foreclose review of every foreign judgment that includes a disclaimer that it does not rest on an impermissible basis, even when that is the actual basis for the decision. In any event, whether the decision was impermissibly retroactive under *Mexican law* is irrelevant. The District Court's conclusion properly depended on whether the Collegiate Court's nullification judgment effectuated a bait-and-switch that COMMISA could not foresee and that deprived COMMISA of a remedy in ways it could not reasonably anticipate. That is what gives the order retroactive effects that *violate U.S. public policy*. The precise reasoning of the Collegiate Court as to

55

whether its decision gave the 2009 statute retroactive effect for purposes of Mexican law is beside the point.

### 3. The Judgment of Annulment Indeed Violates U.S. Public Policy.

Only after COMMISA invested hundreds of millions of dollars in Mexico in reliance on PEP's statutorily-backed promises to arbitrate, after COMMISA performed on the contract for years, after COMMISA fought for years in arbitration to win a $300 million Final Award, and after the District Court confirmed the Award the first time, the Collegiate Court declared a new rule that PEP could escape its promises to arbitrate by rescinding its contracts unilaterally. Adding insult to injury, PEP collected $106 million based on its unreviewable assertion that COMMISA breached—notwithstanding the Tribunal's conclusion that PEP breached and owed COMMISA $300 million. If the arbitration had come out the other way, PEP would have been in a position to enjoy the fruits of its arbitral victory. That heads-I-win, tails-you-lose result plainly violates U.S. public policy.

PEP argues that the no-arbitration rule here—allowing PEP's bait-and-switch that stripped COMMISA of a favorable arbitral award and instead saddled it with a $106 million loss while denying COMMISA an opportunity to be heard—is insufficient to deny deference under the *TermoRio* standard. PEP is wrong. PEP suggests that the District Court quoted *Landgraf* to establish the "Mexican court's

failure to apply an American rule of statutory interpretation." PEP Br. 45. But the District Court did not find a violation of a mere canon of statutory interpretation— it found a gross violation of a basic norm of American justice that is reflected in *Landgraf* but that is more fundamental and is as "'ancient as the law itself.'" *Landgraf*, 511 U.S. at 265 n.17; *see supra* Part III.B.

The application of Section 98 here also clearly affects substantive rights. As PEP notes, "application of a new jurisdictional rule *usually* 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" *Landgraf*, 511 U.S. at 274 (emphasis added). But "[a] jurisdictional rule can deny a litigant a forum for his claim entirely, or may leave him with an alternate forum that will deny relief for some collateral reason (*e.g.*, a statute of limitations bar)." *Id.* at 292–93 (Scalia, J., concurring in the judgment). That is precisely what happened here, where the no-arbitration rule was declared only after the Tax and Administrative Court's 45-day limitations period had expired. The no-arbitration rule thus does not "merely allocate jurisdiction among forums;" it denies substantive rights by nullifying COMMISA's favorable award and depriving COMMISA of an alternative forum to be heard. *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 951 (1997).

PEP maintains that the District Court found the rescission *itself* repugnant to U.S. public policy as it allows "public entities [to] abrogate contracts for reasons

unavailable to private parties." PEP Br. 53. Not so. The District Court took issue with the *effects* of the novel no-arbitration rule, which benefitted the state over a private party by allowing PEP to retroactively disclaim its promise to arbitrate, leaving COMMISA with no remedy and $106 million in the hole.

PEP argues that COMMISA should have sued in the Mexican district courts before the Mexican Supreme Court construed Article 14(VII) to strip them of jurisdiction in 2010. But COMMISA had no reason to know that the Tribunal lacked jurisdiction until the Collegiate Court applied Section 98 retroactively in 2011. Indeed, PEP did not appeal the Preliminary Award's finding of arbitrability, and the Tribunal and two Mexican courts held that Section 98 only applied prospectively. *Supra* at 12, 16.[9] PEP suggests that the Mexican Supreme Court's 2006 decision should have put COMMISA on notice. But that decision only mentioned that relief was available in the Mexican district courts; it did not indicate that relief was unavailable in arbitration. Indeed, PEP waited *more than a year* thereafter before arguing that this dispute could not be arbitrated because of its rescission.

---

[9] *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723 (2011), is inapposite. In that case, an Indian tribe was barred from seeking monetary relief in one forum while a claim for equitable relief was pending in another based upon the same operative facts. Unlike the Indian tribe, COMMISA's primary forum (the arbitration) did not become unavailable until it was too late to seek relief elsewhere.

In short, COMMISA invested in Mexico and forewent the right to pursue its claims in Mexico's courts based on its reasonable expectation that PEP's promises to arbitrate were valid, PEP agreed that the Tribunal could determine its own jurisdiction, PEP did not appeal the Preliminary Award finding jurisdiction, and the Tribunal ultimately found in COMMISA's favor on the merits. But the Collegiate Court's novel and unforeseeable no-arbitration rule wiped out the Award and PEP's promise to arbitrate, denied COMMISA an opportunity to be heard on the merits of its claims, and transformed a major win into a major loss. That is manifestly unjust.

## IV.    The Amount Of The Judgment Is Correct.

The District Court correctly enforced the entire amount of the Award, including the $106 million PEP wrongfully collected on COMMISA's performance bonds. PEP claims that it should only pay $200 million of the $300 million that the Tribunal awarded in damages because it got $100 million back based on its unilateral determination that *COMMISA* breached. This is squarely contrary to the Award and would be patently unfair.

COMMISA posted the performance bonds as security in the event that COMMISA failed to perform. In the Final Award, the Tribunal found that PEP breached, not COMMISA. FA 733–34 (A-867–68). As the Tribunal explained in the Preliminary Award, PEP thus does not have "any right to claim the payment of

59

the bonds." PA 81–82 (A-1509–10). Indeed, the Final Award reiterated that PEP was enjoined from collecting on the bonds. FA 9 (A-143). The Award thus provides clear guidance that the judgment should reflect payment on the bonds.[10]

Even if the Final Award were ambiguous, the District Court could "interpret or clarify [its] terms," *Admart AG v. Stephen & Mary Birch Found., Inc.*, 457 F.3d 302, 309 (3d Cir. 2006), to effectuate the "most plausible interpretation" of the Tribunal's intentions, *Parsons*, 508 F.2d at 978. Here, the "most plausible interpretation" incorporates the bond payments. The Tribunal had every reason to believe that PEP would be unable to collect on the bonds: It found that PEP breached and enjoined PEP from collecting on them. The Tribunal also could not have known to identify the commensurate amount PEP would owe COMMISA if PEP nonetheless somehow collected on the bonds in violation of its own orders. The District Court in turn had every reason to include the bond payments in the final judgment.

---

[10] The District Court did not hold that "'there is nothing in the award itself'" supporting its ruling. PEP Br. 56. The District Court ruled for COMMISA after COMMISA clarified that the Final Award "repeats that PEP is enjoined from taking any actions on the bonds" and that including the amount of the bonds "effectuat[es] the resolutions that were issued in the award." SPA-81–82.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Respectfully submitted,

s/PAUL D. CLEMENT
PAUL D. CLEMENT
 *Counsel of Record*
ZACHARY D. TRIPP
WILLIAM R. LEVI
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

JEFFREY S. BUCHOLTZ
BRIAN CALLANAN
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006

RICHARD T. MAROONEY
CHARLES C. CORRELL, JR.
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036

*Counsel for Appellee*

April 11, 2014

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(N) because it contains 13,970 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font.

April 11, 2014

s/William R. Levi
William R. Levi

## CERTIFICATE OF SERVICE

I hereby certify that, on April 11, 2014, an electronic copy of this Brief for Appellee was filed with the Clerk of Court using the ECF system and thereby served upon all counsel of record.

s/William R. Levi
William R. Levi