## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
**Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

**Docket Number(s):** _____          Caption [use short title] _____

**Motion for:** _____

_____

_____

Set forth below precise, complete statement of relief sought:

_____

_____

_____

_____

_____

_____

**MOVING PARTY:** _____          **OPPOSING PARTY:** _____
    ☐ Plaintiff    ☐ Defendant
    ☐ Appellant/Petitioner    ☐ Appellee/Respondent

**MOVING ATTORNEY:** _____          **OPPOSING ATTORNEY**: _____
    [name of attorney, with firm, address, phone number and e-mail]

_____          _____

_____          _____

_____          _____

Court-Judge/Agency appealed from: _____

**Please check appropriate boxes:**                  **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):          Has request for relief been made below?    ☐ Yes  ☐ No
    ☐ Yes  ☐ No (explain):_____          Has this relief been previously sought in this Court?    ☐ Yes  ☐ No
_____          Requested return date and explanation of emergency:_____

Opposing counsel's position on motion:
    ☐ Unopposed  ☐ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response:
    ☐ Yes  ☐ No  ☐ Don't Know

Is oral argument on motion requested?    ☐ Yes  ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes  ☐ No  If yes, enter date:_____

**Signature of Moving Attorney:**

_____**Date:** _____          Service by:  ☐ CM/ECF    ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# 13-4022-CV

---

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

---

CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL,
S. DE R. L. DE C.V.,

*Petitioner-Appellee,*

v.

PEMEX-EXPLORACIÓN Y PRODUCCIÓN,

*Respondent-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK,
No 1:10-cv-0206-AKH

---

**MOTION BY THE CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA FOR LEAVE TO FILE BRIEF *AMICUS CURIAE*
IN SUPPORT OF PETITIONER-APPELLEE AND AFFIRMANCE**

---

KATHRYN COMERFORD TODD
TYLER R. GREEN
NATIONAL CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
Tele: (202) 463-5337

PETER B. RUTLEDGE
*Counsel of Record*
215 Morton Avenue
Athens, GA 30605
Tele: (706) 850-5870
borutledge70@gmail.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, proposed *amicus curiae* the Chamber of Commerce of the United States of America ("Chamber") certifies as follows:

The Chamber is a nonprofit corporation organized under the laws of the District of Columbia.  It has no parent company and has issued no stock.

Pursuant to Federal Rules of Appellate Procedure 27 and 29(a), the Chamber of Commerce of the United States of America ("Chamber") respectfully moves for leave to file a brief *amicus curiae* in support of Petitioner-Appellee, Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.  On advice of the Clerk's Office, a copy of the brief is attached to this motion.

1.     The Chamber represents three-hundred thousand members and indirectly represents more than three million U.S. businesses and professional organizations of every size and sector and spanning all regions of the United States.  It regularly files briefs before this Court and other courts on matters directly affecting the American business community.

2.     The Chamber has a strong interest in the proper interpretation of treaties governing international arbitration in the United States.  The proper construction of these treaties is important to American companies that conduct overseas business and are parties to international contracts containing arbitration clauses.  The other parties to such contracts can include foreign state-owned entities.  Thus, the Chamber has a special interest in cases like this one where a foreign country's court has annulled an award at the request of an entity owned by that same country.

3.     This *amicus* brief is desirable. American businesses may be both award creditors and award debtors in international arbitrations.  Consequently, the

1

Chamber can offer a unique perspective on the proper construction of the enforcement provisions of international arbitration treaties.

4.     The matters asserted in the *amicus* brief are relevant to the disposition of the case.  The central issue in this case concerns the circumstances under which a United States court can enforce an award annulled by the courts of the arbitral forum.  The Chamber's brief offers a unique perspective on why, in the exceptional circumstances of this case, the district court properly exercised its limited discretion to enforce the award.

5.     Undersigned counsel contacted the parties to request their consent for the filing of this proposed *amicus* brief.  Appellee consented.  Appellant did not consent.  Appellant's counsel does not intend to file a response to this motion.

For the foregoing reasons, the Chamber respectfully requests permission to file the accompanying brief *amicus curiae* in support of Appellee and affirmance.

Respectfully submitted,

April 18, 2014                                  /s _____

KATHRYN COMERFORD TODD          PETER B. RUTLEDGE
TYLER R. GREEN                              *Counsel of Record*
NATIONAL CHAMBER LITIGATION CENTER, INC.    215 Morton Avenue
1615 H Street, N.W.                         Athens, GA 30605
Washington, D.C. 20062                      Tele: (706) 850-5870
Tele: (202) 463-5337                        borutledge70@gmail.com

2

## CERTIFICATE OF SERVICE

I, Peter B. Rutledge, certify that on April 18, 2014 the attached MOTION BY THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA FOR LEAVE TO FILE BRIEF *AMICUS CURIAE* IN SUPPORT OF PETITIONER-APPELLEE AND AFFIRMANCE was filed electronically with the Clerk of the Court of the United States Court of Appeals for the Second Circuit using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

April 18, 2014                              /s_____
                                            Peter B. Rutledge

# 13-4022-CV

## IN THE
## United States Court of Appeals
### FOR THE SECOND CIRCUIT

CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL,
S. DE R. L. DE C.V.,

*Petitioner-Appellee,*

v.

PEMEX-EXPLORACIÓN Y PRODUCCIÓN,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK,
No 1:10-cv-0206-AKH

**BRIEF *AMICUS CURIAE* OF THE CHAMBER OF COMMERCE OF
THE UNITED STATES OF AMERICA
IN SUPPORT OF PETITIONER-APPELLEE AND AFFIRMANCE**

KATHRYN COMERFORD TODD
TYLER R. GREEN
NATIONAL CHAMBER LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
Tele: (202) 463-5337

PETER B. RUTLEDGE
*Counsel of Record*
215 Morton Avenue
Athens, GA 30605
Tele: (706) 850-5870
borutledge70@gmail.com

## CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America is a nonprofit corporation organized under the laws of the District of Columbia.  It has no parent company and has issued no stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES .................................................. iii

IDENTITY, INTEREST AND SOURCE OF AUTHORITY ..................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT ...................................................................9

   I.   A UNITED STATES COURT HAS LIMITED DISCRETION TO
ENFORCE AN INTERNATIONAL ARBITRAL AWARD
ANNULLED IN THE ARBITRAL FORUM. ...............................9

      A.  Several factors, derived from this Circuit's decision in *Europcar*,
should guide a district court's limited discretion to enforce an
arbitral award annulled in the arbitral forum...........................9

      B.  Factors derived from *Europcar* harmonize the existing case law. .........18

   II.  THE DISTRICT COURT PROPERLY EXERCISED ITS LIMITED
DISCRETION TO ENFORCE THE AWARD ANNULLED BY THE
MEXICAN COURT. ...................................................22

CONCLUSION ................................................................26

CERTIFICATE OF COMPLIANCE ...............................................27

CERTIFICATE OF SERVICE .................................................28

## TABLE OF AUTHORITIES

**Cases**

*Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986)...................................................25

*Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194 (2d Cir.
    1999) ......................................................................................................*passim*

*Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*,
    361 F.3d 676 (2d Cir. 2004) .............................................................13

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985)......................................23

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d
    85 (2d Cir. 2005) ..........................................................................10, 13

*Europcar Italia S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310 (2d Cir.
    1998) ......................................................................................................*passim*

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665
    F.3d 384 (2d Cir. 2011) ........................................................................15

*In re Chromalloy Aeroservices*, 939 F. Supp. 907 (D.D.C.1996) ...................*passim*

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).................. 10-11

*Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Indus. Y.
    Comercial*, 745 F. Supp. 172 (S.D.N.Y. 1990) ....................................14

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Das Gas Bumi
    Negara*, 364 F.3d 274 (5th Cir. 2004)..................................................14

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614
    (1985).......................................................................................................4

iii

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**

*Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie du Papier (RAKTA)*, 508 F.2d 969 (2d Cir. 1974) .........................................5, 14, 23

*Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41 (2d Cir. 1994) ...............................................................................................7

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974) ...........................................1, 16

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522 (1987) .................................................................................10

*Spier v. Calzaturificio Tecnica, S.p.A.*, 71 F. Supp. 2d. 279 (S.D.N.Y. 1999) .....................................................................................................10, 19

*Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396 (2d Cir. 2009) ...........25

*TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007) ........*passim*

*Thai-Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, No. 10–CV–5256 (KMW)(DCF), 2014 WL 476239 (S.D.N.Y. Feb. 6, 2014) .............................................................................................16, 19

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15 (2d Cir. 1997) .........................................................................................*passim*

**Statutes**

9 U.S.C. § 207 ...........................................................................................................9

9 U.S.C. § 302 ...........................................................................................................9

9 U.S.C. § 305 ...........................................................................................................8

iv

## TABLE OF AUTHORITIES (cont'd)

**Other Authorities**

Gary B. Born, *International Commercial Arbitration* (2009) ......................... 4-5, 15

Gary B. Born & Peter B. Rutledge, *International Civil Litigation in United States Courts* (5th ed. 2011) ................................................................. 2

John P. Bowman, *The Panama Convention and Its Implementation Under the Federal Arbitration Act* (2002) .................................................... 6-7

Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 302 ("*Geneva Convention*") ................................................ 4-6

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 ("*New York Convention*") ...................................................................*passim*

Kenneth R. Davis, *Unconventional Wisdom:  A New Look at Articles V and VII of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 37 Tex. Int'l L.J. 43 (2002) ......................................... 6

H.R. Rep. No. 101-501 (1990), *reprinted in* 1990 U.S.C.C.A.N. 675 ..................... 7

ICC Rules of Arbitration (1998 version) ................................................. 20

ICC Rules of Arbitration (2012 version) ................................................. 20

Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975, 104 Stat. 448,14 I.L.M. 336 ("*Panama Convention*") .................*passim*

Radu Lelutiu, *Managing Requests for Enforcement of Vacated Awards Under the New York Convention*, 14 Am. Rev. Int'l Arb. 345 (2003)................... 3

## TABLE OF AUTHORITIES (cont'd)

**Other Authorities (cont'd)**

Message to the Senate Transmitting the Inter–American Convention on
    Commercial Arbitration, 1981 Pub. Papers 517 (June 15, 1981) .........................7

Michael L. Morkin et al., *Doing Business with Foreign Sovereign Entities:
    Who Are They and What Are the Risks?*, 17 Bus. L. Today 43 (2007).................2

Horacio A. Grigera Naón, *Arbitration in Latin America:  Overcoming
    Traditional Hostility (An Update)*, 22 Miami Inter-Am L. Rev. 203 (1991).........4

Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration
    (Tentative Draft No. 2, 2012) .................................................................. 10-11, 16

Gary H. Sampliner, *Enforcement of Nullified Foreign Arbitral Awards –
    Chromalloy Revisited*, 14 J. Int'l Arb. 141 (1997).................................................6

Hans Smit, *Annulment and Enforcement of International Arbitral Awards:
    A Practical Perspective*, 18 Am. Rev. Int'l Arb. 297 (2007).........................13, 16

## IDENTITY, INTEREST AND SOURCE OF AUTHORITY[1]

<u>Identity</u>:  The Chamber of Commerce of the United States of America ("Chamber") is the world's largest federation of businesses and associations. The Chamber represents three-hundred thousand direct members and indirectly represents an underlying membership of more than three million U.S. businesses and professional organizations of every size and in every sector and geographic region of the country.  An important function of the Chamber is to represent the interests of its members in matters before the courts, Congress and the Executive Branch.

<u>Interest</u>:  The Chamber has a strong interest in the law governing international arbitration in the United States.  "A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction."  *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974).  Consequently, many American

---

[1]    Pursuant to Federal Rule of Appellate Procedure 29(c)(5), *amicus* certifies that no party's counsel authored this brief in whole or in part.  Furthermore, no party, no party's counsel and no person – other than *amicus*, its members or its counsel – contributed money that was intended to fund the preparation or submission of this brief.

companies are parties to international contracts containing arbitration clauses. Arbitration clauses, unlike forum selection clauses, enable American companies to use a network of treaties governing the enforceability of foreign arbitral awards. (By contrast, the United States is not a party to any treaty governing the enforcement of foreign judgments).  *See* Gary B. Born & Peter B. Rutledge, *International Civil Litigation in United States Courts* 1079-80 (5th ed. 2011). When they prevail, American companies may use these treaties to enforce an award where the debtor has assets.  When they lose, American companies may invoke the exceptions contained in the treaties to resist enforcement in a United States court.

The proper construction of these enforcement provisions is especially important in cases, like this one, involving a state-owned entity.  State-owned entities, otherwise protected by sovereign immunity, often insist upon arbitration, sited within their own territories, as a requirement of doing business with their foreign partners.  *See, e.g.*, Michael L. Morkin et al., *Doing Business with Foreign Sovereign Entities: Who Are They and What Are the Risks?*, 17 Bus. L. Today 43, 45-46 (2007).  Likewise, companies doing business with state-owned entities often seek arbitration to avoid litigation in the territory of the state-owned counterparty. In such transactions, "the breaching party is not infrequently a governmental entity

2

in whose rescue national courts are eager to graciously aid."  Radu Lelutiu,

*Managing Requests for Enforcement of Vacated Awards Under the New York*

*Convention*, 14 Am. Rev. Int'l Arb. 345, 351 (2003).  Proper construction of the

law governing the enforcement of international arbitration awards ensures that the

sovereign's participation does not undermine the commerce-promoting benefits of

international arbitration.

Source of Authority:  Federal Rule of Appellate Procedure 29(a) authorizes

the filing of this brief**.**  Appellee has consented, but Appellant has not.

Consequently, the Chamber has filed an accompanying motion for leave to file this

brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns the circumstances under which a United States court

should exercise its discretion to enforce a foreign arbitral award that has been set

aside by the courts of the country where the arbitration took place.[2]

A century ago, such discretion did not exist.  The prevailing regime

governing the enforcement of foreign arbitral awards rested on the so-called double

---

[2]      Appellant also raises arguments concerning personal jurisdiction, venue and
the amount of the award.  *Amicus* agrees with Appellee's ultimate conclusions on
these issues but limits its discussion to the enforceability question.

3

*exequatur* requirement.  *See* I Gary B. Born, *International Commercial Arbitration* 62 (2009).  According to this requirement, before an arbitral award could be enforced, it first had to be confirmed in the national courts of the country where the arbitration took place (also known as the "arbitral forum").  This approach was reflected in the Geneva Convention of 1927, the dominant multilateral treaty governing the enforcement of foreign arbitral awards at that time.[3]  Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 302 [hereinafter "Geneva Convention"].   Under that Convention, enforcement of an award "*shall be refused if* . . . [it] has been annulled in the country in which it was made."  (emphasis added).  *Id.* at art. 2(a).  Regional treaties in Latin America governing the enforcement of foreign arbitration awards, including the Montevideo Conventions of 1899 and 1940, contained similar requirements.  *See* Horacio A. Grigera Naón, *Arbitration in Latin America:  Overcoming Traditional Hostility (An Update)*, 22 Miami Inter-Am L. Rev. 203, 253 nn.162-63 (1991).

---

[3]      Although the United States never joined the Geneva Convention, this was not due to some greater solicitude toward arbitration but, rather, because it was just beginning to "shake off the old judicial hostility to arbitration" that typified American jurisprudence in the nineteenth and early twentieth centuries.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 638 (1985) (citation omitted).

Later treaties abandoned this double *exequatur* requirement.  The 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (known more commonly as the "New York Convention") reflected this development.  The New York Convention's "basic thrust was to liberalize procedures for enforcing foreign arbitral awards."  *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974).  Among its liberalized procedures, the New York Convention dismantled the requirement of double *exequatur*.  *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997).  Instead, it permitted courts to enforce an award even when an annulment action was pending in the arbitral forum.[4]  *Compare* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. VI, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 [hereinafter "New York Convention"], *with* Geneva Convention, art. 1(d).  It also provided that "enforcement of the award *may* be refused . . . where . . . [t]he award . . . has been set aside or suspended by a competent authority

---

[4]      In addition to the term "annulment," arbitral authorities also use the terms "set aside" or "vacatur" to describe the act whereby a national court of the arbitral forum refuses to confirm an arbitral award rendered within its territory.  *See* II Born, *International Commercial Arbitration* at 2551.  Though the terms differ, their meaning in this context does not.

5

of the country in which, or under the law of which, that award was made."  New York Convention, art. V(1)(e) (emphasis added).  *Compare* Geneva Convention, art. 2(a) ("*shall* be refused").[5]  Taken together, Article VI and Article V(1)(e) of the New York Convention "eradicat[ed] the requirement that a court in the rendering state recognize an award before it could be taken and enforced abroad."  *Toys "R" Us*, 126 F.3d at 22.

The Inter-American Convention on International Commercial Arbitration ("the Panama Convention") built on this model. Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975, 104 Stat. 448,14 I.L.M. 336 [hereinafter "Panama Convention"].  At the time of its completion in 1975, there was a pressing need for such a regional convention:  only two nations in Central and South America adhered to the New York Convention.  *See* John P. Bowman, *The Panama Convention and Its Implementation Under the Federal Arbitration*

---

[5]    Drafters of New York Convention considered – but ultimately did not adopt – a version of Article V that would have required an award to be refused enforcement when one of the grounds (including annulment) was present.  *See generally* Kenneth R. Davis, *Unconventional Wisdom:  A New Look at Articles V and VII of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 37 Tex. Int'l L.J. 43, 60-61 (2002) (discussing *travaux preparatoires* of the New York Convention); Gary H. Sampliner, *Enforcement of Nullified Foreign Arbitral Awards* – Chromalloy *Revisited*, 14 J. Int'l Arb. 141, 146-48 (1997) (same).

*Act* 20 n.59  (2002).  Although the Panama Convention does not track the New York Convention in all respects, their enforceability provisions are virtually identical.[6]  Specifically, the Panama Convention permits courts to enforce an award while an annulment action is pending in the national courts of the arbitral forum.  *Compare* Panama Convention, art. VI, *with* New York Convention, art. VI. Likewise, the Panama Convention provides that enforcement of the award "*may* be refused . . . if . . . the decision . . . has been annulled or suspended by a competent authority of the State in which, or according to the law of which, the decision has been made."  Panama Convention, art. V(1)(e).  *Compare* New York Convention, art. V(1)(e).

Under Article V(1)(e) of the Panama and New York Conventions, district courts have limited discretion to enforce awards annulled by the courts of the arbitral forum.  While this Circuit has not previously articulated factors to guide

---

[6]   As this Court previously has noted, the textual similarities between the two Conventions, the design of the Panama Convention's implementing legislation and the legislative history surrounding the Panama Convention's ratification all "clearly demonstrate[] that Congress intended the Inter–American Convention to reach the same results as those reached under the New York Convention." *Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 45 (2d Cir. 1994).  *See also* H.R. Rep. No. 101-501, at. 4 (1990), *reprinted in* 1990 U.S.C.C.A.N. 675, 678; Message to the Senate Transmitting the Inter–American Convention on Commercial Arbitration, 1981 Pub. Papers 517 (June 15, 1981).

7

the exercise of that discretion, they can be adapted from its decision in *Europcar Italia S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 316 (2d Cir. 1998). The factors include the pro-enforcement bias of the applicable convention, the grounds of annulment, the characteristics of the annulment proceedings, and the likelihood that the annulment order would be entitled to recognition. Application of these factors should be reviewed for abuse of discretion. *See Europcar*, 156 F.3d at 316-17.

In this case, the district court properly exercised its limited discretion under the Panama Convention to enforce an arbitral award vacated by Mexico's courts.[7] Indeed, not just some but all of the relevant factors favor enforcement: the award was annulled on parochial grounds, upon the request of a state-owned entity litigating in its home courts, under circumstances casting doubt on whether the annulment order would be recognized. Those factors, coupled with the Panama Convention's pro-enforcement bias, supply exceptional circumstances justifying the district court's decision to enforce the award.

_____

[7]    Neither party disputes that the Panama Convention applies to this case. Under the test set forth in the legislation implementing that convention, "a majority of the parties to the arbitration agreement are citizens of a State or States that have ratified or acceded to the [Panama Convention] and are member States of the Organization of American States." 9 U.S.C. § 305(1).

8

## ARGUMENT

## I.   A UNITED STATES COURT HAS LIMITED DISCRETION TO ENFORCE AN INTERNATIONAL ARBITRAL AWARD ANNULLED IN THE ARBITRAL FORUM.

Both the Panama and New York Conventions accord courts limited discretion to enforce an award annulled by the courts of the arbitral forum.  In developing factors to guide that discretion, courts should take into account competing principles – the pro-enforcement bias of the conventions and the arbitral forum's regulatory interest.  Based on those principles, the relevant factors include the nature of the annulment proceeding, the grounds relied upon by the annulling court, and the likelihood that the annulment order would be entitled to recognition in this country's courts.  These factors harmonize existing decisions addressing the legal issue this case presents.

### A.   Several factors, derived from this Circuit's decision in *Europcar*, should guide a district court's limited discretion to enforce an arbitral award annulled in the arbitral forum.

Under the Panama Convention and its implementing legislation, a United States court "shall" enforce an arbitral award "unless it finds one of the grounds for refusal . . . of . . . enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  *See also* 9 U.S.C. § 302 (incorporating by reference Section 207 to

cases falling under the Panama Convention).  Article V of the Panama Convention "specifies seven exclusive grounds upon which courts may refuse to recognize an award."  *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005).  The only "ground" raised by Appellant is Article V(1)(e) of the Convention.  (Br. at 32-54).

Article V(1)(e) provides that an award "may" be refused enforcement if it has been annulled by the competent authority of the State in which it was made.  The treaty's use of the term "may" (in contrast to "shall") connotes the discretionary nature of the decision.[8]  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 255 (2004); *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 534-35 (1987); *Europcar*, 156 F.3d at 316.  Federal courts uniformly adopt this view.  *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 939 (D.C. Cir. 2007); *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 (2d Cir. 1999); *Spier v. Calzaturificio Tecnica, S.p.A.*, 71 F. Supp. 2d 279, 286-87 (S.D.N.Y. 1999); *In re Chromalloy Aeroservices*, 939 F. Supp. 907, 909-15 (D.D.C.1996).  *See also* Restatement

---

[8]    The distinction between "may" and "shall" was not lost on the Panama Convention's drafters.  The Panama Convention uses the term "shall" twenty-one times.  *See* Panama Convention, arts. 1-4, 7-13.

(Third) of the U.S. Law of Int'l Commercial Arbitration §4-16 (Tentative Draft No. 2, 2012).

In *Baker Marine*, this Circuit recognized the discretionary nature of the decision to enforce an award annulled in the arbitral forum. *Baker Marine* involved two arbitrations taking place in Nigeria. After the tribunals rendered their awards, the Nigerian Federal High Court annulled them. Despite the annulment orders, the award creditor then sought to enforce the awards in the United States.[9] Citing Article V(1)(e) of the New York Convention, this Circuit declined to do so and observed that the award creditor had "shown no adequate reason" for refusing to recognize the Nigerian annulment decisions. 191 F.3d at 197. *Baker Marine* did not elaborate on what might constitute an "adequate reason" for enforcing an annulled arbitration award. Nor did it articulate any "factors that bear consideration" when courts decide whether to enforce the award. *Intel*, 542 U.S. at 264.

This Circuit's decision in *Europcar* offers a roadmap for how to do so. *Europcar* addressed a closely related question: when a court in an enforcement forum should exercise its discretion under Article VI of the New York or Panama

---

[9]     As noted above, this provision is materially indistinguishable from its counterpart under the Panama Convention. *See supra* p. 7 & n.6.

Convention to adjourn a proceeding in favor of an annulment action. 156 F.3d at

316. As noted above, this discretionary stay provision, like Article V(1)(e), was

part of the package of reforms in the New York and Panama Conventions designed

to dismantle the double *exequatur* requirement. *See supra* at pp. 5-6.

  *Europcar* recognized that the exercise of discretion "must take into account

the inherent tension between competing concerns" – on the one hand, "the goals of

arbitration – the expeditious resolution of disputes and the avoidance of protracted

and expensive litigation" and, on the other hand, "the possibility of conflicting

results and the consequent offense to international comity." 156 F.3d at 317.

These competing concerns prompted this Circuit to articulate a non-exhaustive list

of six factors guiding a court's exercise of discretion in deciding whether to

adjourn enforcement proceedings in favor of an annulment action: (1) the "general

objectives" of arbitration; (2) the status of the annulment proceedings; (3) the level

of scrutiny afforded to the award in the foreign proceedings; (4) the characteristics

of the annulment proceedings; (5) the balance of hardships to the parties; and (6)

any other circumstances that could tend to shift the balance in favor of or against

adjournment. 156 F.3d at 317-18.

  *Europcar*'s roadmap easily can be adapted to the distinct but related

discretionary decision presented here – when should a court enforce an arbitral

award that has been annulled by the courts of the arbitral forum.  Just as in *Europcar*, "competing considerations" frame the inquiry.

A "dominant consideration," as in *Europcar*, is the primary goal of the international arbitration conventions – to facilitate the recognition and enforcement of arbitral awards.  This consideration reflects the "pro-enforcement bias" of these conventions.  *Toys "R" Us*, 126 F.3d at 20.  *See also Encyclopaedia Universalis S.A.*, 403 F.3d at 90 (citing the "strong public policy in favor of international arbitration" and the consequent need for "very limited" judicial review of international arbitral awards); *Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*, 361 F.3d 676, 683 (2d Cir. 2004) (same).

A competing consideration is "the power and authority of the local courts of the rendering state."  *Toys "R" Us*, 126 F.3d at 22.  In this regard, it bears emphasis that, while the Panama and New York Conventions discarded the double *exequatur* requirements, they did not render the annulment orders of the arbitral forum's courts irrelevant.  Annulment by those courts still remains a ground for refusal of enforcement, albeit a discretionary one.  *See* Hans Smit, *Annulment and Enforcement of International Arbitral Awards:  A Practical Perspective*, 18 Am. Rev. Int'l Arb. 297, 299 (2007).

13

Guided by these competing considerations, this Court can articulate a framework, comparable to *Europcar*'s, to guide the discretionary decision here.  At the outset, three requirements must be satisfied: (a) the award must have been annulled; (b) by a competent authority and (c) of a State in which, or under the law of which, the award was made.[10]  *See* Panama Convention, art. V(1)(e); New York Convention, art. V(1)(e).

If those mandatory requirements are satisfied, then a court deciding whether to enforce the annulled award should consider several factors including:

1.    *The general objectives of arbitration* – A central objective of arbitration is the expeditious resolution of disputes.  *Europcar*, 156 F.3d at 317. In the context of enforcement proceedings, that objective favors a "narrow construction" of defenses to enforcement under the Convention, including Article V(1)(e).  *Parsons & Whittemore*, 508 F.2d at 974, 976.  *Cf. Soler*, 473 U.S. at 638

---

[10]    Contrary to Appellant's suggestion (Br. at 33), the phrase "according to the law of which" refers not to the substantive law but, instead, to the procedural law governing the arbitration.  This is the uniform view of every federal court to have considered the issue and the widespread understanding among international arbitration scholars.  *See, e.g., Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Das Gas Bumi Negara*, 364 F.3d 274, 289-90 & n.26 (5th Cir. 2004); *Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Indus. Y. Comercial*, 745 F. Supp. 172, 177-78 (S.D.N.Y. 1990); *see generally* II Born, *International Commercial Arbitration* at 2410-11 & nn.435-36.

14

("[T]he efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal . . . .").

2.      *The level of scrutiny afforded to the award* – International treaties generally do not regulate the grounds for annulment in the arbitral forum, *see Toys "R" Us*, 126 F.3d at 21, but that latitude does not obligate courts elsewhere to accede automatically to every annulment decision.  Countries employ a variety of annulment standards.  Many employ the UNCITRAL Model Law, whose annulment "grounds parallel" those in the New York and Panama Conventions.  II Born, *International Commercial Arbitration* at 2562.  Others, like Mexico, employ parochial standards differing from those set forth in the Convention. (Special Appendix 45-46) [hereinafter "S.A."].

The decision whether to enforce an annulled award must take into account these variations.  When it acceded to the Panama and New York Conventions, the United States committed itself as a matter of international law to a regime of uniform treatment of awards.  *See Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 394 (2d Cir. 2011) (Lynch, J., dissenting). Declining to enforce an award annulled on grounds similar to those set forth in the Conventions advances this goal of "uniform treatment."  By contrast, declining to enforce an award annulled on the basis of the arbitral forum's parochial standards

15

"disrupts the regime of uniform treatment created by the Convention."  Smit, 18 Am. Rev. Int'l Arb. at 303.

3.     *The characteristics of the foreign proceeding* – Parties to arbitration agreements often site their disputes in neutral forums.  *Scherk*, 417 U.S. at 516. But when the arbitration is sited in a party's home forum and that party is a state-owned entity, review of the award by the state's own courts "might raise a suspicion of the [forum] courts' partiality."  *Thai-Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, No. 10–CV–5256 (KMW)(DCF), 2014 WL 476239, at * 8-12 (S.D.N.Y. Feb. 6, 2014).  When the state's own courts annul an award at the request of a state-owned entity, courts elsewhere should closely scrutinize the judgment in question.  *See* Restatement (Third) of the U.S. Law of Int'l Commercial Arbitration §4-16 cmt. d. (Tentative Draft No. 2, 2012). Such scrutiny ensures that the annulment order does not "damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements."  *Scherk*, 417 U.S. at 517.

4.     *Whether the judgment annulling the award would be entitled to recognition or enforcement standards applicable in a United States court* – This factor mediates the risk of conflict between the arbitral award and the annulment

16

order.  Yet foreign judgment enforcement standards, while unquestionably

relevant, should not receive dispositive weight.  First, judgment enforcement

standards concern whether to enforce a money judgment.  They were not designed

to decide whether to give preclusive effect to a foreign court's declaratory

judgment refusing to confirm an arbitral award.  Second, a foreign judgment

annulling an arbitral award, unlike most foreign judgments, does not adjudicate the

merits of the parties' underlying dispute.  *See* Sampliner, 14 J. Int'l Arb. at 161.

     5.    *Any other circumstances that could tend to shift the balance in favor*

*of or against enforcement*[11]– *Europcar* recognized the need to keep the list non-

exhaustive.  This residual factor takes into account the possibility that a particular

case may raise unique circumstances tipping the balance.

---

[11]    Some of the factors articulated in *Europcar* appear to have no analogue in
this inquiry.  For example, the "status of the annulment proceedings" – which is
highly relevant to the question whether to stay parallel enforcement proceedings –
loses relevance when the question becomes what a court in the enforcement forum
should do following a successful annulment.  Likewise, a consideration of the
"balance of hardships" – again quite relevant when weighing the costs of a stay –
drops out when the question becomes how a court in the enforcement forum should
act after a successful annulment proceeding.

### B. Factors derived from *Europcar* harmonize the existing case law.

These factors not only balance the competing considerations but also explain the results in prior cases. In *Baker Marine*, described *supra* at p. 11, those factors weighed against enforceability: while the general pro-enforcement presumption of the arbitration conventions favored enforcement, others outweighed it. The Nigerian court decisions relied upon grounds analogous to those available under the New York Convention for refusing enforcement and implicated the conduct of the arbitration. *Compare Baker Marine*, 191 F.3d at 196 (noting that in the Chevron arbitration the Nigerian "court concluded that the arbitrators had improperly awarded punitive damages, gone beyond the scope of the submissions, incorrectly admitted parole evidence, and made inconsistent awards, among other things"), *with* New York Convention, art. V(1)(c)-(d) (providing the enforcement may be denied when the arbitrators exceeded their powers or did not resolve the dispute in accordance with the applicable procedural law).[12] The case did not involve a state-owned entity, reducing any "suspicion of the [Nigerian] courts' partiality." *See Baker Marine*, 191 F.3d at 197 ("Baker Marine has made no

---

[12]    In the second arbitration (Danos), the Nigerian court found that the "award was unsupported by the evidence." *Baker Marine*, 191 F.3d at 196.

contention that the Nigerian courts acted contrary to Nigerian law."). Nor did any aspect of the case suggest that the Nigerian court judgment might be unenforceable. *See id.* ("Baker Marine has shown no adequate reason for refusing to recognize the judgments of the Nigerian court.").[13]

By contrast, *Chromalloy* represents the exceptional case where the balance of factors all favored enforcement. *Chromalloy* involved arbitration between an American defense contractor and the Egyptian Air Force taking place in Egypt. After the arbitral tribunal rendered an award in favor of the American defense contractor, the Egyptian Air Force persuaded Egypt's own Court of Appeal to set aside the award. The American defense contractor then petitioned for enforcement in the United States, and the district court enforced the award under the New York Convention.[14]

---

[13]    This analysis explains other district court decisions in this circuit. *See Thai-Lao Lignite*, 2014 WL 476239; *Spier*, 71 F. Supp. 2d 279. Despite the pro-enforcement bias of the New York convention (applicable in those cases), all the other considerations pointed against enforcement: the dispute did not involve a sovereign arbitrating in its own forum; the grounds for annulment paralleled ones for denying enforcement under the applicable convention; and the party seeking enforcement had presented no adequate reason for refusing to recognize the annulment order. *See Thai-Lao Lignite*, 2014 WL 476239, at *8-12; *Spier*, 71 F. Supp. 2d at 280, 288.

[14]    In an alternative argument, Appellant attempts to distinguish *Chromalloy* on the ground that the parties in that case had mutually agreed to be bound by the award and not to pursue any appeal or other recourse. *See* Br. at 36 n.8 (citing

Like *Baker Marine*, this decision can be explained by reference to the multi-factor test noted above.  The New York Convention's pro-enforcement bias favored that enforcement.  Moreover, the Egyptian court set aside the award on the ground that the award was "manifestly null," a ground nowhere set forth in the New York (or Panama) Convention, because the arbitrators failed to apply Egyptian administrative law.  *See* Sampliner, 14 J. Int'l Arb. at 142-43 (describing the Egyptian law at issue in *Chromalloy*).  *Compare Chromalloy*, 939 F. Supp. at 911**,** *with* New York Convention, art. V (not listing substantive legal error among the grounds for refusing enforcement), *and* Panama Convention, art. V (same).  *Cf. Toys "R" Us*, 126 F.3d at 23-25 (holding that a convention award may not be refused enforcement on grounds that the tribunal manifestly disregarded the law).  Furthermore, the case involved annulment in favor of a state instrumentality in the state's own courts.  Finally, the court doubted whether the Egyptian court judgment would be recognized in the United States.

---

*Chromalloy*, 939 F. Supp. at 912).  That fact, however, does not support Appellant's argument.  In this case, the parties agreed to subject their arbitration to the "Conciliation and Arbitration Regulations of the International Chamber of Commerce."  (S.A. 40).  Those rules, both the version governing this arbitration and in their current form, contain a very similar undertaking.  *See* ICC Rules of Arbitration Art. 28(6) (1998 version) (in effect at time arbitration in this case commenced); ICC Rules of Arbitration Art. 34(6) (2012 version) (parallel provision in current version of rules).

20

The D.C. Circuit's recent decision in *TermoRio* falls between the poles of *Baker Marine* and *Chromalloy*. *TermoRio* involved an arbitration in Colombia between a Colombian utility and a Colombian state-owned entity. *See TermoRio*, 487 F.3d at 929-30. The tribunal found in favor of the utility, and the state-owned entity petitioned the Colombian courts to annul the award. Eventually, the Colombian Council of State annulled the award on the ground that the parties' arbitration clause violated Colombian law. Following annulment, the utility petitioned for enforcement in a United States court pursuant to the Panama Convention. The district court refused to enforce the award.

The D.C. Circuit affirmed, and its decision too can be explained by reference to the above-enumerated factors. While the pro-enforcement bias of the Panama Convention favored enforcement, other considerations weighed against this outcome. The grounds for annulment certainly did so: the Colombian court annulled the award on the grounds of an invalid arbitration agreement, one of the specifically enumerated grounds for refusing enforcement under the Panama Convention. *Compare TermoRio*, 487 F.3d at 929, *with* Panama Convention, art. V(1)(a). The nature of the annulment proceedings was mixed: while the case did involve a Colombian state-owned entity, there was "nothing in the record here indicating that the proceedings before the [Council of State] were tainted or that

21

the judgment of the court [was] other than authentic." *TermoRio*, 487 F.3d at 930.
Finally, in contrast to *Chromalloy* (but like *Baker Marine*), there was nothing to
suggest that the judgment of the Colombian Council of State was repugnant to
public policy or otherwise would not be entitled to recognition under ordinary
judgment enforcement principles. *See id.* at 938-39.

## II.  THE DISTRICT COURT PROPERLY EXERCISED ITS LIMITED DISCRETION TO ENFORCE THE AWARD ANNULLED BY THE MEXICAN COURT.

In this case, the district court certainly had the option of refusing
enforcement, for the mandatory requirements of Article V(1)(e) were all satisfied –
the award had been set aside by a competent authority of the place where the award
was made.  Furthermore, despite the annulment, not just some but all of the factors
guiding the exercise of the district court's limited discretion favor enforcement:

1.      *The general objectives of arbitration* – As already noted, this case
arises under the Panama Convention that, like the New York Convention, was
designed to enhance the enforceability of arbitration awards.  Narrow construction
of the defenses to enforcement, including Article V(1)(e), promotes that objective.

2.      *The level of scrutiny afforded to the award* – Unlike the Nigerian
court in *Baker Marine* or the Colombian court in *TermoRio*, the Mexican court in

22

this case did not rest its annulment decision on a ground akin to one contained in the applicable convention.  Instead, much like the Egyptian court in *Chromalloy*, it relied on an entirely parochial ground pertaining to the consequence of the administrative rescission unilaterally declared by Appellant.[15]

    3.    *The characteristics of the foreign proceeding* – Unlike *Baker Marine*, this case does not involve arbitration between purely private parties.  Rather much like *Chromalloy*, it involves arbitration with a state-owned entity, which successfully obtained annulment of the award in its own courts.  As noted above,

---

[15]    While the Panama Convention, like the New York Convention, provides that an award may be refused enforcement where the claim is not arbitrable, *see* art. V(2)(a), that exception ordinarily applies to particular classes of claims. *See Parsons & Whittemore*, 508 F.2d at 975 ("The mere fact that an issue of national interest may incidentally figure into the resolution of a breach of contract claim does not make the dispute not arbitrable. Rather, certain categories of claims may be non-arbitrable because of the special national interest vested in their resolution.").  It was never envisioned to apply to the very different set of circumstances present here – namely the unilateral action by one of the parties which, according to the parochial local law given retroactive effect by Mexican courts, can suddenly extinguish the arbitration.  Moreover, as the district court recognized, Mexico's administrative rescission law did not by its terms render Appellee's breach of contract claim non-arbitrable; rather it was the Mexican court's conclusion that Appellee's breach of contract claim was inextricably intertwined with administrative rescission that foreclosed arbitration.  (S.A. 42-43). The United States Supreme Court has squarely counseled against this parochialism regarding the arbitrability of claims and the "inextricably intertwined" reasoning of the Mexican court.  *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

23

that is precisely the circumstance where a court in the enforcement forum should approach annulment with some skepticism.

While *TermoRio* involved annulment at the request of a state-owned entity, a critical fact distinguishes this case. In *TermoRio*, "nothing in the record . . . indicat[ed] that the proceedings before the [Council of State] were tainted or that the judgment of the court [was] other than authentic." 487 F.3d at 930. By contrast, the district court recognized, this case presents the unusual fact pattern where the combination of retroactive application of Mexican law and the consequent lack of any available forum wherein Appellee could pursue its claims raises a legitimate concern about the "characteristics of the foreign proceeding." (S.A. 64-67).

4.    *Whether the judgment annulling the award would be entitled to recognition or enforcement standards applicable in a United States court* – Here, unlike *Baker Marine* and *TermoRio*, Appellee has presented an "adequate reason" for refusing to recognize Mexico's judgment. *Cf. Baker Marine*, 191 F.3d at 197 n.3 ("Recognition of the Nigerian judgment in this case does not conflict with United States public policy."). "[A] judgment that tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property is against public

24

policy." *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (internal

quotations omitted).  While such instances are "rare," *id.*, this case presents

precisely that scenario:  the Mexican court relied on an after-enacted law to justify

its decision and the net effect was to deprive Appellee of any recourse by which to

obtain meaningful relief.  *Cf. Telenor Mobile Commc'ns AS v. Storm LLC*, 584

F.3d 396, 408-09 (2d Cir. 2009) (finding that arbitrators did not manifestly

disregard the applicable law when they refused to credit foreign judgments that

allegedly were the product of collusion).  That outcome from the Mexican

annulment action unquestionably undermines "fairness to litigants," which this

Circuit consistently has recognized constitutes one of the "guiding principles" in

the law governing the recognition of foreign judgments.  *Ackermann*, 788 F.2d at

842.  On the facts here, this factor alone could warrant the district court's exercise

of its limited discretion to enforce the award.

     5.    *Any other circumstances that could tend to shift the balance in favor of or against enforcement* – This case presents no occasion for the Court to consider any other circumstances.  All of the ordinary factors favor enforcement, and Appellant has pointed to no countervailing ones.

* * *

25

In sum, in light of the exceptional circumstances presented by this case – annulment of an arbitral award upon application by a state-owned entity in the state's own courts on parochial grounds and in circumstances casting doubt on the enforceability of the annulment judgment – the district court did not abuse its limited discretion by enforcing the arbitral award in this case.  *See Europcar*, 156 F.3d at 316-17.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s _____

KATHRYN COMERFORD TODD          PETER B. RUTLEDGE
TYLER R. GREEN                      *Counsel of Record*
NATIONAL CHAMBER LITIGATION CENTER, INC.    215 Morton Avenue
1615 H Street, N.W.                 Athens, GA 30605
Washington, D.C. 20062              Tele: (706) 850-5870
Tele: (202) 463-5337                borutledge70@gmail.com

April 18, 2014

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 5,740 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

April 18, 2014                                         /s_____
                                                      Peter B. Rutledge

27

## CERTIFICATE OF SERVICE

I, Peter B. Rutledge, certify that on April 18, 2014 the attached BRIEF

*AMICUS CURIAE* OF THE CHAMBER OF COMMERCE OF THE UNITED

STATES OF AMERICA IN SUPPORT OF THE PETITIONER-APPELLEE AND

AFFIRMANCE was filed electronically with the Clerk of the Court of the United

States Court of Appeals for the Second Circuit using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.

April 18, 2014                                     /s_____

                                                  Peter B. Rutledge

28