13-4022
Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploración Y Producción

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2014


(Argued: November 20, 2014     Decided: August 2, 2016)

Docket No. 13-4022

- - - - - - - - - - - - - - - - - - -x

Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V.,

Petitioner-Appellee,

- v.-

Pemex-Exploración Y Producción,

Respondent-Appellant.

- - - - - - - - - - - - - - - - - - -x


Before:          WINTER, JACOBS, and RAGGI, Circuit Judges.

Respondent-appellant Pemex-Exploración Y Producción ("PEP") appeals

from the judgment of the United States District Court for the Southern District of

New York (Hellerstein, J.) confirming an arbitral award notwithstanding that the

award was nullified by a court in Mexico, where the award was rendered. We conclude that:

(1) There is personal jurisdiction over PEP, and venue lies in the Southern District of New York;

(2) The district court did not abuse its discretion in confirming the award; and;

(3) The district court, which included in its judgment $106 million in performance bonds that PEP collected, did not thus exceed its authority.

Accordingly, we affirm the judgment of the district court in all respects.

Judge Winter concurs in a separate opinion.

> CATHERINE E. STETSON, HOGAN LOVELLS US LLP, Washington, D.C.; on the brief: Dennis H. Tracey, III, Ira M. Feinberg, Hagan C. Scotten & Erin M. Meyer, Hogan Lovells US LLP, New York, NY; Richard C. Lorenzo, Hogan Lovells US LLP, Miami, FL, for Appellant.
>
> PAUL D. CLEMENT (with Zachary D. Tripp & William R. Levi on the brief), BANCROFT PLLC, Washington, D.C.; also on the brief: Jeffrey S. Bucholtz & Brian Callanan, King & Spalding LLP, Washington, DC; Richard T. Marooney & Charles C. Correll, Jr., King & Spalding LLP, New York, NY, for Appellee.

Preet Bharara (with David S. Jones, Caleb
Hayes-Deats & Emily E. Daughtry on the
brief), United States Attorney for the
Southern District of New York, for Amicus
Curiae United States of America; also
on the brief: Joyce Branda, Douglas N.
Letter & Sharon Swingle, Civil Division,
Department of Justice, Washington, D.C.;
Mary E. McLeod, Department of State,
Washington, D.C.

Erik S. Jaffe, Erik S. Jaffe, P.C., Washington,
D.C., for Amicus Curiae The Government
of the United Mexican States in support of
Respondent-Appellant.

Peter B. Rutledge, Athens, GA, for Amicus
Curiae The Chamber of Commerce of the
United States of America in support of
Petitioner-Appellee; on the brief: Kathryn
Comerford Todd & Tyler R. Green,
National Chamber Litigation Center, Inc.,
Washington, D.C.

DENNIS JACOBS, Circuit Judge:

The truly unusual procedural history of this case requires us to reconcile

two settled principles that militate in favor of opposite results:  a district court's

discretion to confirm an arbitral award, and the comity owed to a foreign court's

ruling on the validity of an arbitral award rendered in that country, here, Mexico.

Petitioner-appellee Corporación Mexicana De Mantenimiento Integral, S. De R.L.

3

De C.V. ("COMMISA") contracted with respondent-appellant Pemex-Exploración Y Producción ("PEP"), a state-owned enterprise, to build oil platforms in the Gulf of Mexico. The contracts provided that arbitration would be the exclusive mechanism for dispute resolution. When the parties' relationship disintegrated, each side accused the other of breach. COMMISA initiated arbitration proceedings, prevailed, and in 2009 obtained an award of approximately $300 million.

COMMISA then petitioned the United States District Court for the Southern District of New York (Hellerstein, J.) ("Southern District") for confirmation of the award, which was done. PEP appealed the district court's judgment to this Court ("First Appeal") and simultaneously attacked the arbitral award in the Mexican courts. The Eleventh Collegiate Court in Mexico set aside the arbitral award on the ground that PEP, as an entity deemed part of the Mexican government, could not be forced to arbitrate. Armed with that decision, PEP moved in this Court to vacate the Southern District's judgment and remand the First Appeal in light of the Eleventh Collegiate Court's decision. We granted that motion. On remand, the Southern District conducted an evidentiary hearing, adhered to its previous ruling, issued a new judgment confirming the arbitral award, and thus set the stage for the present appeal.

4

We hold that the Southern District properly exercised its discretion in confirming the award because giving effect to the subsequent nullification of the award in Mexico would run counter to United States public policy and would (in the operative phrasing) be "repugnant to fundamental notions of what is decent and just" in this country. We further conclude that PEP's personal jurisdiction and venue objections are without merit. Finally, we hold that the Southern District did not exceed its authority by including in its judgment $106 million attributed to performance bonds that PEP collected. The judgment is affirmed.

## BACKGROUND

This protracted litigation, begun in 2004, has challenged the courts of two countries. We summarize here only those facts useful for understanding the issues presented and our resolution of them.

### 1.

COMMISA is a Mexican subsidiary of KBR, Inc., a United States construction and military-contracting corporation. PEP is one of four subsidiaries of Petroleos Mexicanos ("PEMEX"), an oil and gas company acting on behalf of the Mexican government. PEMEX and PEP are public entities of the Mexican government, but have the capacity to independently own property and

5

carry out business under their own names.  Together, PEMEX and its subsidiaries

"comprise the state oil and gas company of . . . Mexico."  Joint Appendix ("J.A.")

at 1515.

In 1997, COMMISA and PEP contracted for COMMISA to build oil

platforms in the Gulf of Mexico.  The contract, governed by Mexican law,

contained the following arbitration clause:

> **23.3  <u>Arbitration</u>**.  Any controversy, claim, difference, or
> dispute that may arise from or that is related to, or associated
> with, the present Contract or any instance of breach with the
> present Contract, shall be definitively settled through
> arbitration conducted in Mexico City, D.F., in accordance with
> the Conciliation and Arbitration Regulations of the
> International Chamber of Commerce that are in effect at that
> time.  The arbitrators shall be three in number, and the
> language in which the arbitration shall be conducted shall be
> Spanish.

J.A. at 93.  PEP's (now disputed) authority to bind itself to arbitration was

premised on the following provision of the "PEMEX and Affiliates Organic

Law":

> In the event of international legal acts, Petróleos Mexicanos or its
> Affiliates may agree upon the application of foreign law, the
> jurisdiction of foreign courts in trade matters, and execute arbitration
> agreements whenever deemed appropriate in furtherance of their
> purpose.

Special Appendix ("SPA") at 41.

Two other provisions of the contracts bear on this appeal. One clause gave PEP the unilateral right to "Administrative Rescission" if COMMISA breached the contract or abandoned its work; another clause required COMMISA to post performance bonds.

## 2.

Difficulties arose, in part over PEP's insistence that the platforms be fully constructed before being put into place in the Gulf of Mexico, something COMMISA considered impractical given the weight of the completed platforms. Logistics and cost issues abounded, prompting the parties to execute a new contract in May 2003. The 2003 contract contained virtually-identical arbitration and administrative rescission clauses.

The 2003 contract failed to resolve the parties' differences, and the conflict reached climax in March 2004 when PEP, alleging that COMMISA had failed to meet contractual milestones and had abandoned the project, gave notice of its intent to administratively rescind the contract. PEP seized the platforms, which were 94 percent complete; ejected COMMISA from the work sites; and gave notice by letter of its intention to administratively rescind the contracts. After a fruitless conciliation effort, COMMISA filed a demand for arbitration with the

7

International Chamber of Commerce in December 2004. When PEP informed

COMMISA two weeks later that it was indeed effecting administrative rescission,

COMMISA filed an *amparo* action in the District Court on Administrative Matters

for the Federal District ("Mexican District Court") challenging the

constitutionality, appropriateness, and timeliness of PEP's administrative

rescission[1]; COMMISA lost on all counts.

During the pendency of the *amparo* action, arbitration proceedings began in

Mexico City in May 2005, with the active participation of both parties.

In November 2006, the arbitration panel issued its Preliminary Award,

finding that it possessed jurisdiction over the dispute and enjoining PEP from

attempting to collect on the performance bonds until the issuance of a final

arbitral award authorizing collection. Prior to the issuance of the Preliminary

Award, PEP's arguments did not include a contention that its administrative

rescission was an act of authority not subject to arbitration under Mexican law.

---

[1] An *amparo* action is a mechanism available to litigants in Mexico challenging the validity or constitutionality of governmental acts; the sole remedy is a declaration that the challenged governmental action is invalid.

8

**3.**

Two developments in Mexican law transpired while arbitration

proceedings were ongoing.  In December 2007, the Mexican Congress changed

the available forum for claims that (like COMMISA's) raise issues related to

public contracts, and vested exclusive jurisdiction for such disputes in the Tax

and Administrative Court.  Not incidentally, the switch curtailed the applicable

statute of limitations: previously, ten years for suits in the Mexican District

Courts; afterward, for suits in the Tax and Administrative Court, 45 days.

Second, in May 2009, the Mexican Congress enacted Section 98 of the Law

of Public Works and Related Services  ("Section 98"), which ended arbitration for

certain claims (such as those by COMMISA):

> An arbitration agreement may be executed regarding the disputes
> arising between the parties related to the construction of contractual
> clauses or related to issues arising from the performance of the
> contracts . . . The administrative rescission, early termination of the
> contracts and such cases as the Regulation of this Law may
> determine may not be subject to arbitration proceedings.

J.A. at 3758.

9

**4.**

Promptly after the issuance of the Preliminary Award in November 2006--and before the enactment of Section 98--PEP asked the arbitration tribunal to reconsider its Preliminary Award and--for the first time--contended that administrative rescission was categorically exempt from arbitration as an act of authority on behalf of the Mexican government. The tribunal rejected this argument in its December 2009 Final Award, and, in a voluminous decision, found that PEP breached the contracts and awarded COMMISA approximately $300 million in damages.

COMMISA raced to confirm the award in the Southern District, which ruled in COMMISA's favor in August 2010. PEP appealed that judgment to this Court in the First Appeal and simultaneously challenged the arbitral award in Mexico by filing its own *amparo* action, which eventually made its way to the Eleventh Collegiate Court, the analog of the United States Court of Appeals for the District of Columbia Circuit. In September 2011, the Eleventh Collegiate Court held that PEP's rescission was not arbitrable and ordered that the award be annulled; its analysis repeatedly referenced the newly-enacted Section 98.

10

The First Appeal was still pending when the Eleventh Collegiate Court

rendered its decision.  Pressing its advantage, PEP successfully moved here for

vacatur and remand so that the Southern District could consider the effect of the

Eleventh Collegiate Court's decision.  See Corporación Mexicana de

Mantenimiento Integral, S. De R.L. De C.V. v. Pemex Exploración Y Producción,

No. 10-4656, 2012 WL 9346475, at *1 (2d Cir. Feb. 16, 2012).

On remand, the Southern District received further briefing and conducted

a three-day evidentiary hearing chiefly focused on the meaning of applicable

Mexican legal provisions.  See Corporación Mexicana de Mantenimiento Integral,

S. De R.L. De C.V. v. Pemex Exploración Y Producción, 962 F. Supp. 2d 642, 644

(S.D.N.Y. 2013).  The parties presented dueling experts who disputed whether the

Eleventh Collegiate Court's decision was consistent with the development of

Mexican law, and whether the 2007 change in the applicable statute of limitations

could apply retroactively to the instant dispute.  Ultimately, the Southern District

"decline[d] to defer to the Eleventh Collegiate Court's ruling," and again

"confirm[ed] the Award" on the ground that annulment of the award "violated

basic notions of justice in that it applied a law that was not in existence at the

time the parties' contract was formed and left COMMISA without an apparent

11

ability to litigate its claims." Id.  Specifically, the Southern District concluded

that the Eleventh Collegiate Court applied Section 98 retroactively "to favor a

state enterprise over a private party," and that COMMISA would be left "without

a remedy" for its claims given the compressed statute of limitations for actions

instituted in the Tax and Administrative Court.  Id. at 659-60.

PEP appeals from that judgment.

## DISCUSSION

In reviewing a district court's confirmation of an arbitral award, we

ordinarily review legal issues de novo and findings of fact for clear error.  See

Pike v. Freeman, 266 F.3d 78, 86 (2d Cir. 2001).  In this case, because the Southern

District's holding necessarily encompassed its decision to deny comity to a

foreign judgment, the standard of review is modified: "[w]e review a district

court's decision to extend or deny comity to a foreign proceeding for abuse of

discretion."  Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d

Cir. 1999).  Accordingly, we review the Southern District's denial of comity for

abuse of discretion, and we review underlying conclusions of law de novo and

the underlying findings of fact for clear error.  This approach is consistent with

our precedent in other contexts.  See Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454,

12

464 (2d Cir. 2013) ("We review a district court's grant of class certification for abuse of discretion, and review the conclusions of law underlying that decision *de novo* . . . although 'we review for clear error the factual findings underlying th[at] ruling.'" (alteration in original) (citations omitted) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201 (2d Cir. 2008)).

As to the remaining issues on appeal, we review the Southern District's conclusions of law de novo and findings of fact for clear error.  See, e.g., Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 355 (2d Cir. 2005) (venue); Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 36 (2d Cir. 2001) (personal jurisdiction).

# I

PEP raises two threshold objections challenging: (1) the Southern District's exercise of personal jurisdiction over PEP, and (2) the location of venue in that district.  We consider personal jurisdiction first.

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."  Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982).  "The actions

13

of the defendant may amount to a legal submission to the jurisdiction of the court

. . . ."  Id. at 704-05.  Therefore, "[t]he requirement that a court have personal

jurisdiction is a due process right that may be waived either explicitly or

implicitly."  Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d

Cir. 1998); see also City of N.Y. v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 133 (2d

Cir. 2011) ("Personal jurisdiction, unlike subject-matter jurisdiction, can,

however, be purposely waived or inadvertently forfeited.").  The term

"forfeiture" is more apt than "waiver" here because the issue is whether PEP has

lost its personal jurisdiction objection through its conduct.[2]

When the First Appeal was pending, PEP fully briefed its jurisdiction and

venue arguments.  But, once armed with the Eleventh Collegiate Court decision,

PEP moved this Court to vacate and remand to the Southern District for

reconsideration.  To state the obvious, PEP then believed that the Southern

District would reverse course.  Nowhere in that motion did PEP suggest that the

relief it sought by motion here and on remand in the Southern District might

_____

[2] See Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999) ("The term 'waiver' is best reserved for a litigant's intentional relinquishment of a known right.  Where a litigant's action or inaction is deemed to incur the consequence of loss of a right, or, as here, a defense, the term 'forfeiture' is more appropriate.").

14

offend "traditional notions of fair play and substantial justice" or otherwise

implicate personal jurisdiction concerns.  Gucci America, Inc. v. Weixing Li, 768

F.3d 122, 134 (2d Cir. 2014) (quoting Int'l Shoe Co. v. State of Wash., Office of

Unemployment Compensation and Placement et al., 326 U.S. 310, 316 (1945)).

Thus, PEP's due process objections evidently disappeared when its prospects of

success were buoyed by the Eleventh Collegiate Court's decision.  Because PEP

affirmatively and successfully sought relief from this Court remanding for a new

merits determination in the Southern District, it forfeited its argument that

personal jurisdiction is lacking.  PEP cannot now re-contest personal jurisdiction

merely because it is dissatisfied with its tactical choice.[3]

Our sister circuits have reached similar conclusions in other contexts.  See

Gerber v. Riordan, 649 F.3d 514, 519 (6th Cir. 2011) ("'[T]he voluntary use of

---

[3] COMMISA did not make the forfeiture argument in its initial brief.  Rather, at our direction, the parties submitted post-argument letter briefs on the forfeiture issue.  "Entertaining issues raised for the first time on appeal is discretionary with the panel hearing the appeal."  Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994).  The "general rule that an appellate court will not consider an issue raised for the first time on appeal" "is not an absolute bar . . . the general rule is disregarded when we think it necessary to remedy an obvious injustice."  Id.  Here, as explained in text, our consideration of the issue is necessary to prevent PEP from reviving threshold arguments that are incompatible with seeking merits-based relief from this Court and the Southern District.

15

certain [district] court procedures' serve[s] as 'constructive consent to the personal jurisdiction of the [district] court . . . .'" (alteration in original) (quoting Ins. Corp. of Ireland, 456 U.S. at 704)); PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland), 260 F.3d 453, 460-61 (5th Cir. 2001) ("[W]hen 'a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter.'"(quoting Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 443 (3d Cir. 1999))); see also Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co., 203 F.3d 835 (Table), 2000 WL 147392, at *3 (10th Cir. 2000) ("After its lengthy participation in this litigation, [and] efforts to seek affirmative relief . . . [defendant] may not pull its personal jurisdiction defense 'out of the hat like a rabbit.'"(quoting Fed. Deposit Ins. Corp. v. Oaklawn Apartments, 959 F.2d 170, 176 (10th Cir. 1992))).

Moreover, PEP's personal jurisdiction argument has changed over time, so that it is unclear whether the challenge that we find forfeited is one that was actually raised in the first instance. In the Southern District, PEP's initial motion to dismiss for lack of personal jurisdiction was premised on inadequate service of process. Due process concerns were nowhere to be found; indeed, PEP's counsel

emphasized the limited scope of the personal jurisdiction argument, conceding that the well-known minimum contacts test was inapplicable to PEP.[4]  It was not until briefing was complete that PEP raised before the Southern District the due process point it advances on appeal.[5]

Having sought additional proceedings addressed to the merits, both here and in the Southern District, PEP may not now contest personal jurisdiction.  "To waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking."  Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A., 623 F.3d 440, 443 (7th Cir. 2010).

---

[4] See J.A. at 2006 ("Personal jurisdiction is effected by proper service, and our position is there is no proper service.  The minimal contacts test has been eliminated by the Second Circuit in this context.").

[5] Although COMMISA did not initially argue forfeiture, see supra n.3, it did argue that PEP waived its objection to personal jurisdiction by explicitly conceding that the jurisdictional protections of the Due Process Clause do not apply here.  We need not consider COMMISA's waiver argument because we conclude, in any event, that these jurisdictional protections do not apply to PEP, see infra pp. 20-22, which affirmatively claims that it is functionally the Mexican government.

PEP contends that its motion for a remand to consider the Eleventh

Collegiate Court's decision simply advanced a menu of options not limited to

vacatur and remand, and that this Court's choice to remand cannot support a

finding of forfeiture.  This mischaracterizes PEP's litigation position before this

Court on the First Appeal; PEP explicitly angled for a full vacatur and remand of

the case, and it downplayed other alternatives.  Rather than pursue the First

Appeal on grounds (inter alia) of personal jurisdiction and venue, PEP effectively

abandoned those arguments and pressed for a remand to consider intervening

precedent on which PEP thought it could win.[6]  That abandonment constitutes

forfeiture.

\*   \*   \*

In any event, PEP's due process argument fails because PEP is a

corporation owned by a foreign sovereign.  The jurisdictional protections of the

---

[6] PEP, in its post-argument letter brief, argues that its request was tantamount to a request for a remand following an indicative ruling but concedes it chose not to follow this path.  That choice had consequences; if PEP had moved for an indicative ruling, and the Southern District had issued such a decision, this Court could have "remand[ed] for further proceedings" but would "*retain*[] jurisdiction unless [we] expressly dismisse[d] the appeal."  FED. R. APP. P. 12.1(b) (emphasis added).  That (or, for that matter, a remand pursuant to United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994)) is far afield from what PEP urged this Court to do, which was a full vacatur and remand *without* qualification.

Due Process Clause do not apply to "foreign states and their instrumentalities".

Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d

393, 399 (2d Cir. 2009).  The same conclusion does not follow for foreign

corporations; see Bensmiller v. E.I. Dupont de Nemours & Co., State of La., 47

F.3d 79, 81 (2d Cir. 1995) ("First, the court must determine if the state's long-arm

statute reaches the foreign corporation.  Second, if the statute does reach the

corporation, then the court must decide whether that exercise of jurisdiction

offends due process.").  This distinction rests on the principle that due process

rights can only be exercised by persons,  see Frontera, 582 F.3d at 398, including

corporations, which are persons at law.  See Phillips v. Tobin, 548 F.2d 408, 411

(2d Cir. 1976).  The line between a foreign sovereign and a foreign corporation

can sometimes be indistinct, but our conclusion--that PEP falls in the former

category--is informed by First Nat'l City Bank v. Banco Para el Comercio Exterior

de Cuba, 462 U.S. 611 (1983) ("Bancec").

Bancec established the presumption that "government instrumentalities

established as juridical entities distinct and independent from their sovereign

should normally be treated as such."  Id. at 626-27.  The presumption, however,

"may be overcome in certain circumstances," as "where a corporate entity is so

19

extensively controlled by its owner that a relationship of principal and agent is created." Id. at 628-29. Although Bancec disclaimed a "mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded," the Court indicated that a valid basis for "declin[ing] to adhere blindly to the corporate form" would be "where doing so would cause . . . an injustice." Id. at 632-33. Thus Bancec relied on "equitable principles" to disregard the corporate form and thereby prevent the government of Cuba from hiding behind a juridical entity (to obtain relief) without itself appearing, which would necessarily waive sovereign immunity and force it to answer for a violation of international law. Id. at 630. Although Bancec arose in a different context, it is "applicable when the question is whether the instrumentality should have due process rights to which the state is not entitled." Frontera, 582 F.3d at 400.

This is one of the easy cases because PEP affirmatively claims that it is functionally the Mexican government--which it advances as the reason it cannot be forced to arbitrate. The Eleventh Collegiate Court opinion reinforces that

view.[7]  Applying "recognized equitable principles," PEP should be treated for

personal jurisdiction purposes as the foreign sovereign it claims to be when it

comes to other issues in this litigation.  Bancec, 462 U.S. at 633.  In Mexico, oil is a

state-owned resource, and PEP's actions sought to protect Mexican oil interests

from a foreign private corporation; bluntly put, PEP acted as the state.  That is the

basis of the following argument by PEP that nullification of the arbitral award

should be upheld: "the view that *public* entities can abrogate contracts for reasons

unavailable to private parties is hardly alien to American law.  For example, *the*

*U.S. Government* can block breach-of-contract suits against it by asserting that the

litigation would reveal state secrets."  Appellant's Br. at 53 (emphasis added).

PEP's assertion (in arguing the merits) that it is integral to the Mexican

---

[7] See J.A. at 3749 ("[S]uch administrative rescission of the public works contract . . . involves the supervision of the resources of the State and society for the purposes of meeting the needs of the latter."); id. at 3750 ("[P]ublic powers that aim at safeguarding the public benefit and interest cannot" be waived); id. ("This is supported by the fact that the jurisdictional function exercised to set aside acts of authority is an exclusive function of the State and can only be delegated to its bodies.  However, acting in the capacity as state body entails pursuing, with its own will, public interests.  This is evidently not done by private parties when they submit their disputes to arbitrators, for in those cases they are solely pursuing private objectives."); id. at 3754 ("[A]ppellant acted in its capacity as public entity and authority in a superior-to-subordinate relationship.").

21

government binds it for all portions of this appeal, including personal

jurisdiction.

The authorities on which PEP relies fail to persuade.  In <u>GSS Group Ltd. v.

National Port Authority</u>, 680 F.3d 805, 814 (D.C. Cir. 2012), the D.C. Circuit

recited the principle that the "presumption of separateness gives way only if a

foreign 'corporate entity is so extensively controlled by its owner that a

relationship of principal and agent is created,' or when 'broader equitable

principle[s]' dictate that separate treatment 'would work fraud or injustice.'"

(citations omitted) (quoting <u>Bancec</u>, 462 U.S. at 629).  The court applied the

presumption of separateness: the National Port Authority of Liberia claimed to

be an independent juridical entity, and the court observed that the opposing

party "failed to contest that characterization."  <u>Id.</u> at 817.  The court therefore had

no occasion to consider when a foreign corporation *should* be treated as its owner-

sovereign.  <u>First Investment Corporation of Marshall Islands v. Fujian Mawei

Shipbuilding, Limited</u>, 703 F.3d 742, 755 (5th Cir. 2012) likewise notes that

manipulation of the corporate form "to perpetrate a fraud or injustice" warrants

overcoming the presumption of separateness. In any event, treating PEP as

separate from the Mexican government for the purpose of personal jurisdiction

22

would work an "injustice" insofar as it would allow PEP to characterize its status vis a vís the Mexican government in whatever way is advantageous to its several arguments.  See Bancec, 462 U.S. at 633.

## II

This panel is unanimous in concluding that venue lies in the Southern District of New York.  But we differ as to which rationale is strongest.

The view of two of the panel members is that, for essentially the same reasons that PEP forfeited its challenge to personal jurisdiction, it has a fortiori forfeited its challenge to venue, because venue is "a limitation designed for the convenience of litigants, and, as such, may be waived by them."  Olberding v. Ill. Cent. R.R. Co., 346 U.S. 338, 340 (1953).  An objection to venue "may be lost . . . by submission through conduct.  Whether such surrender of a personal immunity be conceived negatively as a waiver or positively as a consent to be sued, is merely an expression of literary preference.  The essence of the matter is that courts affix to conduct consequences as to place of suit consistent with the policy behind [venue statutes] which is 'to save defendants from inconveniences to which they might be subjected if they could be compelled to answer in any district, or wherever found.'"  Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 168

23

(1939) (citation omitted) (quoting General Inv. Co. v. Lake Shore & M.S. Ry. Co., 260 U.S. 261, 275 (1922)). PEP cannot now reject this forum as extraordinarily inconvenient when it affirmatively sought relief from this Court and from the Southern District of New York.[8]

## III

The domestic enforcement of foreign arbitral awards is governed by two international Conventions: the Inter-American Convention on International

---

[8] The concurring opinion argues that forfeiture is limited to "conduct that deliberately avoids a final disposition of personal jurisdiction and venue issues until a loss on the merits appears likely," i.e. sandbagging. Concurring Op. At 2. PEP's conduct fits the bill: it sought full reconsideration of the merits in the Southern District after the venue and personal jurisdiction issues were fully briefed before this Court, then asserted its personal jurisdiction and venue defenses after losing on the merits in the Southern District.

The concurring opinion contends that PEP's motion to remand was not gamesmanship; however, in light of PEP's entire course of conduct, we see it distinctly otherwise. Further, the sole relief sought by PEP in its motion to remand was reconsideration of the result; PEP's motion argued against holding the appeal in abeyance as impractical given the changed circumstances of the litigation.

Finally, there is a basic and serviceable difference between a Jacobson remand (which elicits an answer to a question that may assist resolution of the *pending* appeal) and an ordinary remand (which allows reconsideration of the outcome). Our remand was of a second kind, notwithstanding that any further appeal was directed to the same panel. See, e.g., United States v. Rivalta, 925 F.2d 596, 597 (2d Cir. 1991).

Commercial Arbitration ("Panama Convention") and the Convention on the

Recognition and Enforcement of Foreign Arbitral Awards ("New York

Convention").  There is no substantive difference between the two[9]: both evince a

"pro-enforcement bias."  Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,

126 F.3d 15, 20 (2d Cir. 1997).  The Federal Arbitration Act ("FAA") expressly

incorporates the terms of the Panama Convention.  See 9 U.S.C. § 301 ("The Inter-

American Convention on International Commercial Arbitration of January 30,

1975, shall be enforced in United States courts in accordance with this

chapter.").[10]

---

[9] See Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc., 23 F.3d
41, 45 (2d Cir. 1994) ("The legislative history of the Inter-American Convention's
implementing statute, however, clearly demonstrates that Congress intended the
Inter-American Convention to reach the same results as those reached under the
New York Convention: 'The New York Convention and the Inter-American
Convention are intended to achieve the same results . . . in view of . . . the parallel
legislation under the Federal Arbitration Act that would be applied to the
Conventions, [it is expected] that courts in the United States would achieve a
general uniformity of results under the two conventions.'"(quoting H.R. Rep. No.
501, 101st Cong., 2d Sess. 4 (1990), reprinted in 1990 U.S.C.C.A.N. 675, 678)).

[10] The Panama Convention applies to this case since a "majority of the parties
to the arbitration agreement are citizens of . . . States that have ratified or acceded
to the [Panama Convention] and are member States of the Organization of
American States."  9 U.S.C. § 305(1).

25

Article V of the Panama Convention sets out--and limits--the discretion of courts in enforcing foreign arbitral awards: "The recognition and execution of the decision *may* be refused, at the request of the party against which it is made, only if such party is able to prove to the competent authority of the State in which recognition and execution are requested" one of seven defenses. Panama Convention art. V(1), Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (emphasis added). "Article V provides the exclusive grounds for refusing confirmation under the Convention, [and] one of those exclusive grounds is where 't[he] award . . . has been [annulled] or suspended by a competent authority of the country in which, or under the law of which, that award was made.'" Yusuf, 126 F.3d at 20 (quoting Panama Convention art. V(1)(e), Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245); see also 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."). In sum, a district court *must* enforce an arbitral award rendered abroad unless a litigant satisfies one of the seven enumerated defenses; if one of the defenses is established, the district court *may* choose to refuse recognition of the award.

26

At first look, the plain text of the Panama Convention seems to
contemplate the unfettered discretion of a district court to enforce an arbitral
award annulled in the awarding jurisdiction. However, discretion is constrained
by the prudential concern of international comity, which remains vital
notwithstanding that it is not expressly codified in the Panama Convention. See
Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru, 109 F.3d 850, 854 (2d Cir.
1997) ("Although courts in this country have long recognized the principles of
international comity and have advocated them in order to promote cooperation
and reciprocity with foreign lands, comity remains a rule of 'practice,
convenience, and expediency,' rather than of law."(quoting Somportex Ltd. v.
Phila. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971))); In re Maxwell
Comm'n Corp. plc, 93 F.3d 1036, 1047 (2d Cir. 1996) ("When construing a statute,
the doctrine of international comity is best understood as a guide where the
issues to be resolved are entangled in international relations.").

Accordingly, "a final judgment obtained through sound procedures in a
foreign country is generally conclusive . . . *unless* . . . enforcement of the judgment
would offend the public policy of the state in which enforcement is sought."
Ackermann v. Levine, 788 F.2d 830, 837 (2d Cir. 1986) (emphasis in original). "A

27

judgment is unenforceable as against public policy to the extent that it is 'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'" Id. at 841 (quoting Tahan v. Hodgson, 662 F.2d 862, 864 (D.C. Cir. 1981)); see also Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V., 809 F.3d 737, 743 (2d Cir. 2016) ("Nevertheless, 'courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States.'"(quoting Pravin, 109 F.3d at 854)).

The public policy exception does not swallow the rule: "[t]he standard is high, and infrequently met"; "a judgment that 'tends clearly' to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property is against public policy." Ackermann, 788 F.2d at 841 (quoting Somportex, 453 F.2d at 443). The exception accommodates uneasily two competing (and equally important) principles: [i] "the goals of comity and res judicata that underlie the doctrine of recognition and enforcement of foreign judgments" and [ii] "fairness to litigants." Id. at 842.

28

Precedent is sparse; but the few cases that are factually analogous have

endorsed this approach.  See Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd., 191

F.3d 194, 197 n.3 (2d Cir. 1999) ("Recognition of the Nigerian [annulment of the

arbitral award] in this case does not conflict with United States public policy.");

see also TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 938 (D.C. Cir. 2007)

("*Baker Marine* is consistent with the view that when a competent foreign court

has nullified a foreign arbitration award, United States courts should not go

behind that decision absent extraordinary circumstances not present in this case

. . . . Therefore, it is unsurprising that the courts have carefully limited the

occasions when a foreign judgment is ignored on grounds of public policy.  A

judgment is unenforceable as against public policy to the extent that it is

'repugnant to fundamental notions of what is decent and just in the State where

enforcement is sought.'" (citation omitted) (quoting Ackermann, 788 F.2d at

841)).

Consequently, although the Panama Convention affords discretion in

enforcing a foreign arbitral award that has been annulled in the awarding

jurisdiction, and thereby advances the Convention's pro-enforcement aim, the

exercise of that discretion here is appropriate only to vindicate "fundamental

29

notions of what is decent and just" in the United States. Id. (quoting Ackermann, 788 F.2d at 841).

## IV

Applying this standard, we conclude that the Southern District did not abuse its discretion in confirming the arbitral award notwithstanding invalidation of the award in the Mexican courts. The high hurdle of the public policy exception is surmounted here by four powerful considerations: (1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum; and (4) the prohibition against government expropriation without compensation.

## 1. Contractual Waivers of Sovereign Immunity

The "Pemex and Affiliates Organic Law" specifically authorized PEP to agree to execute arbitration agreements, as it did in both the 1997 and 2003 contracts; the arbitration clauses likewise constrained COMMISA to arbitrate as the sole recourse for challenging any breach. When arbitration proceedings were underway, PEP participated without contending that its act of administrative

30

rescission was beyond the reach of arbitration; that argument was advanced only after PEP's loss was presaged by issuance of the Preliminary Award.

That valid waivers must be enforced is settled domestic law. The Supreme Court has blessed contractual waivers of sovereign immunity and accompanying agreements to arbitrate. See C&L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411, 418-23 (2001) ("We are satisfied that the Tribe in this case has waived, with the requisite clarity, immunity from the suit . . . . brought to enforce [the] arbitration award . . . [t]he Tribe clearly consented to arbitration and to the enforcement of arbitral awards . . . the Tribe thereby waived its sovereign immunity from . . . suit."); Cooke v. United States, 91 U.S. 389, 398 (1875) ("If [the United States] comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there.").[11]

These values are not local. The North American Free Trade Agreement ("NAFTA"), ratified by Mexico and the United States, treats arbitration as a

---

[11] The Restatement of Foreign Relations Law also espouses this view. See Restatement (Third) of the Foreign Relations Law of the United States § 456(2) (1987)("Under the law of the United States . . . an agreement to arbitrate is a waiver of immunity from jurisdiction in . . . an action to enforce an arbitral award rendered pursuant to the agreement.").

31

"mechanism for the settlement of investment disputes that assures both equal

treatment among investors of the Parties in accordance with the principle of

international reciprocity and due process before an impartial tribunal."  NAFTA

art. 1115, Jan. 1, 1994.

Giving effect to PEP's twelfth-hour invocation of sovereign immunity

shatters COMMISA's investment-backed expectation in contracting, thereby

impairing one of the core aims of contract law.  See Hunt Constr. Grp., Inc. v.

Brennan Beer Gorman/Architects, P.C., 607 F.3d 10, 14 (2d Cir. 2010) ("[C]ontract

law . . . is designed to enforce parties' contractual expectations . . . .").

## 2.  Retroactive Application of Laws

Giving effect to the nullification would likewise impair the closely-related

concept of avoiding retroactive application of laws.  The Mexican government's

adoption of Section 98 was an abrupt departure from the "Pemex and Affiliates

Organic Law" as well as from the contracts signed by the parties; allowing

Section 98 to nullify COMMISA's arbitral award would deprive COMMISA of its

contract rights through a retroactive change in law.

Retroactive legislation that cancels existing contract rights is repugnant to

United States law.  That repugnance is "deeply rooted in [Supreme Court]

32

jurisprudence, and embodies a legal doctrine centuries older than our Republic."

Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994). "Elementary

considerations of fairness dictate that individuals should have an opportunity to

know what the law is and to conform their conduct accordingly; settled

expectations should not be lightly disrupted." Id. Anti-retroactivity is a

principle embedded in "several provisions" of the Constitution, including:

- The Ex Post Facto Clause's ban on retroactive application of penal legislation;

- The proscription against states retroactively impairing the obligation of contracts;

- The prohibition on Bills of Attainder, stopping legislatures from "singling out disfavored persons and meting out summary punishment for past conduct"; and

- The Due Process Clause, and corresponding rights to "fair notice".

Id. at 266. It is therefore understatement to observe that "[r]etroactivity is not

favored in the law." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988).

As the Southern District recognized, "retroactive application of laws and the

unfairness associated with such application is at the center of the dispute before me." Corporación Mexicana, 962 F. Supp. 2d at 659.

Prior to the enactment of Section 98, PEP was authorized to arbitrate, did in fact agree to do so, and actively participated in the arbitration proceedings. The effect of the ruling by the Eleventh Collegiate Court--that acts of administrative rescission are not arbitrable--may well have been compelled by the legislature's enactment of Section 98. But the effect of the ruling amounts to retroactive application of that law. True, the Eleventh Collegiate Court specifically stated it was not retroactively applying Section 98, and we are in no position to pass upon that court's interpretation of Mexican law, or upon the sufficiency of its precedent. We are concerned here with the effect of Section 98 in these circumstances and upon these parties. And it is incontestable that the capacity of PEP to arbitrate was established in prior law; that it was withdrawn with respect to certain disputes that had already arisen; and that it was withdrawn in a way that frustrated contractual expectation, undid an arbitral award, and precluded redress by COMMISA in any forum. The sequence of events and the circumstances in which Section 98 was enacted thus resulted in a retroactive application of Section 98 as a matter of *United States* law. That PEP is part of the government that promulgated the law does not help at all.

34

PEP argues that the Eleventh Collegiate Court's decision followed from a 1994 Mexican Supreme Court decision, and that COMMISA was thus on notice prior to 2009 that administrative rescissions were not arbitrable.  Whether the Eleventh Collegiate Court properly reasoned from the 1994 precedent is emphatically not for U.S. courts to say.  But notice is germane to the issue of enforcement.  It therefore matters that the word "arbitration" does not appear in the 1994 decision, which simply declares that administrative rescission is an act of authority.  One of PEP's own witnesses, in the evidentiary hearing before the Southern District, testified that the 1994 decision was a "weak premise" for the Eleventh Collegiate Court to rely upon, considering the number of other cases going the other way.  J.A. at 3072-73.  It is therefore unsurprising that the opinion of the Eleventh Collegiate Court relies heavily on Section 98 and very little on the Mexican Supreme Court decision.[12]

---

[12] See J.A. at 3758-63 ("This criterion is strengthened by the fact that, due to the amendments of the current law of Public Works and Related Services, Section 98 states as follows . . . .  The express prohibition that the administrative rescission or the early termination of this type of contract cannot be subject to arbitration is present in the second paragraph of this legal provision . . . it is evident that the current trend of the legislator regarding public works is to protect the economy and public expenditure by abandoning the practices that were aimed at granting more participation to private parties than to the State.  Therefore, the State should be granted, once again, suitable mechanisms to fulfill those objectives . . . if, as in

3.  **Availability of a Forum**

If the Southern District had recognized and implemented the nullification of the arbitral award, COMMISA would have had no sure forum in which to bring its contract claims.  The imperative of having cases heard--somewhere--is firmly embedded in legal doctrine:

- The grant of a <u>forum non conveniens</u> motion that would otherwise be proper "would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981).

- The general rule of mootness is relaxed for issues that are "capable of repetition, yet evading review" because otherwise parties would be left "without a chance of redress."  S. Pac. Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 515 (1911).

- In federal habeas corpus cases, a state prisoner can overcome a procedural default stemming from state restrictions on direct appeal,

this case, a contract is subject to administrative rescission by a party acting in the capacity as authority such act may not be tried, modified, avoided or altered by an arbitration panel.  This would be contrary to public policy which is currently particularly protected by the amendment of the law which expressly sets forth such prohibition.").

given a showing of cause and prejudice to allow the prisoner "fair

process" and "the opportunity to comply with the State's procedures

and obtain an adjudication on the merits of his claims." <u>Martinez v.

Ryan</u>, 132 S.Ct. 1309, 1317 (2012).

These examples spring from the same source: litigants with legal claims should

have an opportunity to bring those claims somewhere.

Absent confirmation of the award, COMMISA would lose the opportunity

to bring its claims because of the change in Mexican law subjecting COMMISA's

claims to the 45-day statute of limitations in the Tax and Administrative Court.  It

is no conjecture that COMMISA's suit would be dismissed as time-barred; the

Tax and Administrative Court did precisely that.  <u>See</u> J.A. at 2870-71.

The statute of limitations is not the only barrier COMMISA would face.  Its

claims were tossed by the Tax and Administrative Court on the additional

ground that, because COMMISA's claims were presented in the Mexican District

Court, they were barred by <u>res</u> <u>judicata</u>.  <u>See</u> J.A. at 2872.  This also raises

equitable concerns.  After PEP rescinded, COMMISA instituted an *amparo* action

in the Mexican District Court, which the arbitral panel presumably could not

37

adjudicate.[13]  COMMISA lost.  Later, after the promulgation of Section 98, when

COMMISA sought a ruling in the Tax and Administrative Court, that court

rejected COMMISA's *breach* claims on the ground of <u>res</u> <u>judicata</u>, citing the

*amparo* action.  Since the arbitral award favorable to COMMISA was treated as a

legal nullity, COMMISA was thus twice the victim of unforseen changes in the

law.  Such a result offends basic domestic principles of claim preclusion.  <u>See</u>

<u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980) ("Under res judicata, a final judgment on

the merits of an action precludes the parties or their privies from relitigating

issues that were *or could have been* raised in that action.") (emphasis added).

    We agree with the Southern District that COMMISA's inability to have its

breach claims heard magnifies the injustice.  <u>See</u> <u>Corporación Mexicana</u>, 962 F.

Supp. 2d at 659 ("[T]his unfairness was exacerbated by the fact that the Eleventh

Collegiate Court's decision left COMMISA without a remedy to litigate the

merits of the dispute that the arbitrators had resolved in COMMISA's favor.").

---

[13] <u>See</u> J.A. at 1486 ("COMMISA sought to stop PEP from administratively rescinding the Contracts pursuant to public law provisions, the subject matter of which cannot be brought before this Arbitral Tribunal's Jurisdiction.").

4.  __Government Expropriation Without Compensation__

PEP, acting on behalf of the Mexican government, rescinded the contracts and forcibly removed COMMISA from the project sites.  Then, by legislation, Mexico frustrated relief that had been granted to COMMISA in the arbitral forum and consigned it to a forum in which relief was foreclosed both by the statute of limitations and res judicata.  The Eleventh Collegiate Court did no more than apply this Mexican law.  At the same time, the enforcement of such Mexican law amounted to a taking of private property without compensation for the benefit of the government.  In the United States, this would be an unconstitutional taking.  See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." (citation omitted)).  This feature of United States law is not peculiar to this country.  NAFTA provides that "[n]o party may . . . take a measure tantamount to nationalization or expropriation of such an investment ('expropriation'), except . . . on payment of compensation in accordance with paragraphs 2 through 6."  NAFTA art. 1110, Jan. 1, 1994.  No payment was made in accordance with NAFTA or otherwise.

39

\* \* \*

Any court should act with trepidation and reluctance in enforcing an arbitral award that has been declared a nullity by the courts having jurisdiction over the forum in which the award was rendered. However, we do not think that the Southern District second-guessed the Eleventh Collegiate Court, which appears only to have been implementing the law of Mexico. Rather, the Southern District exercised discretion, as allowed by treaty, to assess whether the nullification of the award offends basic standards of justice in the United States. We hold that in the rare circumstances of this case, the Southern District did not abuse its discretion by confirming the arbitral award at issue because to do otherwise would undermine public confidence in laws and diminish rights of personal liberty and property. See Ackermann, 788 F.2d at 841. Taken together, these circumstances validate the exercise of discretion and justify affirmance.

**V**

Pursuant to the contracts, COMMISA posted $106 million in performance bonds. After entry of the Final Award in favor of COMMISA, PEP collected on the bonds. The Southern District's judgment includes the $106 million. PEP argues that inclusion of that amount in the judgment exceeded the bounds of the Southern District's confirmation authority. See 28 U.S.C. 1605(a)(6).

40

"[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984). The pertinent question, then, is whether the performance bonds were part of the "final arbitration award." Id.

The Preliminary Award ordered PEP to "refrain from filing any claim attempting to collect the bonds granted in its favor . . . until the Tribunal issues its final award, *and* according to such award, PEP has any right to claim the payment of the bonds." J.A. at 143 (emphasis added). The Final Award concluded that PEP was "defeated in the merits" of the dispute, that PEP engaged in "repeated breaches," and that COMMISA's success entitled it to damages, litigation expenses, and costs. Id. at 861-68. The Final Award also emphasized the validity of the Preliminary Award, and its injunction against collecting on the performance bonds: "[I]t must be reminded that in the Preliminary Award it was determined that the Tribunal has jurisdiction to hear . . . the application of conventional penalties through the collection on performance bonds posted by claimant . . . . The aforementioned Preliminary Award is binding and unalterable, as it is now final." Id. at 180.

41

The conditions stated in the Preliminary Award for collection on the performance bonds were the issuance of a final award (which happened), *"and according to such award, PEP has any right to claim the payment of the bonds"*-- a condition that was conspicuously unsatisfied.  Id. at 143 (emphasis added).  The order enjoining PEP from collecting on the performance bonds was therefore part of the Final Award itself.

PEP argues that the omission of any reference to the performance bonds in the damages section of the Final Award points the other way because the panel enumerated the items that comprised the Award in painstaking--and presumably comprehensive--detail.  This argument, however, ignores the sequence of events; PEP relied on the Eleventh Collegiate Court decision as a judgment authorizing it to collect on the performance bonds.  But that ruling was issued in October 2011-- *after* the Final Award had already issued.  So there was no occasion for the Final Award to specify damages stemming from conduct that had not yet occurred, especially since PEP was forbidden from collecting on the bonds unless and until the tribunal determined that PEP was entitled to do so.

Although the confirmation role is limited, we have still allowed district courts to interpret the contents of applicable awards.  See Folkways Music

42

Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993) ("In finding that the

award encompassed rights to the underlying works, the district court properly

interpreted the award.").  The Southern District's interpretation was sound; the

$106 million was properly included in the judgment.

## CONCLUSION

For the foregoing reasons, the judgment of the Southern District is

affirmed.