1  13-4022, <u>Corporación Mexicana de Mantenimiento Integral, S. de</u>
2  <u>R.L. de C.V. v. Pemex Exploración y Producción</u>
3
4  WINTER, <u>Circuit Judge</u>, concurring:

5      I concur in my colleagues' disposition of this appeal while

6  disagreeing with their imposing of a forfeiture with regard to

7  personal jurisdiction and venue.  I agree that PEP should be

8  treated as a foreign sovereign for personal jurisdiction

9  purposes, <u>see</u> Maj. Op. 18-23, and that personal jurisdiction over

10 PEP exists in the Southern District of New York.  I also conclude

11 that venue is proper in the Southern District of New York under

12 28 U.S.C § 1391(f)(3) because PEP is an "agency or

13 instrumentality" of the State of Mexico and was "doing business"

14 in New York.

15     a) <u>Forfeiture</u>

16     My colleagues rule, <u>sua</u> <u>sponte</u>, that, "[b]ecause PEP

17 affirmatively and successfully sought relief from this Court

18 remanding for a new merits determination in the Southern

19 District, it forfeited its argument that personal jurisdiction is

20 lacking."  Maj. Op. 15.  "[F]or essentially the same reasons[,] .

21 . . it has a fortiori forfeited its challenge to venue."  Maj.

22 Op. 23.

23     My colleagues rely principally on "gamesmanship" or

24 "sandbagging" cases, <u>Hamilton v. Atlas Turner, Inc.</u>, 197 F.3d 58,

1

1    62 (2d Cir. 1999) (finding defendant forfeited personal

2    jurisdiction defense by not moving to dismiss in order to "gamble

3    it could raise the personal jurisdiction issue on the eve of

4    trial, in case a trial occurred"), none of which lend their

5    ruling any support whatsoever.  The gamesmanship arises from the

6    fact that defendants have an interest in obtaining a favorable

7    ruling on the merits that would constitute <u>res</u> <u>judicata</u>.  Pursuit

8    of this interest creates an incentive on their part to preserve

9    any existing personal jurisdiction and venue defenses but not

10   seek a definitive ruling -- which might lead only to a new

11   lawsuit elsewhere -- until a favorable merits ruling appears

12   unattainable.  Courts have the opposite incentive.  Why address

13   the merits at all if plaintiffs are in the wrong court?

14   Therefore, we have found forfeiture in conduct that deliberately

15   avoids a final disposition of personal jurisdiction and venue

16   issues until a loss on the merits appears likely.

17        No such gamesmanship occurred in this matter.  Although the

18   grounds on which PEP challenged personal jurisdiction in the

19   district court changed over the course of the litigation, PEP

20   timely litigated that issue and the issue of proper venue in the

21   district court.  In moving to dismiss the petition to confirm the

22   ICC's arbitration award, PEP filed a motion to dismiss, arguing

23   that (i) the district court lacked personal jurisdiction, and

1   (ii) venue was improper under 28 U.S.C § 1391(f)(3) because PEP

2   was not doing business in New York.  An August 25, 2010 hearing

3   thoroughly explored those issues.  In confirming the ICC's

4   arbitration award, the district court expressly held that it had

5   personal jurisdiction over PEP and that venue was proper in the

6   Southern District of New York.

7        On appeal, PEP's brief extensively argued that "[t]he

8   district Court [] erred in holding that it had personal

9   jurisdiction over PEP," Br. of Resp't-Appellant at 19,

10  Corporación Mexicana de Mantenimiento Integral, S. de R.L. de

11  C.V. v. Pemex Exploración y Producción ("PEMEX"), No. 10-4656-cv,

12  2012 WL 9346475 (2d Cir. Feb. 16, 2012), and that it "erred in

13  holding that venue was proper in the SDNY," id. at 22.

14       After briefing in this court, however, the Eleventh

15  Collegiate Court of Mexico rendered its decision invalidating the

16  ICC's arbitration award.  PEP understandably moved before this

17  panel for a remand to allow the district court to reconsider the

18  validity of the arbitration award in light of the Mexican ruling.

19  In so moving, PEP did not mention the personal jurisdiction and

20  venue issues, already fully briefed before this panel, because

21  there had been no intervening events casting light upon those

22  issues.  However, PEP requested in the alternative that the

23  appeal be held in abeyance pending disposition of a Fed. R. Civ.

3

1    P. 60(b) motion, based on the Mexican court ruling, in the

2    district court.  Appearing as <u>amicus</u> <u>curiae</u>, the United States

3    supported the motion to remand.

4        The seeking of a remand was perfectly understandable.  The

5    intervening Mexican decision was of unquestioned relevance to

6    this appeal, as the appearance of the United States as <u>amicus</u>

7    <u>curiae</u> and Judge Jacobs' opinion amply demonstrate.  In all

8    probability, had oral argument proceeded, we would have remanded

9    to obtain the views of the district court as to the bearing of

10   the Mexican judicial ruling on the merits issues.

11       In light of the indisputable relevance of the Mexican

12   ruling, my colleagues' forfeiture ruling is not only <u>sua</u> <u>sponte</u>,

13   but also unprecedented.  We have ruled that courts should proceed

14   with "caution" in finding forfeiture of personal jurisdiction

15   defenses.  <u>Atlas</u>, 197 F.3d at 60.  Forfeiture is to be

16   principally found in cases of "sandbagging," for example, where a

17   defendant "rais[es] the issue of personal jurisdiction on a

18   motion to dismiss, [then] deliberately refrain[s] from pursuing

19   it any further when his motion is denied in the hopes of

20   receiving a favorable disposition on the merits, and then

21   rais[es] the issue again on appeal only if he [is] unhappy with

22   the district court's ultimate decision."  <u>Peterson v. Highland</u>

23   <u>Music, Inc.</u>, 140 F.3d 1313, 1318 (9th Cir. 1998).  "Typically,

4

1    courts have found forfeiture only if the party waited years

2    before moving or engaged in substantial pre-trial activity."

3    Infinity Consulting Grp., LLC v. Am. Cybersystems, Inc., 2010 WL

4    2267470, *1-2 (E.D.N.Y. May 30, 2010); see also In re Helicopter

5    Crash Near Wendle Creek, Brit. Columbia on Aug. 8, 2002, 485

6    F.Supp.2d 47, 52 (D. Conn. 2007) (noting that "[i]n most cases

7    where courts have found waiver, the defendant has waited multiple

8    years after its answer to file a motion to dismiss").

9        More specifically, in most cases where we and other courts

10   have found forfeiture, defendants failed to bring up personal

11   jurisdiction or improper venue defenses in their answer, as

12   required by Fed. R. Evid. 12(h), or had moved for summary

13   judgment on the merits prior to moving to dismiss for lack of

14   personal jurisdiction or improper venue.[1]  In other cases, courts

15   have found forfeiture where the defendant defaulted and later

16   brought a personal jurisdiction defense,[2] or where the defendant

_____

[1] See Concession Consultants, Inc. v. Mirisch, 355 F.2d 369, 371 (2d Cir. 1966) (ruling that the defendants had forfeited the privilege to object to improper venue when they did not make their objection until after the district court raised the issue sua sponte -- long after the defendants had originally filed their answer, which did not oppose venue); Thompson v. United States, 312 F.2d 516, 520 (10th Cir. 1962) (holding that defendant had waived any defense of improper venue when he made the argument only after filing a motion for summary judgment); Misch on Behalf of Estate of Misch v. Zee Enterprises, Inc., 879 F.2d 628, 631-32 (9th Cir. 1989) (noting that a defendant waives personal jurisdiction and improper venue defenses when he files for summary judgment prior to filing motions to dismiss for lack of personal jurisdiction or improper venue).

[2] See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 115 (2d Cir. 2011) (finding defendants waived their personal jurisdiction defense when they initially "press[ed] that defense but then willfully withdr[ew] from the litigation and default[ed], even after being warned of the consequences of doing so"); Trustees of Cent. Laborers' Welfare Fund v. Lowery, 924 F.2d 731, 732-33 (7th Cir. 1991) (finding forfeiture after defendants moved to vacated default judgment entered against them six

1    began vigorously arguing personal jurisdiction or improper venue

2    defenses only after participating in the litigation for a very

3    long time.[3]  In no cases have courts found forfeiture in the

4    circumstances present here -- where PEP timely and repeatedly

5    sought dismissal of the action based on personal jurisdiction and

6    improper venue defenses, failing to do so only in moving to

7    remand -- or holding the appeal in abeyance -- for the district

8    court's consideration of the Mexican court decision rendered

9    after briefing of the appeal in this court.

10       In fact, many courts have declined to find forfeiture where

11   defendants did not argue personal jurisdiction or improper venue

12   defenses at every possible stage of litigation, including cases

13   in which litigants were quite derelict in raising these defenses.

14   See Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of

15   Oregon, Inc., 2016 WL 160721, at *4 (E.D.N.Y. Jan. 13, 2016)

16   (refusing to find forfeiture of personal jurisdiction defense

17   where defendant first made the defense in a motion to dismiss but

18   later failed to make the defense when the district court was

---

years earlier); Robertson v. Dowbenko, 443 Fed.Appx. 659, 661-62 (2d Cir. 2011)
(finding defendant forfeited personal jurisdiction defense by not complying with
discovery orders resulting in default).

[3] See Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999) (finding defendant
forfeited personal jurisdiction defense by not moving to dismiss for four years after
filing his answer and after "considerable pretrial activity [had] occurred");
Continental Bank, N.A. v. Meyer, 10 F.3d 1293, 1297 (7th Cir. 1993) (finding personal
jurisdiction defense forfeited where defendants had "fully participated in litigation
of the merits for over two-and-a-half years[, including participating in discovery,]
without actively contesting personal jurisdiction").

1    considering to dismiss the case on other grounds); In re
2    Helicopter Crash Near Wendle Creek, Brit. Columbia, 485 F.Supp.2d
3    at 51-52 (finding no forfeiture of personal jurisdiction defense
4    where defendant pled the defense in its answer but waited four
5    months to file a motion to dismiss); Phat Fashions, L.L.C. v.
6    Phat Game Athletic Apparel, Inc., No. 00-cv-0201, 2001 WL
7    1041990, *3-4 (S.D.N.Y. Sept. 7, 2001) (finding no forfeiture of
8    personal jurisdiction defense -- even though defendant did not
9    assert the defense until thirteen months after the complaint was
10   filed and the parties had completed discovery on substantive
11   claims -- because "[d]efendant's delay in bringing its motion
12   does not rise to the level of egregiousness that other courts
13   have found sufficient to constitute a forfeiture"); Infinity
14   Consulting Grp., LLC, 2010 WL 2267470, at *1-2 (finding no
15   forfeiture of personal jurisdiction defense even when defendants
16   waited nearly ten months before moving to dismiss on personal
17   jurisdiction grounds and eight months to answer the complaint);
18   Johnson v. Masselli, 2008 WL 111057, at *3 (N.D.Ind. Jan. 4,
19   2008) (ruling defendants did not waive objection to venue by
20   defending against temporary restraining order and participating
21   in hearings and discovery related to preliminary injunction
22   request where objection to venue was raised in responsive
23   pleading); Biro v. Condé Nast, 2014 WL 4851901, at *7 (S.D.N.Y.

7

1    Sept. 30, 2014) (no forfeiture where defendant filed a motion to

2    dismiss "eleven months after filing her answer," and, "[i]n the

3    interim, the parties were engaging in jurisdictional discovery, a

4    process that generated disputes as late as" one month before the

5    motion was filed).  I have found no case imposing forfeiture in

6    circumstances like those before us -- the sole act of delay in

7    pursuing personal jurisdiction and venue defenses being an

8    alternative (to holding the appeal in abeyance) request for a

9    remand on indisputably valid grounds -- much less doing so <u>sua</u>

10   <u>sponte</u>.

11         My colleagues muddy the waters by seeking to distinguish

12   this case from our well-established and routine practice of so-

13   called <u>Jacobson</u> remands.  In typical <u>Jacobson</u> remands, we remand

14   partial jurisdiction to the district court to supplement the

15   record on a discrete factual or legal issue while retaining

16   jurisdiction over the original appeal.  <u>United States v.</u>

17   <u>Jacobson</u>, 15 F.3d 19, 22 (2d Cir. 1994).  <u>Jacobson</u> remands are

18   enormously helpful tools, <u>see</u> <u>United States v. Salameh</u>, 84 F.3d

19   47, 50 (2d Cir. 1996) (noting that <u>Jacobson</u> remands "eliminate[]

20   any question as to the district court's jurisdiction [over the

21   particular issue] and enables [the appellate] [c]ourt to provide,

22   if appropriate, for the automatic restoration of appellate

23   jurisdiction, without the need for a new notice of appeal").

8

1   This rationale may be the result of my colleagues' fear that

2   future litigants will avoid or argue against <u>Jacobson</u> remands

3   entirely, lest they risk forfeiting claims or defenses raised in

4   their original briefs.

5       My colleagues distinguish this matter from routine <u>Jacobson</u>

6   remands on the ground that we retained no jurisdiction in our

7   remand in this matter.  Relying on the cession of partial or full

8   jurisdiction for such a distinction is irrelevant, in my view.  A

9   request for a <u>Jacobson</u> remand may well be part of a factual

10  pattern justifying a forfeiture ruling.

11      In this matter, our remand order limited the issues to be

12  decided by the district court and directed that any subsequent

13  appeal be referred to this panel.  The remand order confined the

14  district court to addressing the effect of the intervening

15  decision of the Eleventh Collegiate Court of Mexico on the

16  arbitrability issues.  <u>PEMEX</u>, 2012 WL 9346475, at *1.  In

17  remanding, we specifically stated we were "reach[ing] no other

18  issue," and we ordered that "[a]ny subsequent appeal in th[e]

19  case should be referred to this panel."  <u>Id.</u>

20      In my innocence -- or lack of prescience -- I thought we

21  were ordering the reference of any subsequent appeal to this

22  panel in the interests of judicial economy because we had

23  familiarized ourselves with the issues other than arbitrability,

1    i.e. personal jurisdiction and venue. As a panel member voting

2    in favor of the remand as justified in the interests of judicial

3    economy, it never occurred to me that my colleagues viewed the

4    limited remand as limiting the issues to be heard on the

5    subsequent appeal. Had I realized such a limitation was

6    contemplated, I would have dissented. It is of small comfort

7    that my innocence and lack of prescience was shared by COMMISA,

8    which never raised forfeiture in arguing the personal

9    jurisdiction and venue issues on the second appeal. Rather, my

10    colleagues dispose of PEP's proffer of an alternative to a full

11    vacatur and remand, i.e. retaining jurisdiction but holding the

12    appeal in abeyance pending disposition of a Rule 60(b) motion, is

13    disregarded because it was "downplayed" while PEP "angled" for a

14    full remand, subjective purposes not glaringly obvious to this

15    observer.

16        b) <u>Venue</u>

17        Because I agree with my colleagues on the merits of the

18    personal jurisdiction issue, I turn to the venue question.

19        Under FSIA, "[a] civil action against a[n] [agency or

20    instrumentality of a foreign state] . . . may be brought[] in any

21    judicial district in which the agency or instrumentality is

10

1  licensed to do business or is doing business . . . ." <u>See</u> 28

2  U.S.C. § 1391(f)(3).[4]

3      FSIA defines "agency or instrumentality of a foreign state"

4  as "any entity" that is (1) "a separate legal person, corporate

5  or otherwise," (2) "an organ of [the] foreign state or political

6  subdivision thereof, or a majority of whose shares or other

7  ownership interest is owned by a foreign state or political

8  subdivision thereof," and (3) "neither a citizen of a State of

9  the United States as defined in section 1332(c) and (e) of this

10  title, nor created under the laws of any third country."  28

11  U.S.C. § 1603(b).  That the first and third requirements are met

12  by PEP is not in dispute.

13      Regarding the second requirement, because PEP is owned by

14  PEMEX, PEP is not an entity whose majority ownership is held by a

15  foreign state.  <u>See</u> <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468,

16  475-77 (2003) (entity whose ownership is separated by "one or

17  more corporate tiers" from foreign state does not fall within

18  majority ownership provision of 28 U.S.C. § 1603(b)(2)).  So, the

19  question becomes whether PEP is an "organ" of the State of

20  Mexico.  I believe that it is.

---

[4] Title 28 U.S.C. § 1391(f)(3) states that "[a] civil action against a foreign state as defined in section 1603(a) of this title may be brought--in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title."  Title 28 U.S.C. § 1603(a), in turn, defines a "foreign state" to "include . . . an agency or instrumentality of a foreign state as defined in [28 U.S.C. § 1603(b)]."

1    In _Filler v. Hanvit Bank_, we adopted a five factor test to

2    determine whether a corporation is an "organ" of a foreign state:

3        (1) whether the foreign state created the entity for a
4        national purpose; (2) whether the foreign state
5        actively supervises the entity; (3) whether the
6        foreign state requires the hiring of public employees
7        and pays their salaries; (4) whether the entity holds
8        exclusive rights to some right in the [foreign]
9        country; and (5) how the entity is treated under
10       foreign state law.
11
12   378 F.3d 213, 217 (2d Cir. 2004) (quoting _Kelly v. Syria Shell_

13   _Petroleum Dev. B.V._, 213 F.3d 841, 846-47 (5th Cir. 2000)); _see_

14   _also_ _USX Corp. v. Adriatic Ins. Co._, 345 F.3d 190, 209 (3d Cir.

15   2003). "_Filler_ invites . . . a balancing process, without

16   particular emphasis on any given factor and without requiring

17   that every factor weigh in favor of, or against, the entity

18   claiming FSIA immunity." _In re Terrorist Attacks on Sept. 11,_

19   _2001_, 538 F.3d 71, 85 (2d Cir. 2008) (internal citation and

20   quotation marks omitted), _abrogated on other grounds by_ _Samantar_

21   _v. Yousuf_, 560 U.S. 305 (2010); _see also_ _European Cmty. v. RJR_

22   _Nabisco, Inc._, 764 F.3d 129 (2d Cir. 2014), _rev'd on other_

23   _grounds by_ 136 S.Ct. 2090 (2016).

24   PEP easily satisfies factors (1), (2), (4), and (5), and may

25   satisfy (3) -- hiring public employees -- although the record is

26   unclear in this regard. First, PEP was created for a national

27   purpose. Since 1938, it has been "entrusted [] with the central

1    planning and management of Mexico's petroleum industry."  J.

2    App'x at 1526.  Second, PEP is highly supervised by the State of

3    Mexico.  The Mexican government controls the annual budget of

4    PEMEX -- which controls PEP -- and can "intervene directly . . .

5    in [PEMEX and its subsidiaries] commercial and operational

6    affairs."  Id. at 1523.  Under PEMEX's charter, the Mexican

7    government appoints all members of PEMEX's board of directors,

8    with ten of the fifteen directors being representatives of the

9    state and/or public officials.  See RJR Nabisco, 764 F.3d at 145

10   ("We have said that a foreign state actively supervises an organ

11   when it appoints the organ's key officials and regulates some of

12   the activities the organ can undertake.")  Third, "Mexican law

13   gives [PEP] the exclusive right to exploit Mexico's hydrocarbon

14   reserves."  Petróleos Mexicanos, Annual Report (Form 20-F) 23

15   (June 30, 2009).  Fourth, Mexican law treats PEP as a government

16   entity, as starkly evidenced by the Eleventh Collegiate Court of

17   Mexico's decision that PEP could not be forced to arbitrate

18   precisely because it is a part of the Mexican government.  See

19   Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd.,

20   476 F.3d 140, 143 (2d Cir. 2007) (finding the foreign state law

21   factor of Filler satisfied when the "Korean government informed

22   the State Department and the district court that it treats [the

23   entity] as a government entity").

13

1    Under our caselaw, if PEP was so intertwined with the State

2    of Mexico as to be deemed the state itself, Section 1391(f)(3)

3    would be inapplicable.  See 28 U.S.C.A. § 1391(f)(3) (applying

4    only "if the action is brought against an agency or

5    instrumentality of a foreign state").  In Garb v. Republic of

6    Poland, we explained that, if the "core functions" of the legal

7    entity "are predominantly governmental," it is a "foreign state,"

8    while if the "core functions" of the legal entity are

9    "predominantly . . . commercial," it is an "agency or

10   instrumentality of a foreign state."  440 F.3d 579, 594 (2d Cir.

11   2006).  In Garb, we held that the Ministry of the Treasury of

12   Poland is not an "agency or instrumentality" of the Polish state,

13   because the core functions of the Treasury are governmental.  Its

14   roles included "hold[ing] and administer[ing] the property of the

15   Polish state," and it also "represent[ed] the Polish State with

16   respect to financial claims brought against the State."  Id. at

17   594-95.

18      In contrast, PEP is clearly a commercial entity.  It has no

19   regulatory functions.  Cf. Servaas Inc. v. Rep. of Iraq, 2011 WL

20   454501, at *3 (2d Cir. Feb. 10, 2011) (finding the core function

21   of the Ministry of Industry of Iraq is governmental and not

22   commercial because, in part, it approves "applications for

23   trademark registration, a regulatory function that [is]

14

1   quintessentially governmental"). Its primary role is to find,

2   develop, and sell oil and natural gas. This is an inherently

3   commercial role. See NML Capital, Ltd. v. Rep. of Argentina, 892

4   F.Supp.2d 530, 533 (S.D.N.Y. 2012) (finding an Argentinean

5   natural gas company's core functions were "predominantly

6   commercial" -- despite its "function[ing] in accordance with the

7   policies and goals of the Republic [of Argentina]" -- because its

8   "primary function is to sell natural gas at low prices in

9   Argentina").

10      I note that my conclusion that PEP is an "agency or

11  instrumentality" of the State of Mexico is entirely consistent

12  with holding -- for personal jurisdiction purposes -- that PEP is

13  a "foreign sovereign" rather than merely a "foreign corporation"

14  under First Nat'l City Bank v. Banco Para el Commercio Exterior

15  de Cuba, 462 U.S. 611 (1983) ("Bancec"), a holding of my

16  colleagues that I join.

17      The core of the venue dispute, however, is whether PEP is

18  "doing business" in New York. This language suggests that some

19  substantial activity of a commercial nature be engaged in by the

20  defendant and that the activity be more than an isolated

21  instance. Significance and continuity must, therefore, be found.

22  Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir.

23  2000). In the present matter, PEP has served as a guarantor for

15

1    thirty-five of PEMEX's bond issuances in New York -- guaranteeing

2    the payment of all principal and interest in the amount of $9.5

3    billion -- and has served as the agent for service of process for

4    each of those issuances.  This significant, continuous course of

5    commercial activity and presence in New York for litigation

6    purposes easily satisfies the pertinent language of Section

7    1391(f)(3).

8         PEP argues, however, that "doing business" must be defined

9    narrowly in light of a purported "settled" meaning given to those

10   words in the context of personal jurisdiction (but before the

11   decision Int'l Shoe Co. v. Wash., 326 U.S. 310 (1945)).

12   Similarly, PEP notes that, when Congress enacted FSIA in 1976, it

13   based Section 1391(f)(3) on 28 U.S.C. § 1391(c), which, at the

14   time, provided that "[a] corporation may be sued in any judicial

15   district in which it is incorporated or licensed to do business

16   or is doing business."  S. Rep. No. 94-1310, at 31 (1976); H.R.

17   Rep. No. 94-1487, at 32 (1976).  PEP relies upon some non-FSIA

18   cases rendered under the old Section 1391(c) that "consistently

19   rejected efforts to rely on a company's participation in the New

20   York financial markets in order to establish venue under" Section

21   1391(c).  Br. of Appellant at 28.

22        Contrary to PEP's suggestion, "doing business" for purposes

23   of Section 1391(c) was historically far from clearly defined.

16

1    <u>See</u> 14D Wright & Miller, Fed. Prac. & Proc. § 3811 n.16 (4th ed.)

2    ("This aspect of the statute [the phrase "doing business"] proved

3    the most difficult to construe."); <u>see also</u> 1 William H. Manz,

4    <u>Foreign Sovereign Immunities Act of 1976 with Amendments: A</u>

5    <u>Legislative History of Pub. L. No. 94-583</u>, 48 (2000) ("[I]t is

6    difficult to say where [instrumentalities] 'reside' under the

7    corporate standards of '. . . doing business' used in section

8    1391(c)."). Indeed, "[t]here was never an exact formula under

9    which the question of 'doing business' was decided," although

10    "[m]ore than a single or casual transaction was required before

11    the corporation was regarded as doing business in the district

12    for federal venue purposes." Wright & Miller, Fed. Prac. & Proc.

13    § 3811 n.16.

14        The language of the statute governs our interpretation. <u>See</u>

15    <u>In re Tribune Co. Fraudulent Conveyance Litig.</u>, 818 F.3d 98, 112-

16    24 (2d Cir. 2016). I find no difficulty in holding that serving

17    as the guarantor of $9.5 billion raised in thirty-five bond

18    issuances and agreeing to be served process in New York regarding

19    enforcement of the guarantees is "doing business" in New York.

20    The quantum of business is significant, the number of

21    transactions easily supports a finding of continuity, and the

22    agreement to be served process in connection with this activity

17

1    nails down PEP's presence in New York for purposes of Section

2    1396.

3            That conclusion is consistent with current caselaw.   In

4    Altmann v. Rep. of Austria, the Ninth Circuit held that an

5    Austrian art gallery owned by the Austrian government was "doing

6    business" in the Central District of California for venue

7    purposes because the gallery's publications and advertisements

8    had been distributed in that District, even though the gallery

9    did not directly publish the materials in California.   317 F.3d

10   954, 972 (9th Cir. 2002), opinion amended on denial of reh'g, 327

11   F.3d 1246 (9th Cir. 2003), and aff'd on other grounds, 541 U.S.

12   677 (2004).   The Ninth Circuit suggested that "doing business,"

13   despite not being defined by FSIA, is essentially synonymous with

14   "commercial activity," which is defined.   See id. (noting with

15   evident agreement that the "district court [had] found 'no

16   authority that suggests that a foreign agency or instrumentality

17   that engages in 'commercial activity' within a district is not

18   also 'doing business' within a district'") (quoting Altmann v.

19   Rep. of Austria, 142 F.Supp.2d 1187, 1215 (C.D. Cal. 2001)).

20           No decision seems to be in conflict with Altmann.   Cf. Arch

21   Trading Corp. v. Rep. of Ecuador, 2015 WL 3443906, *4 (S.D.N.Y.

22   May 28, 2015) (providing little examination of § 1391(f)(3) but

23   finding an Ecuadoran state owned bank was not "doing business" in

18

1    the United States when it merely provided loans to Ecuadoran

2    citizens who had been living abroad on their return to Ecuador);

3    Ocean Faith Shipping Co., Ltd. v. Union of India Food Corp. of

4    India, 1996 WL 227827, at *2 (E.D.La. May 3, 1996) (providing

5    little examination of § 1391(f)(3) but finding that state owned

6    grain shipper was not necessarily "doing business" in New Orleans

7    simply because "the port of New Orleans exports more grain than

8    any port in the world" -- a direct connection had to be shown);

9    Shirobokova v. CSA Czech Airlines, Inc., 335 F.Supp.2d 989, 991

10   (D. Minn. 2004) (finding that code sharing arrangement between

11   airlines were insufficient to establish venue under the "doing

12   business" test in the absence of a physical presence in Minnesota

13   and airline operations in the state).

14        As the district court found, PEP engaged in "systematic,

15   deliberate corporate activity . . . to obtain funds for its

16   operational activities through its parent in New York, and [PEP

17   had] established a presence for the purpose of obtaining these

18   funds in New York."  Corporación Mexicana de Mantenimiento

19   Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción,

20   No. 10-cv-00206 (AKH), ECF No. 47, at *25 (S.D.N.Y. Aug. 26,

21   2010).  Serving as a guarantor for thirty-five bond issuances and

22   agreeing to accept service of process for those issuances is a

23   substantial "commercial" activity.

1    Other precedent also supports my conclusion.  For example,

2    in Rep. of Argentina v. Weltover, Inc., the Supreme Court held

3    that Argentina was engaged in "commercial activity" when it

4    issued bonds in the United States.  504 U.S. 607, 609-14 (1992);

5    see also Jackson v. People's Rep. of China, 550 F.Supp. 869, 873

6    (D.Ala. 1982) (applying the commercial activity exception to

7    bonds issued by China on the basis that "[i]t is clear that the

8    sale, issuance for sale and authorization of issuance for sale in

9    the United States constitutes a 'commercial activity'").

10   Likewise, in Mortimer Off Shore Servs., Ltd. v. Fed. Republic of

11   Germany, we concluded that the Federal Republic of Germany's

12   assumption of liability for West German bonds issued in the

13   United States was "commercial activity" under FSIA.  615 F.3d 97,

14   107 (2d Cir. 2010).

15        c) Conclusion

16        I therefore concur in the result.

17